John P. Kristensen (SBN 224132)
**KRISTENSEN LAW GROUP**
120 Santa Barbara St., Suite C9
Santa Barbara, California 93101
Telephone: (805) 837-2000
*john@kristensen.law*

Jarrett L. Ellzey* (Texas Bar No. 24040864)
Leigh S. Montgomery* (Texas Bar No. 24052214)
Tommy Kherkher* (Texas Bar No. 24113389)
Josh Sanford* (Arkansas Bar No. 2001037)
**EKSM, LLP**
1105 Milford Street
Houston, Texas 77006
Phone: (888) 350-3931
*jellzey@eksm.com*
*lmontgomery@eksm.com*
*tkherkher@eksm.com*
*jsanford@eksm.com*

**ATTORNEYS FOR PLAINTIFF AND THE PUTATIVE
CLASS** (* denotes *pro hac vice* forthcoming)

# THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| TRENTON SMITH, individually and on behalf of all others similarly situated, | ) Case No.: 8:25-cv-161 |
| Plaintiffs, | ) **CLASS ACTION** |
| vs. | ) **COMPLAINT FOR DAMAGES** |
| JOHN SHAHIDI, an individual; NELK, INC. dba NELK, FULL SEND, a Canadian Company, METACARD, LLC, a Delaware Limited Liability Company; NELK USA, INC., a Delaware Corporation; KYLE FORGEARD, an individual. | ) **1. Breach of Fiduciary Duty;**<br>) **2. Fraud; and**<br>) **3. Violation of Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*** |
| Defendants. | ) **DEMAND FOR JURY TRIAL**<br>) **DECLARATION OF TRENTON SMITH** |

Plaintiff Trenton Smith ("Plaintiff" or "Smith") brings this Class Action Complaint against Nelk, Inc. dba Nelk or Full Send, Nelk USA, Inc. (collectively "Nelk" or "Defendant"), Metacard LLC ("Metacard" or "Defendant"), Kyle Forgeard and John Shahidi, individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon information and belief, based upon investigation of counsel, published reports, and personal knowledge:

## I.   NATURE OF THE ACTION

1.   This is a class action lawsuit against snake-oil salesmen masquerading as entrepreneurs. Defendants sold digital assets that did not have characteristics, uses, or benefits they advertised and promoted and, either through reckless incompetence or greed, failed to provide the promised business ventures or digital rewards—the purported purpose of Defendants' endeavor that may have concealed their scheme.

2.   Founder Defendants Kyle Forgeard and John Shahidi are Internet-famous YouTube personalities known for their YouTube Channel "Nelk Boys," which gained notoriety and a cult following of 8.22 million subscribers for its prank videos and podcasts in which Forgeard and his team interviewed notable personalities such as O.J. Simpson, then-former-President Donald Trump, Elon Musk, and Mike Tyson.

3.   Following the success of their YouTube channel and podcast, Forgeard and Shahidi branched out into other business ventures, including apparel, fitness supplements, a hard seltzer brand, and other merchandise, all under the Nelk Boys' "Full Send" brand. Shahidi is the President of all Full Send ventures.

4.   The Full Send business venture at issue in this case is Forgeard and Shahidi's foray into digital investing and cryptocurrency. Forgeard and Shahidi created the company Metacard, LLC, specifically to sell digital assets that would ostensibly provide the holder access to business investment opportunities in ventures such as lounges, gyms, festivals, casinos and restaurants, as well as access

1    to products and services including apparel, virtual stores, virtual festivals,

2    Metaverse casinos, and recording artists.

3        5.      Defendants sold digital investments in the form of Full Send Metacard

4    NFTs ("Metacards"). Holders of Metacards were to receive shares in business

5    ventures, whether digital or real-world, and exclusive access to events, venues, and

6    products run by the company.

7        6.      Non-Fungible Tokens ("NFTs"), as discussed below, are a form of

8    digital assets that can be purchased, sold, and transferred on other cryptocurrencies,

9    such as the OpenSea NFT marketplace.

10       7.      Defendants sold Metacards in OpenSea in January of 2022, and

11   earned over $23 million by selling Metacards for thousands of dollars per piece.

