# EXHIBIT 1

Exhibit 1
4

1  John P. Kristensen (SBN 224132)
2  **KRISTENSEN LAW GROUP**
   120 Santa Barbara St., Suite C9
3  Santa Barbara, California 93101
   Telephone: (805) 837-2000
4  *john@kristensen.law*

5  Jarrett L. Ellzey* (Texas Bar No. 24040864)
6  Leigh S. Montgomery* (Texas Bar No. 24052214)
   Tommy Kherkher* (Texas Bar No. 24113389)
7  Josh Sanford* (Arkansas Bar No. 2001037)
   **EKSM, LLP**
8  1105 Milford Street
   Houston, Texas 77006
9  Phone: (888) 350-3931
   *jellzey@eksm.com*
10 *lmontgomery@eksm.com*
   *tkherkher@eksm.com*
11 *jsanford@eksm.com*
12

13 **ATTORNEYS FOR PLAINTIFFS AND THE PUTATIVE CLASS**
   (* denotes *pro hac vice* forthcoming)

14 **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
15 **IN AND FOR THE COUNTY OF ORANGE**

16 ANDRAWES HUSARY, individually and        ) Case No.:
   on behalf of all others similarly situated,  )
17                                            ) **CLASS ACTION**
                                              )
18                        Plaintiffs,         ) **COMPLAINT FOR INJUNCTIVE RELIEF**
        vs.                                   )
19                                            )
   JOHN SHAHIDI, an individual; NELK,         ) **1) Violation of California's Unfair**
20 INC. dba NELK, FULL SEND, a Canadian       )    **Competition Law, Cal. Bus. & Prof. Code**
   Company, METACARD, LLC, a Delaware         )    **§§ 17200**
21 Limited Liability Company; NELK USA,       )
   INC., a Delaware Corporation; KYLE         )
22 FORGEARD, an individual.                   )
                                              )
23                        Defendants.         )
24 _____   )

25        Plaintiff Andrawes Husary ("Plaintiff" or "Husary") (Collectively "Plaintiffs") brings this

26 Class Action Complaint against Nelk, Inc. dba Nelk or Full Send, Nelk USA, Inc. (collectively

27 "Nelk" or "Defendant"), Metacard LLC ("Metacard" or "Defendant"), Kyle Forgeard and John

28 Shahidi, individually and on behalf of all others similarly situated ("Class Members"), and

1    alleges, upon information and belief, based upon investigation of counsel, published reports, and

2    personal knowledge:

3    **I.    NATURE OF THE ACTION**

4        1.    This is a class action lawsuit against snake-oil salesmen masquerading as

5    entrepreneurs. Defendants sold digital assets that did not have characteristics, uses, or benefits

6    they advertised and promoted and, either through reckless incompetence or greed, failed to

7    provide the promised business ventures or digital rewards—the purported purpose of

8    Defendants' endeavor that may have concealed their scheme.

9        2.    Founder Defendants Kyle Forgeard and John Shahidi are Internet-famous

10   YouTube personalities known for their YouTube Channel "Nelk Boys," which gained notoriety

11   and a cult following of 8.22 million subscribers for its prank videos and podcasts in which

12   Forgeard and his team interviewed notable personalities such as O.J. Simpson, then-former-

13   President Donald Trump, Elon Musk, and Mike Tyson.

14       3.    Following the success of their YouTube channel and podcast, Forgeard and

15   Shahidi branched out into other business ventures, including apparel, fitness supplements, a hard

16   seltzer brand, and other merchandise, all under the Nelk Boys' "Full Send" brand. Shahidi is the

17   President of all Full Send ventures.

18       4.    The Full Send business venture at issue in this case is Forgeard and Shahidi's

19   foray into digital investing and cryptocurrency. Forgeard and Shahidi created the company

20   Metacard, LLC, specifically to sell digital assets that would ostensibly provide the holder access

21   to business investment opportunities in ventures such as lounges, gyms, festivals, casinos and

22   restaurants, as well as access to products and services including apparel, virtual stores, virtual

23   festivals, Metaverse casinos, and recording artists.

24       5.    Defendants sold digital investments in the form of Full Send Metacard NFTs

25   ("Metacards"). Holders of Metacards were to receive shares in business ventures, whether digital

26   or real-world, and exclusive access to events, venues, and products run by the company.

27       6.    Non-Fungible Tokens ("NFTs"), as discussed below, are a form of digital assets

28   that can be purchased, sold, and transferred on other cryptocurrencies, such as the OpenSea NFT

Exhibit 1
6

marketplace.

7.    Defendants sold Metacards in OpenSea in January of 2022, and earned over $23 million by selling Metacards for thousands of dollars per piece. Individuals purchased Metacards using either their regular credit cards or with Ethereum, an established and regulated cryptocurrency.

8.    Defendants offered a few "perks" associated with owning a Metacard but ultimately failed to deliver any of the promised business ventures or investment opportunities. Specifically, Defendants offered a 50% off promo code to buy Full Send branded supplements, one opportunity to attend an event where Snoop Dogg performed and claimed on Instagram that they have given away $250,000 worth of merchandise to Metacard holders, but ultimately Metacard holders have seen nothing of the promised return on the $23 million investment they funded.

9.    Defendants have offered no explanation as to why they have failed to provide any of the promised returns on Plaintiffs' investments. Defendants capitalized on Forgeard's platform and fame to misrepresent the status of their business ventures to entice Forgeard's loyal online fans and the public into investing in Metacards and then failed to ever provide the promised return on those investments in the form of digital and real-world businesses, apparel, stores, or festivals.

10.    Accordingly, Plaintiff sues Defendants seeking redress for their unlawful conduct.

## II.    PARTIES

11.    Defendant John Shahidi is and at all times mentioned herein was an individual citizen of California, residing in Orange County, California.

12.    Plaintiff Andrawes Husary is and at all times mentioned herein was an individual citizen of California, residing in San Mateo County, California.

13.    Defendant Kyle Forgeard is an entertainer with a sizeable online audience. Based on his own statements, information, and belief, he is a founder and an owner of Metacard LLC. Defendant Kyle Forgeard is believed to have moved from California to Florida recently.



14.     Defendant Nelk, Inc. dba Nelk or Full Send is a Canadian corporation with its principal place of business located at 525 8t Ave., SW, #2400, Calgary, Alberta T2P 1G1.