12   Individuals purchased Metacards using either their regular credit cards or with

13   Ethereum, an established and regulated cryptocurrency.

14       8.      Defendants offered a few "perks" associated with owning a Metacard

15   but ultimately failed to deliver any of the promised business ventures or investment

16   opportunities. Specifically, Defendants offered a 50% off promo code to buy Full

17   Send branded supplements, one opportunity to attend an event where Snoop Dogg

18   performed, and claimed on Instagram that they have given away $250,000 worth

19   of merchandise to Metacard holders, but ultimately Metacard holders have seen

20   nothing of the promised return on the $23 million investment they funded.

21       9.      Defendants have offered no explanation as to why they have failed to

22   provide any of the promised returns on Plaintiffs' investments. Defendants

23   capitalized on Forgeard's platform and fame to misrepresent the status of their

24   business ventures to entice Forgeard's loyal online fans and the public into

25   investing in Metacards and then failed to ever provide the promised return on those

26   investments in the form of digital and real-world businesses, apparel, stores, or

27   festivals.

28   ///

10.     Accordingly, Plaintiff sues Defendants seeking redress for their unlawful conduct.

## II.    PARTIES

11.     Defendant John Shahidi is and at all times mentioned herein was an individual citizen of California, residing in Orange County, California.

12.     Defendant Kyle Forgeard is an entertainer with a sizeable online audience. Based on his own statements, information, and belief, he is a founder and an owner of Metacard LLC. Defendant Kyle Forgeard is believed to have moved from California to Florida recently.

13.     Defendant Nelk, Inc. dba Nelk or Full Send is a Canadian corporation with its principal place of business located at 525 8t Ave., SW, #2400, Calgary, Alberta T2P 1G1.

14.     Defendant Nelk USA, Inc. is a Delaware corporation that had its principal place of business during the events herein in California. It registered with the California Secretary of State on April 2, 2020, with its principal place of business at 3928 Fredonia Drive, in Los Angeles, which is a residential street in the Cahuenga pass, south of Mulholland. In 2022, when Defendants started the activities, they were based at 3011 S. Croddy Way in Santa Ana, California 92704. In 2024, Nelk moved to Florida, but maintains a California office at 26025 Mureau Road, Suite 120, Calabasas, California 91302.  Nelk USA, Inc.'s registered agent for service of process is Mycorporation Business Service, Inc. which is also conveniently located at 26025 Mureau Road, Suite 120, Calabasas, California 91302.

15.     Defendant Nelk, Inc. may be served via its American subsidiary, Nelk USA, Inc.

16.     Defendant Metacard, LLC is a Delaware limited liability corporation with its principal place of business located at 3011 S. Croddy Way in Santa Ana, California 92704. Its registered agent for service of process is Defendant Kyle

Forgeard.

17.    At all times herein mentioned, each and every defendant herein was the owner, agent (actual and ostensible), servant, joint venture, alter ego and employee, each of the other and each was acting within the course and scope of his or her ownership, agency, service, joint venture and employment.

18.    At all times mentioned herein, each and every defendant was the successor of the other and each assumes the responsibility for the acts and omissions of all other defendants.

## III.    JURISDICTION AND VENUE

19.    This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds $5 million, exclusive of interest and costs, there are approximately 10,000 members in the proposed class (with damages estimated to be approximately $2,300 each), and at least one Class Member is a citizen of a state different from a Defendant to establish minimal diversity.

20.    This Court has general personal jurisdiction over Defendants Shahidi, who is a California resident, and Metacard, LLC has its principal place of business in California.

21.    Venue is proper in this Court under 28 U.S.C. §1391(b) because Defendants conduct business in this District and because a substantial part of the acts or omissions giving rise to this action occurred within this District.

## IV.    ADDITIONAL FACTUAL ALLEGATIONS

### A.    THE METACARD SCAM

22.    In January of 2022, Defendants launched their Metacard project to provide business venture investment opportunities and exclusive events and products to holders.

23.    Instead of following the usual model of minting NFTs based on unique digital artwork that the purchaser could select based on personal preference,

Defendants minted 10,000 NFTs that were essentially identical and varied only in text, border, and background depending on the NFT "rarity" level. The rarer the NFT, the more perks the holder was to receive. NFT rarity was assigned at random and was not revealed until after purchase, presumably to entice purchases to buy as many NFTs as possible to increase the chance of obtaining an extremely rare NFT.

24.    Accordingly, unlike other NFT projects, Metacards held no intrinsic value. The only value Metacards provided was in the amenities and perks to which the NFT was supposed to provide access.