15.     Defendant Nelk USA, Inc. is a Delaware corporation that had its principal place of business during the events herein in California. It registered with the California Secretary of State on April 2, 2020, with its principal place of business at 3928 Fredonia Drive, in Los Angeles, which is a residential street in the Cahuenga pass, south of Mulholland. In 2022, when Defendants started the activities, they were based at 3011 S. Croddy Way in Santa Ana, California 92704. In 2024, Nelk moved to Florida, but maintains a California office at 26025 Mureau Road, Suite 120, Calabasas, California 91302.  Nelk USA, Inc.'s registered agent for service of process is Mycorporation Business Service, Inc. which is also conveniently located at 26025 Mureau Road, Suite 120, Calabasas, California 91302.

16.     Defendant Nelk, Inc. may be served via its American subsidiary, Nelk USA, Inc.

17.     Defendant Metacard, LLC is a Delaware limited liability corporation with its principal place of business located at 3011 S. Croddy Way in Santa Ana, California 92704. Its registered agent for service of process is Defendant Kyle Forgeard.

18.     At all times herein mentioned, each and every defendant herein was the owner, agent (actual and ostensible), servant, joint venture, alter ego and employee, each of the other and each was acting within the course and scope of his or her ownership, agency, service, joint venture and employment.

19.     The true names and capacities of defendants sued herein as Does 1 through 100, inclusive are unknown to Plaintiff who therefore sues said defendants by such fictitious names. Plaintiff prays for leave to amend this Complaint to show their true names and capacities when the same have been finally determined. Plaintiff is informed and believes, and upon such information and belief alleges thereon, that each of the defendants designated herein as DOE is negligently, intentionally, strictly liable or otherwise legally responsible in some manner for the events and happenings herein referred to, and negligently, strictly liable intentionally or otherwise caused injury and damages proximately thereby to Plaintiff, as is hereinafter alleged.

///

Exhibit 1
8

20.     At all times herein mentioned, each and every defendant herein was the owner, agent, servant, joint venture, alter ego and employee, each of the other and each was acting within the course and scope of his or her ownership, agency, service, joint venture and employment.

21.     At all times mentioned herein, each and every defendant was the successor of the other and each assumes the responsibility for the acts and omissions of all other defendants.

## III.   JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action pursuant to Article VI, § 10 of the California Constitution.

23.     This Court has general personal jurisdiction over Defendant, because Defendant's division, had its principal place of business ("nerve center") in Orange County.

24.     Venue is proper in this Court because the principal acts and omissions complained of were committed in Orange County.

25.     Federal jurisdiction does not exist here. Plaintiffs, the Putative Class Members, and Defendant are all California citizen and resident for purposes of determining jurisdiction. There is no diversity. 28 U.S.C. §1332 requires complete diversity of citizenship among the parties. None of the causes of action involve substantial questions of federal law. In fact, the cause of action is an equitable claim, not a legal claim. The Ninth Circuit precludes claims for equitable relief, and they must be dismissed **without prejudice**. Guzman v. Polaris Indus. (9th Cir. Sep. 29, 2022) 2022 WL 4543709. Any removal would be sanctioning worthy. Protection against local prejudice is another essential purpose of removal jurisdiction based on diversity of citizenship. Thus, defendants cannot remove a case to federal court if any defendant is a citizen of the State in which such action is brought. 28 U.S.C. §1441(b)(2); *Spencer v. Altec Indus., Inc.* (9th Cir. 2004) 393 F.3d 867, 870. Therefore, there is neither complete diversity nor federal question jurisdiction and this matter is properly venued in this Court.

26.     This Court has general personal jurisdiction over Defendants Shahidi, who is a California resident, and Metacard, LLC has its principal place of business in California.

///

## IV.   ADDITIONAL FACTUAL ALLEGATIONS

### A.   THE METACARD SCAM AND PRE-SALE REPRESENTATIONS

27.   In January of 2022, Defendants launched their Metacard project to provide business venture investment opportunities and exclusive events and products to holders.

28.   Instead of following the usual model of minting NFTs based on unique digital artwork that the purchaser could select based on personal preference, Defendants minted 10,000 NFTs that were essentially identical and varied only in text, border, and background depending on the NFT "rarity" level. The rarer the NFT, the more perks the holder was to receive. NFT rarity was assigned at random and was not revealed until after purchase, presumably to entice purchases to buy as many NFTs as possible to increase the chance of obtaining an extremely rare NFT.

29.   Accordingly, unlike other NFT projects, Metacards held no intrinsic value. The only value Metacards provided was in the amenities and perks to which the NFT was supposed to provide access.

30.   Leading up to the launch of the Metacards, Founder Defendants capitalized on their YouTube fame by directing fans to their NFT discord server in which they touted the Metacards' exclusive perks. Founder Defendants strategically released and withheld information to create a false sense of urgency to entice their fans into buying into their crypto scheme.

31.   On January 18, 2022, the day before the official release of Metacards, the Founder Defendants used their podcast, Full Send Podcast, to promote the sale of Metacards. The podcast episode number 25 ("the podcast episode") was entitled "How the Full Send NFT Will Help Us Build an Empire," and included Defendant John Shahidi and his brother, Sam Shahidi, who is the COO of Nelk Boys Full Send Podcast, and several other individuals who discussed the upcoming Metacard NFT project and sale.

32.   Also on January 18, 2022, the Defendants held a livestream ("the livestream") attended by more than 240,000 individuals to promote the sale of Metacards. Founder Defendants spoke at the livestream about the Metacard NFT project and sale and directed attendees to the podcast episode for more information.

33.    Also on January 18, 2022, the "nelkboys" Instagram posted about the Metacard NFT project ("the Instagram post"). As with the livestream, the Instagram post directed viewers to the podcast episode.

34.    Defendants are responsible for, directed and adopted the content of the podcast episode, the livestream and the Instagram post.

35.    The podcast, the livestream and the Instagram post all confirmed that the Metacard was not about holding a unique piece of digital art, as is the case with many NFTs, and Defendants assured potential buyers that the Metacard not a "pump and dump" scheme. For example:

a.    In the podcast episode Defendants stated, "The Metacard is all about utilities and not art."

b.    The Instagram post stated, "First off if you are looking for a quick flip to make some quick money go buy another animal that looks like it's on molly NFT. This project is a long-term play."

c.    In the livestream, Shahidi stated, "This is not, this is not for the day trader."

d.    In the livestream, Forgeard stated, "This isn't crazy cougars or Xanax out lizards, like go spend money on that if you want to follow pump and dump influencers and flip it in a month and like invest or buy this. If you believe in our brand, that's. That's the people that we want in our community. We want people that are going to be. We're targeting those types of people. We're not targeting pump and dump type people. So, want to build a really strong community."