25.    Leading up to the launch of the Metacards, Founder Defendants capitalized on their YouTube fame by directing fans to their NFT discord server in which they touted the Metacards' exclusive perks. Founder Defendants strategically released and withheld information to create a false sense of urgency to entice their fans into buying into their crypto scheme.

26.    Defendants promised that Metacards would unlock certain perks and amenities to their holders. Specifically, Metacards would grant the holders access to exclusive Nelk Boys content, including behind-the-scenes videos, bonus footage, and unreleased material. Metacards holders would receive invitations or early access to virtual meetings, live streams, or digital meetups with the Nelk Boys. Metacards would grant access to the Full Send and Nelk Boys community, which included exclusive forums, chat groups, and conversations with the Nelk Boys and other NFT holders. Metacard holders were to receive discounts on Full Send branded merchandise such as clothing and accessories. And finally, Metacard holders would be invited to participate in Nelk Boys projects or collaborations.

27.    Defendants launched the Metacards on January 19, 2022, and all 10,000 NFTs were sold within 10 minutes, earning Defendants over $23 million.

28.    Forgeard specifically described the purchase of a Metacard as an investment on his Full Send podcast: "I think the NFT shit is so cool because to

me it's like a modern-day or, like a decentralized way for people to like invest in us." Forgeard also explicitly stated that the purpose of the NFT was to provide the capital Defendants needed to launch their businesses: "Our fans give us money — and then in exchange, we give them a Metacard and then so they have something right that they can verify is theirs. And now we have all this money, and our job is to build shit."

29.    As months passed and Defendants failed to make progress on any of the promised business ventures, Metacard holders expressed frustration in the Full Send discord. Forgeard responded, "Making sure our ventures are as profitable as possible so when we cut y'all [sic] in its [sic] worth it."

30.    Responding to the growing discontent among Metacard holders, Defendants arranged a few exclusive events for Metacard holders. The most significant event was held in Spring of 2022 in Los Angeles: Defendants held an event at which Snoop Dogg performed. Due to geographic and financial constraints, only 300 out of the 7,000 Metacard holders attended.

31.    In March of 2022, Forgeard announced that Full Send would open a sports bar with well-known Miami restauranteur Dave Grutman, who Forgeard claimed owned the rarest of Metacards, a "cyber red" Metacard. The sports bar never opened.

32.    At the same time, Defendants quickly started telling Metacard holders they made their purchases as investments and more communication was coming:



kyleforgeard ✓ 03/28/2022 8:15 PM
You guys bought this to make money and dont worry that is what we want as well! More communication coming as well

33.    Defendants arranged a few smaller events such as private watch parties, but these events were only attended by a fraction of the Metacard community, again mostly due to geographic and financial constraints.

34.    Defendants' announcements promised in March 2022 of Massive ROI.





35.     Defendants promised they were working on something big in April 2022:



36.     As for discounts and products, Defendants offered all Metacard holders a 50% off coupon for Full Send branded supplements. Defendants made an unsubstantiated claim on social media that they have given away $250,000 worth of merchandise to Metacard holders, but Plaintiffs have not received any merchandise, product, or apparel.

37.     In many social media "giveaways," Defendants conducted illegal lotteries disguised as raffle events in which they gave away expensive products or large cash prizes. One Metacard holder received $100,000 in one of these "giveaways."

///

///

///

///

///

38.    In June 2022, Defendants were still stringing along Plaintiff and the Class Members:



39.    Meanwhile, the value of Metacards has dropped by 75%. Founder Defendants have abandoned the Metacard discord and stopped touting the benefits of owning a Full Send Metacard on their social media and YouTube channels. Plaintiffs and most Metacard holders have received zero return on their investment of $23 million and have received no answers as to what Defendants have accomplished with that $23 million.

40.    On information and belief, Defendants manipulated the Metacard product market. Their standard operating procedure has been to promise products and services they failed to deliver on only to abandon the project and community

they promised to support. Due to these unconscionable practices, Defendants should disgorge any revenue, profits, or any other gains from their scheme to Plaintiffs.

41.    In June 2022, the postings on discord continued:





42.    In September, the postings on discord continued:



43.    Defendants knew or should have known that they were falsely advertising a non-functional product and that consumers would be deceived by their false representations. Defendants acted with reckless disregard when they made such false representations and are responsible for Plaintiffs' damages.