36.    Instead of being a simple piece of digital art or collector's item, Defendants represented that the Metacard would provide specific benefits to purchasers.

37.    Metacard benefits touted by Defendants included exclusive access to Defendants' current and future business endeavors. For example:

a.    During the podcast episode, Defendants stated, "I think what [the Metacard] gives you access to is like I said, everything that we have now, and then everything that we're going to do, not only in the physical world, but also as the world becomes more digital, everything that we're going to do in the digital world and in the

KRISTENSEN LAW GROUP

Exhibit 1
11

1    metaverse . . . ."

2    b.    The Instagram post stated, "The FULLSEND METACARD will give you

3    exclusive access to what we do in the physical world and metaverse.'

4    38.    In addition to access to business endeavors, the Metacard would provide holders

5    with specific amenities and perks, including "first access" and "exclusive access" to numerous

6    projects and merchandise.

7    a.    During the livestream, Forgeard stated, "We actually have a few different projects

8    that we're going to be launching in the NFT space. This won't be like our only

9    project, but if you're a meta card holder, you're going to get first access as well."

10    b.    During the livestream, Forgeard also stated, "We'll be doing a lot of collabs in the

11    space with cool projects. Some will be like one of hundreds, maybe one of a

12    thousand, some will be one of ones. So, we're going to be doing a ton of projects.

13    In all those projects the only first access goes to Metacard holders."

14    c.    The podcast episode referenced the success of Defendants' related business, the

15    "Happy Dad" line of alcoholic seltzers, as well as the success of the Full Send

16    podcast and merchandise. Defendants noted that the Happy Dad seltzers and the

17    podcast were targeted toward their "special and loyal and awesome" fan base and

18    indicated that the Metacard NFT project would do the same.

19    d.    During the podcast episode, Defendants stated, "Metacard holders will have first

20    access to the other NFT projects like Happy Dad."

21    e.    Similarly, the Instagram post stated, "The METACARD will also act as a mint

22    pass. Holders will get first access to the many other NFT projects that we will drop

23    including a Happy Dad project and FULLSEND collabs with other Cool NFT

24    projects."

25    f.    During the podcast episode, Defendants also stated, "Metacard holders will have

26    first access to merch going forward."

27    g.    During the podcast episode, Defendants stated that they would "drop some

28    projects that might be just purely art, because some projects are just purely a flex,

1    and you want a dop profile picture." Defendants went on to state that they had "a

2    plan to drop a specific project just for that," but clarified that such projects would

3    be "really rare" and only available to Metacard holders."

4    h.    Also, during the podcast episode, Defendants clearly communicated "This is

5          something special that we're building, I believe. And I feel like buyers right now

6          are getting in early. And as we build this empire, **you're getting one of 10,000**

7          **people that's getting access to everything that we're going to fucking do**."

8          (emphasis added).

9    39.    Defendants also claimed that the Metacard would provide membership-style

10   benefits. For example:

11   a.    During the livestream, Forgeard stated, "And one thing I'm so pumped about is

12         because I kind of said it in our Instagram caption, but it's cool now because we

13         don't have to go to dinner with like investors and like pitch them an idea and say,

14         like, get them to believe in us . . . . So, as you guys join this community, you guys

15         are helping us build something and you're also hopefully getting a more valuable

16         token."

17   b.    As Defendants in the Instagram post, "It's really cool for me because now instead

18         of having dinner with investors, trying to pitch them ideas and get them to believe

19         in us we can go straight to our community . . . .. This NFT project allows our

20         community to help us build these projects and then get rewarded when we are

21         successful."

22   c.    Similarly, during the podcast episode, Defendants stated that "this project allows

23         us to speed up some of the . . . to start, to start it to financing, right? Because we're

24         always like, oh we're going to budget this, where are we going to get that? And

25         now we have partners, right? People are going to be bought into it, right? And

26         we're going to produce or perform."

27   d.    During the podcast episode, Defendants referenced business input from Metacard

28         holders, stating "that's something we've talked about doing this year, whether it's

1    with one of our projects where . . . a Happy Dad flavor or decide would be the

2    DAO [Decentralized Autonomous Organization] would . . . vote on it . . .. Or it

3    could even be a merch design, or it could be in something as simple as the merch

4    drop date, right?"

5    e.    During the livestream, Forgeard stated with respect to Defendants' NFT projects,

6        "We'll hold a community vote. Everything's about the community. So, everyone's

7        feeling cocaine chickens. We will tell our artists to start drawing them."

8    40.    Defendants represented that the funds raised would be invested in Defendants'

9    businesses and the promised perks and benefits and cast Metacard purchasers as "partners" who

10   would provide input regarding the business. For example:

11   a.    During the livestream, Forgeard stated, "And one thing I'm so pumped about is

12       because I kind of said it in our Instagram caption, but it's cool now because we

13       don't have to go to dinner with like investors and like pitch them an idea and say,

14       like, get them to believe in us . . .. So, as you guys join this community, you guys

15       are helping us build something and you're also hopefully getting a more valuable

16       token."

17   b.    As Defendants in the Instagram post, "It's really cool for me because now instead

18       of having dinner with investors, trying to pitch them ideas and get them to believe

19       in us we can go straight to our community . . .. This NFT project allows our

20       community to help us build these projects and then get rewarded when we are

21       successful."

22   c.    Similarly, during the podcast episode, Defendants stated that "this project allows

23       us to speed up some of the . . . to start, to start it to financing, right? Because we're

24       always like, oh we're going to budget this, where are we going to get that? And

25       now we have partners, right? People are going to be bought into it, right? And

26       we're going to produce or perform."

27   d.    During the podcast episode, Defendants referenced business input from Metacard

28       holders, stating "that's something we've talked about doing this year, whether it's

with one of our projects where . . . a Happy Dad flavor or decide would be the DAO [Decentralized Autonomous Organization] would . . . vote on it . . .. Or it could even be a merch design, or it could be in something as simple as the merch drop date, right?"

e.   During the livestream, Forgeard stated with respect to Defendants' NFT projects, "We'll hold a community vote. Everything's about the community. So, everyone's feeling cocaine chickens. We will tell our artists to start drawing them."