44.    Defendants claim to have launched a beef jerky company called "Bored Jerky," but Bored Jerky is a simple rebranding of a pre-existing beef jerky company, meaning very little capital was required to launch the Bored Jerky product. More importantly, Defendants have offered no equity in Bored Jerky to Metacard holders, despite promising that holding a Metacard granted partnership

into all Full Send business ventures.

45.    Defendants were never permitted to solicit investments from the public related to Full Send. The entity Metacard, LLC, was created to serve as a fraudulent vehicle for the sole purpose of selling patently worthless, unregistered Metacard NFTs to enrich Full Send's founders, promoter/manager, and affiliates. Absent Defendants' fraudulent conduct and misrepresentations, Metacards could not have been offered and sold to investors at any price.

46.    Defendants promoted Metacards using Forgeard's online platforms—such as their YouTube channels and podcasts, as well as other social media accounts to consumers unfamiliar with digital currency products, as opportunities to invest in any Full Send business opportunity, which Defendants promised would include lounges, gyms, festivals, casinos, and restaurants. This led to tens of thousands of people purchasing Metacards.

47.    The Full Send business ventures and investments would never come to fruition—but that did not deter Defendants' scheme. Defendants maintained course and manipulated the digital currency market for Metacards to their advantage by executing a "rug pull," which is a colloquial term used to describe a scheme in which an NFT developer solicits funds from prospective NFT purchasers promising them certain benefits. Once the purchasers' funds are used to purchase the NFTs, the developers abruptly abandon the project and fail to deliver the promised benefits all while fraudulently retaining the purchasers' funds.

48.    As part of Defendants' NFT scheme, Defendants marketed Metacards to purchasers by falsely claiming that, in exchange for transferring cryptocurrency to purchase the Metacard, purchasers would later receive benefits, including, among other things, rewards, exclusive access to products and services, and a return on Full Send business venture profits. Soon after completing the sale of all their Metacards, Defendants, together with others, transferred millions of dollars' worth of purchasers' cryptocurrency to, among other places, wallets controlled by

Defendants.

49.    Founder Defendants specifically promised that Full Send gyms would open throughout the country and Metacard holders would have free access. In March of 2022, Founder Defendants stated that a Full Send restaurant and sports bar would open in Miami. Neither the restaurant nor any gym has opened since these promises were made.

50.    Defendants promised Metacard holders would receive exclusive and first access to Full Send products, events, and services. To appease Metacard holders who wanted answers regarding when they would see any return on their investment, Forgeard stated: "Trust me our goal is not to make this a fan club. Y'all [sic] are the layer between us and the rest of our fanbase. Stuff should go to you guys first and then you sell the rest."

51.    Ostensibly as a follow-through on this promise, held a few events that only a handful of Metacard holders were able to attend, and offered all Metacard holders a nominal discount on certain Full Send branded products. This is the only return most Metacard holders have received on their investment.

52.    Defendants conducted illegal lotteries disguised as raffle events in which they gave away expensive products or large cash prizes.

53.    Defendants claim to have started a Full Send branded beef jerky company, nor has any Metacard holder received a return on this particular investment.

54.    Founder Defendants have not responded to Metacard holder demands for what has been done with the $23 million Defendants earned. Forgeard has not posted in the Full Send discord channel since August of 2022 and remains unresponsive to inquiries about when he will return to answer for his promises. Defendants failed to follow through on any of these promises.

55.    The public sale of Metacards were clear offers and sales of investments because, inter alia, Defendants touted, and Plaintiffs and other

purchasers were conditioned to expect, and did reasonably expect, that the Metacards received would be worth more than the ETH, BTC, or other virtual currencies invested. Additionally, Defendants explicitly referred to the Full Send ventures as business investments that would make the purchaser money.

56.    The Claims are based on Defendants' fraudulent and manipulative scheme to enrich themselves by issuing false and materially misleading statements concerning the existence of the Full Send business ventures, that it would make investors' money, the value of Metacards and the benefits from owning Metacards, and that the Defendants were actively supporting the project, its online ecosystem, or the game.

57.    Defendants' false and materially misleading statements appeared in press releases, online chat rooms or forums located on websites, white papers, postings on social media websites such as Twitter, promotional videos posted on websites such as YouTube, internet podcast interviews and other materials relating to Full Send and Metacards which were disseminated widely to the investing public.