41.   Defendants insisted that business ideas were already under development and that they had already devoted resources and would continue to devote resources to the Metacard promises. For example:

a.   During the podcast episode, Defendants insisted that Defendants were going to "do it right," which meant building a business around Metacard purchasers. Specifically, Defendants stated:

> What's the long-term play? Because I think what's going to happen is . . . a lot of NFTs are going to start phasing out because they don't know how to build a business and a business model and run an operation for years and years and years to support the investment of all these people that put something into this asset, right? And they bought into it. And so that's where we come in and we're like, dude, **we have a team, we have a budget, we have a play, and we'll go way deeper into this to make sure that this is something that is supported through all the ups and downs that happen in the FTE world and the metaverse world** and whatever the next name of anything is. (emphasis added).

b.   During the livestream, Shahidi stated, "We've been working on this really since October. We put, you know, our foot down on the gas in late November and pretty much worked through the holidays, which was a good thing because I actually got Covid. So, like I was stuck in the house for 10 days working on this with Kyle and

1    Sammy and our entire team."

2    c.    During the livestream, Shahidi also stated, "And we're going to have those utilities

3    that we talk about on, you know, publicly and on the Spotify podcast is, you know,

4    we're, we're getting to work on those. Those are going to be, those aren't things

5    that we're going to talk about and do next year. We're, you know, like I said earlier

6    in this Discord chat is **we're getting to work right away**. You know, that's what

7    we're going to be up late tonight. Working on those lounges will be." (emphasis

8    added).

9    d.    Also on the livestream, Forgeard and Shahidi discussed opening physical locations

10    for the businesses that would be funded by the Metacard purchasers and confirmed

11    that they would be getting to work on these types of projects "right away:"

12        **Forgeard**: Yeah, but I think. I think the price that you're going to

13    see is, like. It's just. It's something that we chose that if we want to open

14    up all these physical locations and offer real utility and build, like, the

15    ultimate club members, this is just, like, the reality of what it is, you know,

16    like that. That's how I feel. Yeah.

17        **Shahidi**: This is a. We're building this. We're. We're treating this

18    as a real business, you know, just no different than a company out there.

19    That's fine. An ipo. And it's going to, you know, go public and, you know,

20    takes those money to build the business and grow the business. Like, that's

21    how we're treating this.

22        **Forgeard**: And I want to open shit up soon. Like, I don't want this

23    to be like, you know.

24        **Shahidi**: No, no, this isn't like, thank you for this tomorrow, and

25    we'll. We'll see you next year. Like, we're. **We're getting to work right**

26    **away**. 100. (emphasis added).

27    42.    Defendants even suggested that the Metacard would function like stock or an

28    initial public offering (IPO), suggesting that purchasers were like shareholders. For example:

a.  During the podcast episode, Defendants stated, "I look at it as . . . it's like a decentralized stock in a way."

b.  During the livestream, Forgeard stated, "It's like a stock in a, in a weird way where you guys can buy into it. And the more that we achieve in real life and the more utility that we add to this token, it's obviously going to become more valuable."

c.  Also, during the livestream, Shahidi stated, "We're treating this as a real business, you know, just no different than a company out there. That's fine. An IPO. And it's going to, you know, go public and, you know, takes those money to build the business and grow the business."

43.  The Metacard launch page included representations similar to those described above, including "exclusive access to what Full Send does in the physical and Metaverse," as well as references to upcoming lounges, gyms, festivals, and more, as reflected in the following screenshot image of the Metacard launch page:



44.  Defendants also represented that Metacards would grant the holders access to exclusive Nelk Boys content, including behind-the-scenes videos, bonus footage, and unreleased material. Metacards holders would receive invitations or early access to virtual meetings, live streams, or digital meetups with the Nelk Boys. Metacards would grant access to the Full Send and Nelk Boys community, which included exclusive forums, chat groups, and conversations

with the Nelk Boys and other NFT holders. Metacard holders were to receive discounts on Full Send branded merchandise such as clothing and accessories. And finally, Metacard holders would be invited to participate in Nelk Boys projects or collaborations.

45.    Metacard purchasers relied on the representations made by Defendants leading up to the Metacard sale described above. Metacard purchasers expected to receive the promised benefits of owning a Metacard and further expected that Defendants would pursue the promised benefits in good faith, just as Defendants stated they would do. Metacard purchasers would not have purchased the Metacards had they known that the representations made Defendants were false and that Defendants did not intend to fulfill their promises.

46.    Defendants knew at all times that the Metacard did not have any intrinsic value.

47.    Defendants knew at all times that they did not have any plans or otherwise intend to pursue the promised benefits of the Metacard in good faith.

48.    Defendants knew at all times that the purchasers of Metacard would not receive any of the promised benefits of the Metacard, and that purchasers of the Metacard would suffer damages as a result of the purchase.

49.    Despite their knowledge, Defendants agreed amongst themselves to promote the sale of the Metacard and worked together to do so.

50.    In doing so, Defendants held themselves out as being uniquely knowledgeable about products similar to the Metacard. For example, the podcast episode included comments indicating that Defendants owned numerous NFTs and hoped that they could use their platform to "educate our fan base," and suggesting that Defendants had once been offered a million dollars to promote someone else's NFT but that they had rejected that offer because they wanted to do it "right."

51.    Defendants launched the Metacards on January 19, 2022, and all 10,000 NFTs were sold within 10 minutes, earning Defendants over $23 million.

52.    All Defendants benefited financially from the sale of Metacards.

53.    Despite earning over $23 million, Defendants did not use the funds to fulfill the promised benefits and perks of owning a Metacard as Defendants said they would, but rather

1    Defendants used the funds for their own personal benefit.

2    **B. POST-SALE FALLOUT**

3        54.    Forgeard specifically described the purchase of a Metacard as an investment on

4    his Full Send podcast: "I think the NFT shit is so cool because to me it's like a modern-day or,

5    like a decentralized way for people to like invest in us." Forgeard also explicitly stated that the

6    purpose of the NFT was to provide the capital Defendants needed to launch their businesses:

7    "Our fans give us money — and then in exchange, we give them a Metacard and then so they

8    have something right that they can verify is theirs. And now we have all this money, and our job

9    is to build shit."

10        55.    Defendants used discord channels before the Metacard sale as a platform to

11    disseminate information and increase awareness of the sale. Defendants also used discord

12    channels after the Metacard sale to communicate with Metacard purchasers, although post-sale

13    communication dwindled and then disappeared completely once the fraudulent nature of the

14    Metacard sale became apparent.

15        56.    As months passed and Defendants failed to make progress on any of the promised

16    business ventures, Metacard holders expressed frustration in the Full Send discord. Forgeard

17    responded, "Making sure our ventures are as profitable as possible so when we cut y'all [sic] in

18    its [sic] worth it."