58.    Each of Defendants' misrepresentations and omissions were material because they were designed to, and did, entice the public into purchasing investments (Metacards) which were nothing more than a vehicle for the individual Defendants' personal enrichment. As detailed *infra*, when the magnitude of Defendants' failure to support the project and create the business venture was revealed, the trading prices of Metacards plummeted.

59.    Plaintiffs allege that Defendants acted with scienter in connection with their claims. Proof of Defendants' scienter comes, in part, from podcasts in which Founder Defendants were interviewed. These podcasts show, among other things, that Metacard was a fraudulent scheme since its inception, Metacards have at all times been patently worthless, and that no investor would have purchased any Metacards absent Defendants' fraudulent acts.

60.    Plaintiffs and others similarly situated deserve redress from Defendants for their fraudulently promoting and selling products that did not function as advertised, failing to support the Full Send Metacard project, and manipulating the digital currency. Defendants operated this fraudulent venture to exploit and steal from Plaintiffs and other customers who trusted Forgeard and Shahidi's false representations. As a result, Defendants defrauded Plaintiffs and thousands of other consumers and unjustly enriched themselves by profiting off Plaintiffs and others without delivering on their promises.

61.    The false statements and further misrepresentations continued into 2023:



62.    Today, investors and purchasers in Metacards have little to show for their investments other than broken promises. For these reasons, Plaintiffs on behalf of themselves, and all similarly situated, seeks compensatory, injunctive,

and rescissory relief, providing rescission and repayment of all investments made to purchase Metacards during the class period, and the right to secure and conserve such funds until repayment.

### B.    BEEF JERKY COVERUP

63.    After years of broken promises of the next club, gym or other shared ventures, Defendants realized they had serious legal exposure. Their plan to escape liability involved…. beef jerky. They teased this venture, two years after the original sale:









64.     Defendants announced in April 2024, that for a short, limited period of time, Metacard owners could join a "landmark initiative at the intersection of products, crypto, and digital assets that will help pave the way for the future of decentralized community ownership of real-world products."

65.     The Program was for a limited time, and in exchange to participate you had to release all of your claims pursuant to California *Civ.* Code § 1542 related to Metacard

C.     **PLAINTIFF'S EXPERIENCE**

66.     Plaintiff Trenton Smith purchased a Metacard for $2,300 after receiving, accepting and relying on the misrepresentations by Defendants. After two years of Defendants continuing to claim that new ventures or opportunities were going to be provided to Metacard holders, Plaintiff still believed the Defendants' misrepresentation. Eventually, Plaintiff came to realize that the purchase was all a scam, and that Defendants had no desire to ever provide any goods or services anywhere remotely near the value of the $2,300 Plaintiff spent. Defendants continuing misrepresentation were made, in part, to delay and discovery by Plaintiff or other class members.

67.     Plaintiff suffered actual injury in the form of damages and lost money for purchasing a worthless Metacard at an insanely inflated price.

V.     **PLAINTIFF'S AND CLASS ACTION ALLEGATIONS**

68.     Plaintiff brings this nationwide class action on behalf of himself and on behalf of others similarly situated under Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

69.     The Class that Plaintiff seeks to represent is defined as follows:

> **All persons who purchased Metacards through the date of class certification.**

///

70.     Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

71.     Plaintiff reserves the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery.

72.     <u>Numerosity,</u> Fed R. Civ. P. 23(a)(l): Class Members are numerous that joinder of all of them in a single proceeding is impracticable. The exact number of Class Members is unknown to Plaintiff now, but it is reportedly at least 10,000.

73.     <u>Commonality,</u> Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a.     Whether Defendants fraudulently promoted investment products, that did not function as promoted, causing investors/consumers like those in the Putative Class to invest in Metacard NFTs;

b.     Whether Defendants fraudulently promoted future products or services, or futures in products or services—products or services Defendants knew would not exist as promoted or at all—causing consumers like those in the Putative Class to purchase said futures or invest further in Metacard NFTs;

c.     Whether Defendants violated their agreement(s) to deliver functional products and services and breached their agreement(s);

d.     Whether Defendants knew Metacard projects would not be functional when they claimed they would be or were, and made false representations despite that knowledge;