19        57.    Responding to the growing discontent among Metacard holders, Defendants

20    arranged a few exclusive events for Metacard holders. The most significant event was held in

21    about April of 2022 in Los Angeles: Defendants held an event at which Snoop Dogg performed.

22    Due to geographic and financial constraints, only 300 out of the 7,000 Metacard holders attended.

23        58.    In March of 2022, Forgeard announced that Full Send would open a sports bar

24    with well-known Miami restauranteur Dave Grutman, who Forgeard claimed owned the rarest of

25    Metacards, a "cyber red" Metacard. The sports bar never opened.

26    ///

27    ///

28    ///

59. At the same time, Defendants reassured Metacard holders they made their purchases as investments, and more communication was coming.



60. Defendants arranged a few smaller events such as private watch parties, but these events were only attended by a fraction of the Metacard community, again mostly due to geographic and financial constraints.

61. The few events offered by Defendants did not meet Defendants' promises of ongoing perks and benefits for Metacard holders. Metacard purchasers did not purchase the Metacard for a few limited events but rather purchased the Metacard with the expectation that Defendants would continue to offer events and other benefits to Metacard holders, just as Defendants said they would do.



62. By March of 2022, it became clear that Defendants were beginning to abandon the promise of ongoing perks such as attendance at events and access to merchandise, and instead Defendants began focusing on Metacard holders "return on investment" (ROI).

///

63.     ROI is essentially a measure of how much profit or less an investment has earned and ignores non-monetary perks such as access to merchandise.



64.     Defendants promised they were working on something big in April 2022:

65.     As for discounts and products, Defendants offered all Metacard holders a 50% off coupon for Full Send branded supplements.



66.     Defendants made an unsubstantiated claim on social media that they have given away $250,000 worth of merchandise to Metacard holders, but Plaintiffs have not received any merchandise, product, or apparel. Nor did such giveaways fulfill the promises of perks and

1    benefits to all Metacard holders.

2    67.    In many social media "giveaways," Defendants conducted illegal lotteries

3    disguised as raffle events in which they gave away expensive products or large cash prizes. One

4    Metacard holder received $100,000 in one of these "giveaways." Lotteries and raffles were not

5    among the perks and benefits that enticed Metacard purchasers to purchase Metacards.

     68.    In June 2022, Defendants were still stringing along Plaintiffs and the Class

6    Members:



24    ///

25    ///

26    ///

27    ///

28    ///

Exhibit 1
22

69.   In June 2022, the postings on Discord continued.



#° 🤛 | holders-chat

kyleforgeard ✔ 09/07/2022 00:13
Our only goal is to see this floor price as
high as possible. I can tell you that

70.   Defendants claim to have launched a beef jerky company called "Bored Jerky," but Bored Jerky is a simple rebranding of a pre-existing beef jerky company, meaning very little capital was required to launch the Bored Jerky product. More importantly, Defendants have offered no equity in Bored Jerky to Metacard holders, despite promising that holding a Metacard granted partnership into all Full Send business ventures.

71.   Defendants were never permitted to solicit investments from the public related to Full Send. The entity Metacard, LLC, was created to serve as a fraudulent vehicle for the sole purpose of selling patently worthless, unregistered Metacard NFTs to enrich Full Send's founders, promoter/manager, and affiliates. Absent Defendants' fraudulent conduct and misrepresentations, Metacards could not have been offered and sold to investors at any price.

72.   Meanwhile, the value of Metacards has dropped by 75%. Founder Defendants have abandoned the Metacard discord and stopped touting the benefits of owning a Full Send Metacard on their social media and YouTube channels. Plaintiffs and most Metacard holders have received zero return on their investment of $23 million and have received no answers as to what Defendants have accomplished with that $23 million.

73.   On information and belief, Defendants manipulated the Metacard product market.

74.   As set forth above, prior to releasing Metacard for sale, Defendants informed Plaintiffs and the Class Members that Defendants had been working toward, and would continue to work toward, providing perks and benefits of Metacard ownership. Upon information and

KRISTENSEN
LAW GROUP

belief, Defendants failed to devote any effort toward fulfilling the promises of Metacard ownership.

75.     Defendants' standard operating procedure has been to promise products and services they failed to deliver on only to abandon the project and community they promised to support. Due to these unconscionable practices, Defendants should disgorge any revenue, profits, or any other gains from their scheme to Plaintiffs and the Class Members.

76.     Defendants knew or should have known that they were falsely advertising a non-functional product and that consumers would be deceived by their false representations. Defendants acted with knowledge and reckless disregard when they made such false representations and are responsible for Plaintiffs' damages.

77.     Defendants promoted Metacards using Forgeard's online platforms— such as their YouTube channels and podcasts, as well as other social media accounts to consumers unfamiliar with digital currency products, as opportunities to invest in any Full Send business opportunity, which Defendants promised would include lounges, gyms, festivals, casinos, and restaurants. This led to tens of thousands of people purchasing Metacards.

78.     The Full Send business ventures and investments would never come to fruition— but that did not deter Defendants' scheme. Defendants maintained course and manipulated the digital currency market for Metacards to their advantage by executing a "rug pull," which is a colloquial term used to describe a scheme in which an NFT developer solicits funds from prospective NFT purchasers promising them certain benefits. Once the purchasers' funds are used to purchase the NFTs, the developers abruptly abandon the project and fail to deliver the promised benefits all while fraudulently retaining the purchasers' funds.

79.     As part of Defendants' NFT scheme, Defendants marketed Metacards to purchasers by falsely claiming that, in exchange for transferring cryptocurrency to purchase the Metacard, purchasers would later receive benefits, including, among other things, rewards, exclusive access to products and services, and a return on Full Send business venture profits. Soon after completing the sale of all their Metacards, Defendants, together with others, transferred millions of dollars' worth of purchasers' cryptocurrency to, among other places, wallets controlled by Defendants.

80. Defendants promised Metacard holders would receive exclusive and first access to Full Send products, events, and services. To appease Metacard holders who wanted answers regarding when they would see any return on their investment, Forgeard stated: "Trust me our goal is not to make this a fan club. Y'all [sic] are the layer between us and the rest of our fanbase. Stuff should go to you guys first and then you sell the rest."

81. Ostensibly as a follow-through on this promise, held a few events that only a handful of Metacard holders were able to attend, and offered all Metacard holders a nominal discount on certain Full Send branded products. This is the only return most Metacard holders have received on their purchase.

82. Defendants conducted illegal lotteries disguised as raffle events in which they gave away expensive products or large cash prizes.