///

e.   Whether Defendants had a duty to provide functional products and services to their consumers, and if Defendants violated that duty;

f.   Whether Defendants failed to deliver on its promises to consumers to provide functional products and services;

g.   Whether Defendant made any false representations to their investors or consumers, and whether Defendants knew those representations to be false, or whether those assertions were made recklessly and without adequate investigation of their truth or falsity; and

h.   Whether Defendants received revenues from their fraudulent venture, and the amount of those revenues;

74.   There are questions of law common to the Putative Class and those questions predominate over questions affecting any individual Putative Class Member. Common questions of law include but are not limited to:

a.   Whether Defendants' conduct in (1) making false representations about Metacard NFTs (2) failing to provide functional Metacard products and services, (3) selling Metacards as investments, and (4) manipulating the Metacard market, constitute acts of fraud;

b.   Whether Defendants' conduct common to the Putative Class has resulted or will result in Defendants being enriched at the expense of Putative Class Members, or in Defendant retaining a benefit to the detriment and loss of Putative Class Members, in frustration of the fundamental principles of justice, equity, and good conscience, and thus constitutes unjust enrichment;

c.   Whether Defendants' conduct common to the Putative Class demonstrates willfulness, malice, or recklessness, or whether Defendants proceeded with conscious disregard for the rights of others, therefore entitling Putative Class Members to punitive damages.

1    75.   <u>Typicality,</u> Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of
2    the claims of the Putative Class Members. Plaintiff would only seek individual or
3    actual damages if class certification is denied. In addition, Plaintiff is entitled to
4    relief under the same causes of action and upon the same facts as the other Members
5    of the Putative Class. Plaintiff is advancing the same claims and legal theories on
6    behalf of herself and all other Class Members, and no defenses are unique to
7    Plaintiff. Plaintiff's claims and those of Class Members arise from the same
8    operative facts and are based on the same legal theories.

9    76.   <u>Adequacy,</u> Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately
10   represent and protect the interests of the Class Members in that Plaintiff has no
11   disabling conflicts of interest that would be antagonistic to those of the other
12   Members of the Class. Plaintiffs seeks no relief that is antagonistic or adverse to
13   the Members of the Class and the infringement of the rights and the damages
14   Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained
15   counsel experienced in complex class action litigation, and Plaintiff intends to
16   prosecute this action vigorously.

17   77.   <u>Predominance.</u> Defendant has engaged in a common course of conduct
18   toward Plaintiff and Class Members. The common issues arising from Defendant's
19   conduct affecting Class Members set out above predominate over any
20   individualized issues. Adjudication of these common issues in a single action has
21   important and desirable advantages of judicial economy.

22   78.   <u>Superiority and Manageability,</u> Fed. R. Civ. P. 23(b)(3): Class
23   litigation is an appropriate method for fair and efficient adjudication of the claims
24   involved. Class action treatment is superior to all other available methods for the
25   fair and efficient adjudication of the controversy alleged here; it will permit many
26   Class Members to prosecute their common claims in a single forum simultaneously,
27   efficiently, and without the unnecessary duplication of evidence, effort, and
28   expense that hundreds of individual actions would require. Class action treatment

1  will permit the adjudication of modest claims by certain Class Members, who could

2  not individually afford to litigate a complex claim against large corporations, like

3  Defendants. Further, even for those Class Members who could afford to litigate

4  such a claim, it would still be economically impractical and impose a burden on the

5  courts.

6       79.    The prosecution of separate actions by individual Class Members

7  would create a risk of inconsistent or varying adjudications with respect to

8  individual Class Members, which would establish incompatible standards of

9  conduct for Defendant. In contrast, the conduct of this action as a class action

10  presents far fewer management difficulties, conserves judicial resources and the

11  parties' resources, and protects the rights of each Class member.

12       80.    Defendant has acted on grounds that apply generally to the Class as a

13  whole, so that class certification, injunctive relief, and corresponding declaratory

14  relief are appropriate on a Class-wide basis.

15       81.    Finally, all members of the proposed Class are readily ascertainable.

16  Defendant has access to Class Members' names and addresses affected by the Data

17  Breach. Class Members have already been preliminarily identified and sent notice

18  of the Data Breach by Defendant.