83. Defendants claim to have started a Full Send branded beef jerky company, but no Metacard holder received a return on this particular investment.

84. Founder Defendants have not responded to Metacard holder demands for what has been done with the $23 million Defendants earned.

85. Defendants ceased using the discord channels as a means of communicating with Metacard purchasers, and Forgeard has not posted in the Full Send discord channel since August of 2022 and remains unresponsive to inquiries about when he will return to answer for his promises.

86. Defendants failed to follow through on any of these promises.

87. The Claims in this case are based on Defendants' fraudulent and manipulative scheme to enrich themselves by issuing false and materially misleading statements concerning:

    a. the existence of the Full Send business ventures and Metacard purchasers' investments and access to those business ventures;

    b. Defendants' efforts to make Metacard purchasers' money through business ventures;

    c. the value of Metacards;

    d. the benefits of owning Metacards, including first or exclusive access to

1      merchandise and future NFTs, as well as gyms, clubs and other businesses;

2      e.      that the money raised from Metacards would be put into developing businesses

3              from which Metacard purchasers would receive rewards;

4      f.      that Defendants had already started developing Metacard projects such as lounges;

5      g.      that the Defendants were actively supporting the Metacard project and its online

6              ecosystem.

7      88.     Defendants' false and materially misleading statements appeared in press releases,

8  online chat rooms or forums located on websites, white papers, postings on social media websites

9  such as Twitter, promotional videos posted on websites such as YouTube, internet podcast

10 interviews and other materials relating to Full Send and Metacards which were disseminated

11 widely to the investing public.

12     89.     Each of Defendants' misrepresentations and omissions were material because they

13 were designed to, and did, entice the public into purchasing investments (Metacards) which were

14 nothing more than a vehicle for the individual Defendants' personal enrichment. When the

15 magnitude of Defendants' failure to support the project and create the business venture was

16 revealed, the trading prices of Metacards plummeted.

17     90.     Plaintiffs allege that Defendants acted with scienter in connection with their

18 claims. Proof of Defendants' scienter comes, in part, from podcasts in which Founder Defendants

19 were interviewed. These podcasts show, among other things, that Metacard was a fraudulent

20 scheme since its inception, Metacards have at all times been patently worthless, and that no

21 investor would have purchased any Metacards absent Defendants' fraudulent statements and acts.

22     91.     Plaintiffs and others similarly situated deserve redress from Defendants for their

23 fraudulently promoting and selling products that did not function as advertised, failing to support

24 the Full Send Metacard project, and manipulating the digital currency. Defendants operated this

25 fraudulent venture to exploit and steal from Plaintiffs and other customers who trusted Forgeard

26 and Shahidi's false representations. As a result, Defendants defrauded Plaintiffs and thousands

27 of other consumers and unjustly enriched themselves by profiting off Plaintiffs and others without

28 delivering on their promises.

92.    The false statements and further misrepresentations continued into 2023:



93.    Today, investors and purchasers in Metacards have little to show for their investments other than broken promises. For these reasons, Plaintiff on behalf of himself, and all similarly situated, seeks compensatory, injunctive and rescissory relief, providing rescission and repayment of all investments made to purchase Metacards during the class period, and the right to secure and conserve such funds until repayment.

## C. THE BEEF JERKY COVERUP

94.    After years of broken promises of the next club, gym or other shared ventures, Defendants realized they had serious legal exposure. Their plan to escape liability involved…. beef jerky. They teased this venture, two years after the original sale:

///

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28









///



95.    Defendants announced in April 2024, that for a short, limited period of time, Metacard owners could join a "landmark initiative at the intersection of products, crypto, and digital assets that will help pave the way for the future of decentralized community ownership of real-world products."

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

96.    Defendants' OpenSea communication is reflected in the following screenshots taken after the passing of the 30-day deadline, but upon information and belief reflects the language of the April 2024 posting except for the reference to the deadline being passed:




///

///

///

///

///

97.    Defendant's discord communication was as follows:



///

///

///

///

///

98.   Defendants subsequently posted the following on May 20, 2024, on Discord:




///

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26  ///
27  ///
28  ///



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23




24    99.    The "landmark initiative" involved the official launch of Defendants' "Bored

25    Jerky" line of beef jerky products, which was announced as an "exclusive Metacard Holder

26    Program."

27    100.    Under the Program, Defendants represented that they had "reserved 40% of Bored

28    Jerky as a company for YOUR [Metacard holders'] benefit."

101.    The forty percent of Bored Jerky held by Metacard holders was to be held in "Phantom Stock Plan" set to expire in ten years with a possibility of extension if an exit had not yet occurred.

102.    In order to participate in the Program, Metacard holders were required to refer three new customers to the Bored Jerky website, boredjerky.com, using a unique referral code, with a "new customer" being defined by having a unique email address at checkout.

103.    Also, in order to participate in the Program, Defendants required Metacard purchasers to release all of their claims related to Metacard pursuant to California *Civ.* Code § 1542.

104.    For those who did not want to participate in the Program, Defendants represented that they would refund the Metacard purchase price with interest.

105.    To obtain the refund, the Metacard holder was required to sign a "Token Rescission Agreement" with Defendant Metacard LLC, which provided that the Metacard holder would return all "Full-Send Metacard" blockchain-based tokens held by the Metacard holder in exchange for payment of $2,300.

106.    The "Token Rescission Agreement" did not provide for interest as promised by Defendants in their communications about the Program.

107.    Upon information and belief, despite performing their obligations under the Token Rescission Agreement, Metacard holders who entered into the Token Rescission Agreement with Defendants never received any payment from Defendants as promised.

108.    The offers described above were only available for thirty days—from May 20, 2024, until June 20, 2024—and were communicated through the OpenSea and discord channels that were already largely unused by Defendants to communicate with and support Metacard purchasers.

109.    Accordingly, the communication was not reasonably designed to actually reach Metacard purchasers, and in fact, not all Metacard purchasers saw the communication until after the thirty-day deadline had already passed.

///

110.   Many individuals who purchased Metacards did not receive the communication about the Bored Jerky Program or the Token Rescission Agreement prior to the expiration of the thirty-day deadline.

111.   Those individuals have fully lost the opportunity to participate in the Bored Jerky Program or the Token Rescission Agreement, as well as having lost any benefit that might have been received through ownership of a Metacard.

112.   Once the thirty-day deadline passed, Defendant discontinued any benefits of the Metacard and ceased pursuing any of the promised perks and benefits of the Metacard, rendering the Metacard completely valueless and obselete.