19  **VI.**    **<u>CAUSES OF ACTION</u>**

20  **<u>FIRST CAUSE OF ACTION</u>**

21  **BREACH OF FIDUCIARY DUTY**

22  **(On Behalf of Plaintiff and All Class Members Against All Defendants)**

23       82.    Plaintiff re-alleges and incorporates the above allegations as if fully

24  set forth herein.

25       83.    Plaintiff and Defendants entered into a fiduciary relationship, as

26  described above, and additionally wherein Defendants acted as Plaintiff's agent for

27  access to the Metacards. Defendants treated the relationship as confidential

28  throughout the relevant period.

84.     Defendants had a duty to disclose to Plaintiff the true nature and market of the Metacards it was selling.

85.     As a result of Defendants' wrongful acts in concealing and misrepresenting these facts, Plaintiff purchased a Metacard through Defendants and has been significantly damaged thereby Plaintiff also suffered incidental and consequential damages.

86.     Plaintiff discovered that Defendants had fraudulently overcharged Plaintiff for the Metacard and that the Metacard he purchased was worthless. Plaintiff had no reason to know of Defendants' fraud before such discovery because Plaintiff lacked sufficient information to enable him to make that determination, and such information was not available to her. In addition, Defendants concealed the true facts from Plaintiff and continuously provided false representations about the quality, price, rarity and attributes of the Metacard.

87.     The actions were done by Defendants with malice, oppression and fraud and all acts were ratified by the other Defendants. The foregoing conduct of Defendants: (i) constitutes intentional misrepresentation, deceit, and/or concealment of material facts known to Defendants with the intent on the part of Defendants of depriving Plaintiff of his money and capital, property and legal rights or otherwise causing Plaintiff injury; (ii) was intended by Defendants to cause injury to Plaintiff and/or was despicable conduct that was carried out by Defendants with a willful and conscious disregard of the rights of Plaintiff; and/or (iii) was despicable conduct that subjected Plaintiff to cruel and unusual hardship in conscious disregard of Plaintiff's rights so as to justify an award of punitive damages against Defendants pursuant to Cal. *Civ. Code* § 3294.

///

///

///

///

## SECOND CAUSE OF ACTION

### FRAUD

### (On Behalf of Plaintiff and All Class Members Against All Defendants)

88.     Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

89.     Defendants sold Plaintiff and the Class Members Metacards for $2,300 with false promises as described above to entice them to purchase the cards. At the time of the sale, they had no plans other than to see how much money they could raise from their fan base. Defendants knew they were simply seeking to raise money and not provide anything substantively of value in response. They cloaked the purchase in the terms of an investment with promises of some future benefits that they never intended to provide.

90.     As a result, Plaintiff and Class Members relied on those false representations (they are identified above) and purchased the Metacards, received nothing in value in exchange. This was the Fyre Festival of NFT offers.

91.     The actions were done by Defendants with malice, oppression and fraud and all acts were ratified by the other Defendants. The foregoing conduct of Defendants: (i) constitutes intentional misrepresentation, deceit, and/or concealment of material facts known to Defendants with the intent on the part of Defendants of depriving Plaintiff of his money and capital, property and legal rights or otherwise causing Plaintiff injury; (ii) was intended by Defendants to cause injury to Plaintiff and/or was despicable conduct that was carried out by Defendants with a willful and conscious disregard of the rights of Plaintiff; and/or (iii) was despicable conduct that subjected Plaintiff to cruel and unusual hardship in conscious disregard of Plaintiff's rights so as to justify an award of punitive damages against Defendants pursuant to Cal. *Civ. Code* § 3294.

///

///

## THIRD CAUSE OF ACTION

### CALIFORNIA LEGAL REMEDIES ACT

### (On Behalf of Plaintiff and All Class Members Against All Defendants)

92.     Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

93.     The California Consumers Legal Remedies Act ("CLRA"), Cal. *Civ. Code* §§ 1770, *et seq.*, was enacted to protect consumers against unfair and deceptive business practices. It creates a non-exclusive statutory remedy for unfair methods of competition and unfair or deceptive acts or business practices. Its self-declared purpose is to protect consumers against these unfair and deceptive business practices, and to provide efficient and economical procedures to secure such protection. Cal. *Civ. Code* § 1760. The CLRA was designed to be liberally construed and applied in favor of consumers to promote its underlying purposes. *Id*. The CLRA applies to Defendants' acts and practices described herein because it extends to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to Plaintiff and the Class.