113.   Defendants intentionally used communication channels that would not reach all Metacard purchasers and intentionally set a thirty-day deadline so as to deprive Metacard purchasers of the opportunity to participate in either the Beef Jerky Program or the Token Rescission Agreement and to create the false impression that Metacard purchasers who did not participate no longer had any rights as Metacard holders.

114.   Further, upon information and belief, Metacard holders who opted in to the Bored Jerky Program have not received any benefit from that bargain.

115.   As of the filing of this Complaint, it is not possible to purchase Bored Jerky products. The Bored Jerky website, boredjerky.com, redirects purchase requests to the online retailer Amazon, whose website reflects that Bored Jerky products are currently unavailable.

116.   As with the Metacard program, Defendants failed to pursue Bored Jerky in good faith. Defendants failed to adequately fund, staff, plan the Bored Jerky business and never had any intention of doing so.

117.   The Bored Jerky Program was simply another attempt by Defendants to fleece Metacard purchasers and keep Metacard purchasers' money without providing anything in return.

118.   Defendants never had any intent to repay Metacard purchasers under the Token Rescission Agreement and never had any intent to pursue Bored Jerky as a viable product. Rather, both the Token Rescission Agreement and Bored Jerky Program were a façade intended to strip Metacard purchasers of their rights.

119.    The mere fact that Defendants offered Metacard purchasers the option to enter the Token Rescission Agreement or Bored Jerky Program is an acknowledgment by Defendants that it failed to fulfill its promises related to the Metacard.

120.    Defendants also failed to comply with their Token Recission Agreements, which further evidences the bad faith of Defendants.

**D. PLAINTIFFS' EXPERIENCES**

**B.    PLAINTIFF'S EXPERIENCE**

121.    Plaintiff Andrawes Husary purchased a Metacard for approximately $2,300 on or about January 18, 2022, after receiving, accepting and relying on the misrepresentations by Defendants. After two years of Defendants continuing to claim that new ventures or opportunities were going to be provided to Metacard holders, Plaintiff still believed the Defendants' misrepresentation. Eventually, Plaintiff came to realize that the purchase was all a scam, and that Defendants had no desire to ever provide any goods or services anywhere remotely near the value of the $2,300 Plaintiff spent. Defendants' continuing misrepresentation were made, in part, to delay and discovery by Plaintiff or other class members.

122.    Plaintiffs suffered actual injury in the form of damages and lost money for purchasing a worthless Metacard at an insanely inflated price.

**V.    PLAINTIFF'S AND CLASS ACTION ALLEGATIONS**

123.    Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated pursuant to the provisions of California Code of Civil Procedure § 382.

124.    Plaintiff's proposed Class is as follows, subject to amendment as appropriate: Class that Plaintiff seeks to represent is defined as follows:

**All persons who purchased Metacards through the date of class certification.**

125.    Excluded from this class definition are employees, officers, directors of Defendants (unless individually named), and attorneys appearing this case, and any judge assigned to hear this action.

///

126.    Plaintiff reserves the right to modify this class definition as they obtain relevant information, including attribution tracking data and other records, through discovery.

127.    Each of the persons identified in this Putative Class has been harmed by the acts of Defendants because Defendants interfered with a business relationship of each member of the Putative Class, as well as converted each Class member's rightfully owed commissions and other benefits.

128.    Defendants have been unjustly enriched at the expense of each member of the Putative Class.

129.    The proposed Class meets the criteria for certification under *Code Civ. Proc.* § 382 because the class of persons who suffered the same harm as Plaintiff is easily ascertainable.

**The Action Meets the Requirements to be Certified as a Class**

130.    Plaintiff is member of the proposed Class.

131.    The proposed Class can be identified through Defendant's records and merchant partners' databases.

*Numerosity*

132.    The number of Putative Class members is believed to be in the thousands, rendering the class so numerous that individual joinder of all Class members is impracticable.

133.    The exact number and identities of the Class members are unknown at this time and can only be ascertained through discovery. Identification of the Class members is a matter capable of ministerial determination from Defendant's records.

*Commonality*

134.    Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a.    Whether Defendants fraudulently promoted investment products, that did not function as promoted, causing investors/consumers like those in the Putative Class to invest in Metacard NFTs;

b.    Whether Defendants fraudulently promoted future products or services, or futures in products or services—products or services Defendants knew would not exist as

promoted or at all—causing consumers like those in the Putative Class to purchase said futures or invest further in Metacard NFTs;

c.      Whether Defendants violated their agreement(s) to deliver functional products and services and breached their agreement(s);

d.      Whether Defendants knew Metacard projects would not be functional when they claimed they would be or were, and made false representations despite that knowledge;

e.      Whether Defendants had a duty to provide functional products and services to their consumers, and if Defendants violated that duty;

f.      Whether Defendants failed to deliver on its promises to consumers to provide functional products and services;

g.      Whether Defendant made any false representations to their investors or consumers, and whether Defendants knew those representations to be false, or whether those assertions were made recklessly and without adequate investigation of their truth or falsity; and

h.      Whether Defendants received revenues from their fraudulent venture, and the amount of those revenues;

135.    There are questions of law common to the Putative Class and those questions predominate over questions affecting any individual Putative Class Member. Common questions of law include but are not limited to:

a.      Whether Defendants' conduct in (1) making false representations about Metacard NFTs (2) failing to provide functional Metacard products and services, (3) selling Metacards as investments, and (4) manipulating the Metacard market, constitute acts of fraud;

b.      Whether Defendants' conduct common to the Putative Class has resulted or will result in Defendants being enriched at the expense of Putative Class Members, or in Defendant retaining a benefit to the detriment and loss of Putative Class Members, in frustration of the fundamental principles of justice, equity, and good

conscience, and thus constitutes unjust enrichment;

c.    Whether Defendants' conduct common to the Putative Class demonstrates willfulness, malice, or recklessness, or whether Defendants proceeded with conscious disregard for the rights of others, therefore entitling Putative Class Members to punitive damages.

### Typicality

136.    Plaintiff's claims are typical of the claims of the Putative Class Members. Plaintiff would only seek individual or actual damages if class certification is denied. In addition, Plaintiff is entitled to relief under the same causes of action and upon the same facts as the other Members of the Putative Class. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class Members, and no defenses are unique to Plaintiff. Plaintiff's claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

### Adequacy

137.    Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

### Predominance

138.    Defendant has engaged in a common course of conduct toward Plaintiff and Class Members. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

### Superiority

139.    Class certification is appropriate because Defendant has acted on grounds generally applicable to the proposed Putative Class, making appropriate equitable injunctive relief with

respect to Plaintiff and the proposed Putative Class members. Rule 3.765(b) Likewise, issues that will arise in this case are appropriate for certification under Rule 3.765(b) because such issues are common to the Class, the resolution of which would advance the matter and the parties' interests therein. Such issues include, but are not limited to:

(a)    Did Defendant's policies and practices effectively steal attribution from members of the Putative Class?