94.     The Metacards themselves are "goods" or "services" within the meaning of Cal. *Civ. Code* § 1761(a) or (b), and the transactions/agreements are "transactions" within the meaning of Cal. *Civ. Code* § 1761(e).

95.     Plaintiff and the Class Members are each a "consumer" within the meaning of Cal. *Civ. Code* § 1761(d).

96.     Defendants acts and practices occurred within the process of selling "goods", "services" and/or entering into "transactions.

97.     Defendants had exclusive knowledge of undisclosed material facts, *i.e.* the actual price of the Metacards and their properties, which was not known to Plaintiff or the Class Members.

98.     Defendants engaged in unfair acts and practices by withholding and misrepresenting material facts about the properties of the Metacards they sold

Plaintiff and the Class Members.

99.    Plaintiff and the Class Members were not aware of the actual properties of the Metacards at the times of purchase and/or sale.

100.   Had Plaintiff and the Class Members known of the properties of the Metacards, they would not have proceeded with purchasing and/or selling them through Defendants.

101.   Defendants has violated the CLRA by engaging in the above unfair acts and practices, which results in the following violations:

(a)    In violation of § 1770(a)(2), Defendants has misrepresented the source, sponsorship, approval, or certification of goods or services;

(b)    In violation of § 1770(a)(5), Defendants has represented that the Metacards have characteristics, uses and benefits that they do not have;

(c)    In violation of 1770(a)(7), Defendants has represented that the Metacards are of a particular standard, quality or grade when they are not;

(d)    In violation of 1770(a)(9), Defendants has advertised goods or services with intent not to sell them as advertised;

(e)    In violation of 1770(a)(13), Defendants has made false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions;

(f)    In violation of 1770(a)(14), Defendants has made false or misleading statements that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

(g)    In violation of 1770(a)(19), Defendants inserted unconscionable provisions in allegedly binding notices to, if they even apply, including, but not limited to, waiving claims for certain damages, including but not limited to, claims for punitive damages.

102.   The actions were done by Defendants with malice, oppression and fraud and all acts were ratified by the other Defendants.

103. Pursuant to Cal. *Civ. Code* § 1782(d), Plaintiff and the Class Members. seeks a Court order enjoining the above-described wrongful acts and practices of Defendants and for restitution and disgorgement.

104. Pursuant to Cal. *Civ. Code* § 1780(d), filed concurrently herewith is an affidavit showing that this action has been commenced in the proper forum.

105. Pursuant to Cal. *Civ. Code* § 1782, Plaintiff intends to notify Defendants of the particular violations of Cal. *Civ. Code* § 1770 (the "Notice Letter"). If Defendants fails to comply with Plaintiff's demands within thirty days of receipt of the Notice Letter, pursuant to Cal. *Civ. Code* § 1782, Plaintiffs will amend this Complaint to request damages and other monetary relief under the CLRA.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of herself and the Class described above seeks the following relief:

1. For an Order certifying the Class, and appointing Plaintiff and his Counsel to represent the Class;

2. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein;

3. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

4. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

5. For an award of punitive damages, as allowable by law;

6. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

7. Pre-judgment and post-judgment interest on any amounts awarded; and

8. Any other relief that this court may deem just and proper.

Dated: January 29, 2025

**KRISTENSEN LAW GROUP & EKSM, LLP**

*/s/ John P. Kristensen*

John P. Kristensen
Jarrett L. Ellzey
Leigh S. Montgomery
Tommy Kherkher
Josh Sanford

***Attorneys for Plaintiff and the Putative Class***

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury for all such trieble claims.

Dated: January 29, 2025

**KRISTENSEN LAW GROUP & EKSM, LLP**

*/s/ John P. Kristensen*

John P. Kristensen
Jarrett L. Ellzey
Leigh S. Montgomery
Tommy Kherkher
Josh Sanford

***Attorneys for Plaintiff and the Putative Class***

## <u>DECLARATION OF TRENTON SMITH</u>

I, Trenton Smith, declare that if called as a witness, I could and would competently testify to the following facts:

1.    I submit this declaration pursuant to Section 1780(d) of the California Consumer Legal Remedies Act. I have personal knowledge of the matters set forth below and as a witness, I could and would be competent to testify thereto.

2.    It is my understanding that defendants conduct regular and sustained business in Orange County, California.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed on _____1/29/2025_____.



Trenton Smith