(b)    Did Defendant profit from customer acquisition which was generated by members of the Putative Class?

(c)    Did Defendant's actions in stealing attribution from Plaintiff damage the relationship between Defendant's merchant partners and members of the Putative Class?

(d)    Whether Defendant intentionally damaged the relationship between Defendant's merchant partners and members of the Putative Class?

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW

#### (On Behalf of Plaintiff and All Class Members Against All Defendants)

140.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

141.    Plaintiff and Defendants entered into a fiduciary relationship, as described above, and additionally wherein Defendants acted as Plaintiff's agent for access to the Metacards. Defendants treated the relationship as confidential throughout the relevant period.

142.    Defendants had a duty to disclose to Plaintiff the true nature and market of the Metacards it was selling.

143.    As a result of Defendants' wrongful acts in concealing and misrepresenting these facts, Plaintiff purchased a Metacard through Defendants and has been significantly damaged thereby Plaintiff also suffered incidental and consequential damages.

144.    The California Unfair Competition Law, Cal. *Bus. & Prof. Code* §§ 17200, *et seq.*, ("UCL") prohibits any unlawful, unfair or fraudulent business act or practice.

*UNLAWFUL*

145.    Defendants committed "unlawful" business acts and practices by engaging in conduct that violates the CLRA, Cal. *Civ. Code* §§ 1770(a)(5), (a)(7), (a)(9), (a)(13), (a)(14) and (a)(19) as well as California's False Advertising Law. Such conduct is ongoing and continues to this date and violates the unlawful prong of the UCL.

146.    Defendants' acts and omissions violated federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by SEC

147.    Defendants' unlawful solicitation, offer, and sale of unregistered securities are violations of the Securities Act of 1933 (the "Securities Act") Sections 5 [15 U.S.C. § 77e(a)(1)], 12(a)(1) [15 U.S.C. § 77l(a)(1)], and 15(a) [15 U.S.C. § 77o(a)]. Defendants' public offer and sale of METACARDs were unlawful offerings of unregistered securities for which no exemption from registration was available under the Securities Act.

148.    The Securities Act's registration requirements are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions. Absent registration, issuers of securities may market their securities with no disclosure requirements whatsoever. For example, an issuer could omit any information that would make a potential investor think twice before investing (*e.g.*, conflicts of interest or major setbacks to core product lines), peddle its securities using unbounded exaggerations regarding the progress of its product development and business plan, or even fabricate the existence of a game supporting the digital products, as was the case here.

149.    Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent the protections of the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security. As detailed herein, Defendants' public offers and sales of Metacards were most likely offers and sales of unregistered securities.

150.    Plaintiff alleges that Defendants acted with scienter in connection with their claims under the Exchange Act. Proof of Defendants' scienter comes, in part, from podcasts in

1    which Founder Defendants were interviewed. These podcasts show, among other things, that

2    Metacard was a fraudulent scheme since its inception, Metacards have at all times been patently

3    worthless, and that no investor would have purchased any Metacards absent Defendants'

4    fraudulent acts.

5        151.    Plaintiff and others similarly situated deserve redress from Defendants for their

6    fraudulently promoting and selling products that did not function as advertised, failing to support

7    the Full Send Metacard project, and manipulating the digital currency. Defendants operated this

8    fraudulent venture to exploit and steal from Plaintiff and other customers who trusted Forgeard

9    and Shahidi's false representations. As a result, Defendants defrauded Plaintiff and thousands of

10    other consumers and unjustly enriched themselves by profiting off Plaintiff and others without

11    delivering on their promises.

12        152.    Today, investors in Metacards have little to show for their investments other than

13    broken promises. For these reasons, Plaintiff on behalf of himself, and all similarly situated

14    investors, seeks compensatory, injunctive, and rescissory relief, providing rescission and

15    repayment of all investments made to purchase Metacards during the class period, and the right

16    to secure and conserve such funds until repayment.

17        *FRAUDULENT*

18        153.    In order to prevail under the "fraudulent" prong of the UCL, a consumer must

19    allege that the fraudulent business practice was likely to deceive members of the public.

20        154.    The test for "fraud" as contemplated by Cal. *Bus. & Prof. Code* §§ 17200, *et seq.*

21    is whether the public is likely to be deceived. Unlike common law fraud, a UCL violation can be

22    established even if no one was actually deceived, relied upon the fraudulent practice, or sustained

23    any damage.

24        155.    Such conduct is ongoing and continues to this date and violates the fraudulent

25    prong of the UCL.

26        156.    On April 6, 2017, in *McGill v. Citibank, N.A.*, 2 Cal.5th 945 (2017), the California

27    Supreme Court ruled that any contract that waives the statutory remedy of public injunctive relief

28    under the Unfair Competition Law, False Advertising Law, and Consumers Legal Remedies Act

1    is contrary to California public policy and this unenforceable under California law.

2         157.    As such, Plaintiff and the Class seek public injunctive relief to prevent Defendants

3    from continuing with their unlawful business acts and practices as alleged herein to ensure that

4    Defendants do not continue to harm the general public by continuing to engage in the unlawful

5    business acts and practices as alleged herein.

6         158.    Plaintiff, individually, and on behalf of all California consumers, seeks individual,

7    representative, and public injunctive relief and any necessary order or judgments that will prevent

8    Defendants from continuing with their unlawful business acts and practices as alleged herein.

9         159.    Plaintiff seeks declaratory relief, restitution and disgorgement of all profits

10   obtained, and public injunctive relief as previously described.

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the Class described above seeks the following relief:

1. For an Order certifying the Class, and appointing Plaintiff and his Counsel to represent the Class;

2. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein;

3. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

4. For restitutionary relief;

5. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

6. Pre-judgment and post-judgment interest on any amounts awarded; and

7. Any other relief that this court may deem just and proper.

Dated: May 28, 2025

KRISTENSEN LAW GROUP & EKSM, LLP

*/s/ John P. Kristensen*

John P. Kristensen
Jarrett L. Ellzey
Leigh S. Montgomery
Tommy Kherkher
Josh Sanford

***Attorneys for Plaintiff and the Putative Class***