John P. Kristensen (SBN 224132)
**KRISTENSEN LAW GROUP**
120 Santa Barbara Street, Suite C9
Santa Barbara, California 93101
Telephone: 805-837-2000
john@kristensen.law

Jarrett L. Ellzey* (Texas Bar No. 24040864)
Leigh S. Montgomery* (Texas Bar No. 24052214)
Tommy Kherkher* (Texas Bar No. 24113389)
Josh Sanford* (Arkansas Bar No. 2001037)
**EKSM, LLP**
4200 Montrose Blvd., Ste. 200
Houston, Texas 77006
Phone: (888) 350-3931

**ATTORNEYS FOR PLAINTIFF AND THE PUTATIVE CLASS**
(* denotes *pro hac vice*)

## THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| TRENTON SMITH, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> JOHN SHAHIDI, an individual; NELK, INC. dba NELK, FULL SEND, a Canadian Company, METACARD, LLC, a Delaware Limited Liability Company; NELK USA, INC., a Delaware Corporation; KYLE FORGEARD, an individual, <br><br> Defendants. | Case No. 8:25-cv-161-FWS-DDFM <br><br> <u>**CLASS ACTION**</u> <br><br> **SECOND AMENDED COMPLAINT FOR DAMAGES** <br><br> 1. **Fraud;** <br> 2. **Violation of Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq.; and** <br> 3. **Civil Conspiracy** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Trenton Smith ("Plaintiff") brings this Second Amended Class Action Complaint against Defendants Nelk, Inc. dba Nelk or Full Send, Nelk USA, Inc. (collectively "Nelk"), Metacard LLC ("Metacard"), Kyle Forgeard and John Shahidi (all Defendants collectively referred to as "Defendants"), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon information and belief, based upon investigation of counsel, published reports, and personal knowledge:

## I.    INTRODUCTION

1.    This is a class action lawsuit against snake-oil salesmen masquerading as entrepreneurs. Defendants sold digital assets that did not have characteristics, uses, or benefits they advertised and promoted and, either through reckless incompetence or greed, failed to provide the promised business ventures or digital rewards—the purported purpose of Defendants' endeavor that may have concealed their scheme.

2.    Founder Defendants Kyle Forgeard and John Shahidi (collectively "Founder Defendants") are Internet- famous YouTube personalities known for their YouTube Channel "Nelk Boys," which gained notoriety and a cult following of 8.22 million subscribers for its prank videos and podcasts in which Forgeard and his team interviewed notable personalities such as O.J. Simpson, then-former-President Donald Trump, Elon Musk, and Mike Tyson.

3.    Following the success of their YouTube channel and podcast, Forgeard and Shahidi branched out into other business ventures, including apparel, fitness supplements, a hard seltzer brand, and other merchandise, all under the Nelk Boys' "Full Send" brand. Shahidi is the President of all Full Send ventures. Forgeard and Shahidi control the Full Send brand and are responsible for all content and business ventures related to the Full Send brand.

4.    The Full Send business venture at issue in this case is Forgeard and Shahidi's foray into digital investing and cryptocurrency. Forgeard and Shahidi created the company Metacard, LLC, specifically to sell digital assets that would ostensibly provide the holder access to business investment opportunities in ventures

such as lounges, gyms, festivals, casinos and restaurants, as well as access to products and services including apparel, virtual stores, virtual festivals, Metaverse casinos, and recording artists.

5.    Defendants sold digital investments in the form of Full Send Metacard NFTs ("Metacards"). Holders of Metacards were to receive shares in business ventures, whether digital or real-world, and exclusive access to events, venues, and products run by the company.

6.    Non-Fungible Tokens ("NFTs"), as discussed below, are a form of digital assets that can be purchased, sold, and transferred on other cryptocurrencies, such as the OpenSea NFT marketplace.

7.    When a non-fungible token (NFT) project is launched, the creator can embed royalty provisions directly into the project's smart contract. A smart contract is the self-executing code that governs the rules of the NFT blockchain such as Ethereum.

8.    Ethereum is a decentralized, open-source blockchain platform that enables peer-to-peer transactions and the execution of self-enforcing "smart contracts." Its native cryptocurrency is called Ether (ETH). ETH is used to pay for transaction fees, power smart contract operations, and act as a medium of exchange and value within the Ethereum ecosystem.

9.    Through this code, the creator can specify that a fixed percentage of the sale price must be automatically routed back to the creator's wallet each time the NFT is resold on a secondary marketplace. When the NFT is transferred, marketplaces that honor these smart contract rules (such as OpenSea) automatically calculate the royalty and send the designated percentage of the transaction to the creator's account. In this way, creators continue to earn ongoing revenue from the treading activity of their NFTs, even after the initial mint has concluded.

10.    Defendants sold Metacards in OpenSea in January of 2022 and earned over $23 million in approximately one day by selling Metacards for thousands of dollars per piece. Individuals purchased Metacards using either their regular credit

cards or with Ethereum, an established and regulated cryptocurrency.

11.    Defendants embedded a ten percent (10%) royalty clause into the Metacard NFT smart contract. This royalty would earn the Defendants approximately $4.3 million after the initial January 2022 offering.

12.    Defendants offered a few "perks" associated with owning a Metacard but ultimately failed to deliver any of the promised business ventures or investment opportunities. Specifically, Defendants offered a 50% off promo code to buy Full Send branded supplements, one opportunity to attend an event where Snoop Dogg performed, and claimed on Instagram that they have given away $250,000 worth of merchandise to Metacard holders, but ultimately Metacard holders have seen nothing of the promised return on the $23 million investment they funded.

13.    Defendants did not simply fail to deliver on their promises — as the facts will demonstrate below, they never intended to perform them at all. From the outset, Defendants' plan was to enrich themselves by diverting the vast majority of the $23 million raised from consumers. By pocketing the proceeds, they rendered performance of their promises economically impossible. The truth is revealed by the on-chain data: within just four months, the Metacard treasury had been drained from approximately 7,426 ETH on January 21, 2022, to only 258 ETH by April 11, 2022. Defendants' pre-sale intent was to cash out, not to build gyms, casinos, or community benefits. This contemporaneous conduct shows that their promises were fraudulent at the time they were made, and Defendants knew those statements to be false at the time.

14.    Even though ninety-six and a half percent (96.5%) of the funds were drained from the project's wallet within the first four months, Defendants kept making material misrepresentations through their social media channels in order to continue to earning the 10% royalty fee from the Metacard NFT trading on the secondary market. For over two-years, Defendants continued to make false statements in order to prop up the value of the Metacard NFT on the secondary market despite knowing it was economically impossible to execute on what was promised. Defendants pockets

1    approximately $4.3 million in royalties.

2    15.    Defendants have offered no explanation as to why they have failed to

3    provide any of the promised returns on Plaintiff's investments. Defendants capitalized

4    on Forgeard's platform and fame to misrepresent the status of their business ventures

5    to entice Forgeard's loyal online fans and the public into investing in Metacards and

6    then failed to ever provide the promised return on those investments in the form of

7    digital and real-world businesses, apparel, stores, or festivals.

8    16.    Accordingly, Plaintiff sues Defendants seeking redress for their unlawful

9    conduct.

10   **II.    PARTIES**

11   17.    Plaintiff Trenton Smith is a natural person residing in Santa Barbara

12   County, California.

13   18.    Defendant John Shahidi is and at all times mentioned herein was an

14   individual citizen of California, residing in Orange County, California.

15   19.    Defendant Kyle Forgeard is an entertainer with a sizeable online audience.

16   Based on his own statements, information, and belief, he is a founder and an owner of

17   Metacard LLC. Defendant Kyle Forgeard is believed to have moved from California

18   to Florida recently.

19   20.    Defendant Nelk, Inc. dba Nelk or Full Send is a Canadian corporation with

20   its principal place of business located at 525 8t Ave., SW, #2400, Calgary, Alberta T2P

21   1G1.

22   21.    Defendant Nelk USA, Inc. is a Delaware corporation that had its principal

23   place of business during the events herein in California. It registered with the California

24   Secretary of State on April 2, 2020, with its principal place of business at 3928 Fredonia

25   Drive, in Los Angeles, which is a residential street in the Cahuenga pass, south of

26   Mulholland. In 2022, when Defendants started the activities, they were based at 3011

27   S. Croddy Way in Santa Ana, California 92704. In 2024, Nelk moved to Florida, but

28   maintains a California office at 26025 Mureau Road, Suite 120, Calabasas, California

1  91302. Nelk USA, Inc.'s registered agent for service of process is Mycorporation

2  Business Service, Inc., which is also conveniently located at 26025 Mureau Road, Suite

3  120, Calabasas, California 91302.

4      22.    Defendant Nelk, Inc. may be served via its American subsidiary, Nelk

5  USA, Inc.

6      23.    Defendant Metacard, LLC is a Delaware limited liability corporation with

7  its principal place of business located at 3011 S. Croddy Way in Santa Ana, California

8  92704. Its registered agent for service of process is Defendant Kyle Forgeard.

9      24.    At all times herein mentioned, each and every Defendant herein was the

10  owner, agent (actual and ostensible), servant, joint venture, alter ego and employee,

11  each of the other and each was acting within the course and scope of his or her

12  ownership, agency, service, joint venture and employment.

13      25.    At all times mentioned herein, each and every Defendant was the

14  successor of the other and each assumes the responsibility for the acts and omissions

15  of all other Defendants.

16  **III.**    <u>**JURISDICTION AND VENUE**</u>

17      26.    This Court has subject matter and diversity jurisdiction over this action

18  under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of

19  controversy exceeds $5 million, exclusive of interest and costs, there are

20  approximately 10,000 members in the proposed class (with damages estimated to be

21  approximately $2,300 each), and at least one Class Member is a citizen of a state

22  different from a Defendant to establish minimal diversity.

23      27.    This Court has general personal jurisdiction over Defendants Shahidi, who

24  is a California resident, and Metacard, LLC has its principal place of business in

25  California.

26      28.    Venue is proper in this Court under 28 U.S.C. §1391(b) because

27  Defendants conduct business in this District and because a substantial part of the acts

28  or omissions giving rise to this action occurred within this District.

## IV.    ADDITIONAL FACTUAL ALLEGATIONS

### A.    THE METACARD SCAM AND PRE-SALE REPRESENTATIONS

29.    In January of 2022, Defendants launched their Metacard project to provide business venture investment opportunities and exclusive events and products to holders.

30.    Instead of following the usual model of minting NFTs based on unique digital artwork that the purchaser could select based on personal preference, Defendants minted 10,000 NFTs that were essentially identical and varied only in text, border, and background depending on the NFT "rarity" level. The rarer the NFT, the more perks the holder was to receive. NFT rarity was assigned at random and was not revealed until after purchase, presumably to entice purchases to buy as many NFTs as possible to increase the chance of obtaining an extremely rare NFT.

31.    Accordingly, unlike other NFT projects, Metacards held no intrinsic value. The only value Metacards provided was in the amenities, perks and opportunities to which the NFT was supposed to provide access.

32.    Leading up to the launch of the Metacards, Founder Defendants capitalized on their YouTube fame by directing fans to their NFT discord server in which they touted the Metacards' exclusive perks. Founder Defendants strategically released and withheld information to create a false sense of urgency to entice their fans into buying into their crypto scheme.

33.    On January 18, 2022, the day before the official release of Metacards, the Founder Defendants used their podcast, Full Send Podcast, to promote the sale of Metacards. The podcast episode number 25 ("the podcast episode") was entitled "How the Full Send NFT Will Help Us Build an Empire," and included Defendant John Shahidi and his brother, Sam Shahidi, who is the COO of Nelk Boys Full Send Podcast, and several other individuals who discussed the upcoming Metacard NFT project and sale.

///

34.    Also on January 18, 2022, the Defendants held a livestream ("the livestream") attended by more than 240,000 individuals to promote the sale of Metacards. Founder Defendants spoke at the livestream about the Metacard NFT project and sale and directed attendees to the podcast episode for more information.

35.    Also on January 18, 2022, the "nelkboys" Instagram posted about the Metacard NFT project ("the Instagram post"). As with the livestream, the Instagram post directed viewers to the podcast episode.

36.    Defendants are responsible for, directed and adopted the content of the podcast episode, the livestream and the Instagram post.

37.    The podcast, the livestream and the Instagram post all confirmed that the Metacard was not about holding a unique piece of digital art, as is the case with many NFTs, and Defendants assured potential buyers that the Metacard not a "pump and dump" scheme. For example:

a.    In the podcast episode Defendants stated, "The Metacard is all about utilities and not art."

b.    The Instagram post stated, "First off if you are looking for a quick flip to make some quick money go buy another animal that looks like its on molly NFT. This project is a long term play."

c.    In the livestream, Shahidi stated, "This is not, this is not for the day trader."

d.    In the livestream, Forgeard stated, "This isn't crazy cougars or Xanax out lizards, like go spend money on that if you want to follow pump and dump influencers and flip it in a month and like invest or buy this. If you believe in our brand, that's. That's the people that we want in our community. We want people that are going to be. We're targeting those types of people. We're not targeting pump and dump type people. So want to build a really strong community."

///

38.    Instead of being a simple piece of digital art or collector's item, Defendants represented that the Metacard would provide specific benefits to purchasers.

39.    Metacard benefits touted by Defendants included exclusive access to Defendants' current and future business endeavors. For example:

a.    During the podcast episode, Defendants stated, "I think what [the Metacard] gives you access to is like I said, everything that we have now, and then everything that we're going to do, not only in the physical world, but also as the world becomes more digital, everything that we're going to do in the digital world and in the metaverse . . . ."

b.    The Instagram post stated, "The FULLSEND METACARD will give you exclusive access to what we do in the physical world and metaverse.'

40.    In addition to access to business endeavors, the Metacard would provide holders with specific amenities and perks, including "first access" and "exclusive access" to numerous projects and merchandise.

a.    During the livestream, Forgeard stated, "We actually have a few different projects that we're going to be launching in the NFT space. This won't be like our only project, but if you're a meta card holder, you're going to get first access as well."

b.    During the livestream, Forgeard also stated, "We'll be doing a lot of collabs in the space with cool projects. Some will be like one of hundreds, maybe one of a thousand, some will be one of ones. So we're going to be doing a ton of projects. In all those projects the only first access goes to Metacard holders."

c.    The podcast episode referenced the success of Defendants' related business, the "Happy Dad" line of alcoholic seltzers, as well as the success of the Full Send podcast and merchandise. Defendants noted that the Happy Dad seltzers and the podcast were targeted toward their "special

and loyal and awesome" fan base and indicated that the Metacard NFT project would do the same.

d.    During the podcast episode, Defendants stated, "Metacard holders will have first access to the other NFT projects like Happy Dad."

e.    Similarly, the Instagram post stated, "The METACARD will also act as a mint pass. Holders will get first access to the many other NFT projects that we will drop including a Happy Dad project and FULLSEND collabs with other Cool NFT projects."

f.    During the podcast episode, Defendants also stated, "Metacard holders will have first access to merch going forward."

g.    During the podcast episode, Defendants stated that they would "drop some projects that might be just purely art, because some projects are just purely a flex, and you want a dop profile picture." Defendants went on to state that they had "a plan to drop a specific project just for that," but clarified that such projects would be "really rare" and only available to Metacard holders."

h.    Also during the podcast episode, Defendants clearly communicated "This is something special that we're building, I believe. And I feel like buyers right now are getting in early. And as we build this empire, **you're getting one of 10,000 people that's getting access to everything that we're going to fucking do**." (emphasis added)).

41.    Defendants also claimed that the Metacard would provide membership-style benefits. For example:

a.    During the livestream, Forgeard stated, "And one thing I'm so pumped about is because I kind of said it in our Instagram caption, but it's cool now because we don't have to go to dinner with like investors and like pitch them an idea and say, like, get them to believe in us . . .So as you guys join this community, you guys are helping us build something and

1    you're also hopefully getting a more valuable token."

2    b.    As Defendants in the Instagram post, "Its really cool for me because now

3    instead of having dinner with investors, trying to pitch them ideas and get

4    them to believe in us we can go straight to the our community . . .This

5    NFT project allows our community to help us build these projects and then

6    get rewarded when we are successful."

7    c.    Similarly, during the podcast episode, Defendants stated that "this project

8    allows us to speed up some of the . . . to start, to start it to financing, right?

9    Because we're always like, oh we're going to budget this, where are we

10    going to get that? And now we have partners, right? People are going to

11    be bought into it, right? And we're going to produce or perform."

12    d.    During the podcast episode, Defendants referenced business input from

13    Metacard holders, stating "that's something we've talked about doing this

14    year, whether it's with one of our projects where . . . a Happy Dad flavor

15    or decide would be the DAO [Decentralized Autonomous Organization]

16    would . . . vote on it . . . . Or it could even be a merch design, or it could

17    be in something as simple as the merch drop date, right?"

18    e.    During the livestream, Forgeard stated with respect to Defendants' NFT

19    projects, "We'll hold a community vote. Everything's about the

20    community. So everyone's feeling cocaine chickens. We will tell our

21    artists to start drawing them."

22    42.    Defendants represented that the funds raised would be invested in

23    Defendants' businesses and the promised perks and benefits and cast Metacard

24    purchasers as "partners" who would provide input regarding the business. For

25    example:

26    a.    During the livestream, Forgeard stated, "And one thing I'm so pumped

27    about is because I kind of said it in our Instagram caption, but it's cool

28    now because we don't have to go to dinner with like investors and like

1    pitch them an idea and say, like, get them to believe in us . . . So as you

2    guys join this community, you guys are helping us build something and

3    you're also hopefully getting a more valuable token."

b.    As Defendants in the Instagram post, "Its really cool for me because now

instead of having dinner with investors, trying to pitch them ideas and get

them to believe in us we can go straight to the our community . . .This

NFT project allows our community to help us build these projects and then

get rewarded when we are successful."

c.    Similarly, during the podcast episode, Defendants stated that "this project

allows us to speed up some of the . . . to start, to start it to financing, right?

Because we're always like, oh we're going to budget this, where are we

going to get that? And now we have partners, right? People are going to

be bought into it, right? And we're going to produce or perform."

d.    During the podcast episode, Defendants referenced business input from

Metacard holders, stating "that's something we've talked about doing this

year, whether it's with one of our projects where . . . a Happy Dad flavor

or decide would be the DAO [Decentralized Autonomous Organization]

would . . . vote on it . . . Or it could even be a merch design, or it could be

in something as simple as the merch drop date, right?"

e.    During the livestream, Forgeard stated with respect to Defendants' NFT

projects, "We'll hold a community vote. Everything's about the

community. So everyone's feeling cocaine chickens. We will tell our

artists to start drawing them."

43.    Defendants insisted that business ideas were already under development

and that they had already devoted resources and would continue to devote resources

to the Metacard promises. For example:

a.    During the podcast episode, Defendants insisted that Defendants were

going to "do it right," which meant building a business around Metacard

purchasers. Specifically, Defendants stated:

> What's the long-term play? Because I think what's going to happen is . . . a lot of NFTs are going to start phasing out because they don't know how to build a business and a business model and run an operation for years and years and years to support the investment of all these people that put something into this asset, right? And they bought into it. And so that's where we come in and we're like, dude, **we have a team, we have a budget, we have a play, and we'll go way deeper into this to make sure that this is something that is supported through all the ups and downs that happen in the FTE world and the metaverse world** and whatever the next name of anything is. (emphasis added).

b.    During the livestream, Shahidi stated, "We've been working on this really since October. We put, you know, our foot down on the gas in late November and pretty much worked through the holidays, which was a good thing because I actually got Covid. So like I was stuck in the house for 10 days working on this with Kyle and Sammy and our entire team."

c.    During the livestream, Shahidi also stated, "And we're going to have those utilities that we talk about on, you know, publicly and on the Spotify podcast is, you know, we're, we're getting to work on those. Those are going to be, those aren't things that we're going to talk about and do next year. We're, you know, like I said earlier in this Discord chat is **we're getting to work right away**. You know, that's what we're going to be up late tonight. Working on those lounges will be." (emphasis added).

d.    Also on the livestream, Forgeard and Shahidi discussed opening physical locations for the businesses that would be funded by the Metacard purchasers and confirmed that they would be getting to work on these

types of projects "right away:"

    **Forgeard**: Yeah, but I think. I think the price that you're going to see is, like. It's just. It's something that we chose that if we want to open up all these physical locations and offer real utility and build, like, the ultimate club members, this is just, like, the reality of what it is, you know, like that. That's how I feel. Yeah.

    **Shahidi**: This is a. We're building this. We're. We're treating this as a real business, you know, just no different than a company out there. That's fine. An ipo. And it's going to, you know, go public and, you know, takes those money to build the business and grow the business. Like, that's how we're treating this.

    **Forgeard**: And I want to open shit up soon. Like, I don't want this to be like, you know.

    **Shahidi**: No, no, this isn't like, thank you for this tomorrow, and we'll. We'll see you next year. Like, we're. **We're getting to work right away**. 100. (emphasis added).

44.    Defendants even suggested that the Metacard would function like stock or an initial public offering (IPO), suggesting that purchasers were like shareholders. For example:

    a.    During the podcast episode, Defendants stated, "I look at it as . . . it's like a decentralized stock in a way."

    b.    During the livestream, Forgeard stated, "It's like a stock in a, in a weird way where you guys can buy into it. And the more that we achieve in real life and the more utility that we add to this token, it's obviously going to become more valuable."

    c.    Also during the livestream, Shahidi stated, "We're treating this as a real business, you know, just no different than a company out there. That's fine. An IPO. And it's going to, you know, go public and, you know, takes

those money to build the business and grow the business."

45.    The Metacard launch page included representations similar to those described above, including "exclusive access to what Full Send does in the physical and Metaverse," as well as references to upcoming lounges, gyms, festivals, and more, as reflected in the following screenshot image of the Metacard launch page:



46.    Defendants also represented that Metacards would grant the holders access to exclusive Nelk Boys content, including behind-the-scenes videos, bonus footage, and unreleased material. Metacards holders would receive invitations or early access to virtual meetings, live streams, or digital meetups with the Nelk Boys. Metacards would grant access to the Full Send and Nelk Boys community, which included exclusive forums, chat groups, and conversations with the Nelk Boys and other NFT holders. Metacard holders were to receive discounts on Full Send branded merchandise such as clothing and accessories. And finally, Metacard holders would be invited to participate in Nelk Boys projects or collaborations.

47.    Metacard purchasers relied on the representations made by Defendants leading up to the Metacard sale described above. Metacard purchasers expected to receive the promised benefits of owning a Metacard and further expected that Defendants would pursue the promised benefits in good faith, just as Defendants stated

1  they would do. Metacard purchasers would not have purchased the Metacards had they

2  known that the representations made Defendants were false and that Defendants did

3  not intend to fulfill their promises.

4      48.    Defendants knew at all times that the Metacard did not have any intrinsic

5  value.

6      49.    Defendants knew at all times that they did not have any plans or otherwise

7  intend to pursue the promised benefits of the Metacard in good faith.

8      50.    Defendants knew at all times that the purchasers of Metacard would not

9  receive any of the promised benefits of the Metacard, and that purchasers of the

10 Metacard would suffer damages as a result of the purchase.

11     51.    Despite their knowledge, Defendants agreed amongst themselves to

12 promote the sale of the Metacard and worked together to do so.

13     52.    In doing so, Defendants held themselves out as being uniquely

14 knowledgeable about products similar to the Metacard. For example, the podcast

15 episode included comments indicating that Defendants owned numerous NFTs and

16 hoped that they could use their platform to "educate our fan base," and suggesting that

17 Defendants had once been offered a million dollars to promote someone else's NFT

18 but that they had rejected that offer because they wanted to do it "right."

19     53.    Defendants launched the Metacards on January 19, 2022, and all 10,000

20 NFTs were sold within 10 minutes, earning Defendants over $23 million.

21     54.    All Defendants benefited financially from the sale of Metacards.

22     55.    Despite earning over $23 million, Defendants did not use the funds to

23 fulfill the promised benefits and perks of owning a Metacard as Defendants said they

24 would, but rather Defendants used the funds for their own personal benefit.

25 **B.    POST-SALE FALLOUT**

26     56.    Immediately after the initial sale, Defendants began transferring out the

27 proceeds while continuing to issue marketing messages and public statements

28 promoting the Metacard NFT. These promotions emphasized that the NFTs would

continue to increase in value, propping up the secondary market and enabling Defendants to collect additional royalty income, even as their withdrawals made their promises economically impossible.

57.    Forgeard specifically described the purchase of a Metacard as an investment on his Full Send podcast: "I think the NFT shit is so cool because to me it's like a modern-day or, like a decentralized way for people to like invest in us." Forgeard also explicitly stated that the purpose of the NFT was to provide the capital Defendants needed to launch their businesses: "Our fans give us money — and then in exchange, we give them a Metacard and then so they have something right that they can verify is theirs. And now we have all this money, and our job is to build shit."

58.    Defendants used discord channels before the Metacard sale as a platform to disseminate information and increase awareness of the sale. Defendants also used discord channels after the Metacard sale to communicate with Metacard purchasers, although post-sale communication dwindled and then disappeared completely once the fraudulent nature of the Metacard sale became apparent.

59.    After the initial sale, Defendants continued to hype their non-existent project across their various social media platforms. Causing the price of a Metacard to sore on the secondary market.

60.    The price of a Metacard went from the $2,300 dollar mint price to well above $3,000 dollars in the months following the January 2022 launch.

61.    Defendants set a ten percent (10%) royalty on all secondary market transactions.

62.    Purchasers who resold their Metacard on secondary marketplaces were subject to this royalty.

63.    As a result, Defendants collected an additional 1,500 ETH (worth approximately $4.3 million dollar) from royalties on the secondary market.

64.    As months passed and Defendants failed to make progress on any of the promised business ventures, Metacard holders expressed frustration in the Full Send

1  discord. Forgeard responded, "Making sure our ventures are as profitable as possible

2  so when we cut y'all [sic] in its [sic] worth it."

3      65.    Responding to the growing discontent among Metacard holders,

4  Defendants arranged a few exclusive events for Metacard holders. The most significant

5  event was held in about April of 2022 in Los Angeles: Defendants held an event at

6  which Snoop Dogg performed. Due to geographic and financial constraints, only 300

7  out of the 7,000 Metacard holders attended.

8      66.    In March of 2022, after Defendants had transferred out approximately

9  eighty percent (80%) of the initial funds raised from the Metacard treasury address,

10  Forgeard announced that Full Send would open a sports bar with well-known Miami

11  restauranteur Dave Grutman, who Forgeard claimed owned the rarest of Metacards, a

12  "cyber red" Metacard. The sports bar never opened.

13      67.    At the same time, Defendants reassured Metacard holders they made their

14  purchases as investments and more communication was coming. These representations

15  continued to fuel Defendants royalty fees on the secondary market.



68.    Defendants arranged a few smaller events such as private watch parties, but these events were only attended by a fraction of the Metacard community, again mostly due to geographic and financial constraints.

69.    The few events offered by Defendants did not meet Defendants' promises of ongoing perks and benefits for Metacard holders. Metacard purchasers did not purchase the Metacard for a few limited events, but rather purchased the Metacard with the expectation that Defendants would continue to offer events and other benefits to Metacard holders, just as Defendants said they would do.

70.    By March of 2022, it became clear that Defendants were beginning to abandon the promise of ongoing perks such as attendance at events and access to merchandise, and instead Defendants began focusing on Metacard holders "return on investment" (ROI).



71.    ROI is essentially a measure of how much profit or less an investment has earned and ignores non-monetary perks such as access to merchandise.

72.    Defendants promised they were working on something big in April 2022:



73.    As for discounts and products, Defendants offered all Metacard holders a 50% off coupon for Full Send branded supplements.

74.    Defendants made an unsubstantiated claim on social media that they have given away $250,000 worth of merchandise to Metacard holders, but Plaintiff has not received any merchandise, product, or apparel. Nor did such giveaways fulfill the promises of perks and benefits to all Metacard holders.

75.    In many social media "giveaways," Defendants conducted illegal lotteries disguised as raffle events in which they gave away expensive products or large cash prizes. One Metacard holder received $100,000 in one of these "giveaways." Lotteries and raffles were not among the perks and benefits that enticed Metacard purchasers to purchase Metacards.

76.    In June 2022, after approximately ninety-six and a half percent (96.5%) of the initial funds raised were transferred from the Metacard NFT treasury,

Defendants were still stringing along Plaintiff and the Class Members:



77.    In June 2022, the postings on discord continued:



78.    In September, the postings on discord continued:



79.    Defendants claim to have launched a beef jerky company called "Bored Jerky," but Bored Jerky is a simple rebranding of a pre-existing beef jerky company, meaning very little capital was required to launch the Bored Jerky product. More importantly, Defendants have offered no equity in Bored Jerky to Metacard holders, despite promising that holding a Metacard granted partnership into all Full Send business ventures.

80.    Defendants were never permitted to solicit investments from the public related to Full Send. The entity Metacard, LLC, was created to serve as a fraudulent vehicle for the sole purpose of selling patently worthless, unregistered Metacard NFTs to enrich Full Send's founders, promoter/manager, and affiliates. Absent Defendants' fraudulent conduct and misrepresentations, Metacards could not have been offered and sold to investors at any price.

81.    Meanwhile, the value of Metacards has dropped by 75%. Founder Defendants have abandoned the Metacard discord and stopped touting the benefits of owning a Full Send Metacard on their social media and YouTube channels. Plaintiff and most Metacard holders have received zero return on their investment of $23 million and have received no answers as to what Defendants have accomplished with that $23 million.

82.    On information and belief, Defendants manipulated the Metacard product market.

83.    Defendants' scienter is manifest. At the time they marketed and sold the Metacard NFTs, Defendants knew they would never deliver gyms, casinos, exclusive events, or the other promised benefits.

84.    Defendants instead always intended to enrich themselves first and foremost. Their public comparison of the Metacard sale to a "stock" or "IPO" was a false analogy; unlike an IPO, where funds are earmarked for corporate growth, Defendants secretly planned to take purchaser funds for personal use.

85.    On-chain records of the Metacard treasury wallet confirm this intent. Immediately following the January 19, 2022, launch, the wallet contained more than 7,426 ETH, valued at over $23 million. Within days, Defendants began siphoning these funds into their own accounts. By January 25, 2022, the balance had fallen to 3,123 ETH. By February 17, 2022, only 2,122 ETH remained. On February 23, 2022, just 1,540 ETH remained. By April 11, 2022—less than four months after the launch—the balance had collapsed to 258 ETH.



86.    These rapid outflows demonstrate that Defendants never reserved capital to build gyms, casinos, merchandise pipelines, or other promised ventures. Instead, their pre-sale plan was to extract value for themselves, leaving purchasers with empty promises.

///

87.    Because Defendants always intended to enrich themselves first, their promises to consumers were economically impossible at the moment they were made. No reasonably available funds remained to develop the goods and services touted in their marketing. On information and belief, the promised goods and services required tens of millions of investment funds, and completely inadequate funds remained after four months. This shows scienter: Defendants' statements were knowingly false and intended to trick consumers into investing in a project that Defendants knew they would never deliver.

88.    As set forth above, prior to releasing Metacard for sale, Defendants informed Plaintiff and the Class Members that Defendants had been working toward, and would continue to work toward, providing perks and benefits of Metacard ownership. Upon information and belief, Defendants failed to devote any effort toward fulfilling the promises of Metacard ownership.

89.    Defendants' standard operating procedure has been to promise products and services they failed to deliver on only to abandon the project and community they promised to support. Due to these unconscionable practices, Defendants should disgorge any revenue, profits, or any other gains from their scheme to Plaintiff and the Class Members.

90.    Defendants knew or should have known that they were falsely advertising a non-functional product and that consumers would be deceived by their false representations. Defendants acted with knowledge and reckless disregard when they made such false representations and are responsible for Plaintiff's damages.

91.    Defendants promoted Metacards using Forgeard's online platforms— such as their YouTube channels and podcasts, as well as other social media accounts to consumers unfamiliar with digital currency products, as opportunities to invest in any Full Send business opportunity, which Defendants promised would include lounges, gyms, festivals, casinos, and restaurants. This led to tens of thousands of people purchasing Metacards.

92.    The Full Send business ventures and investments would never come to fruition—but that did not deter Defendants' scheme. Defendants maintained course and manipulated the digital currency market for Metacards to their advantage by executing a "rug pull," which is a colloquial term used to describe a scheme in which an NFT developer solicits funds from prospective NFT purchasers promising them certain benefits. Once the purchasers' funds are used to purchase the NFTs, the developers abruptly abandon the project and fail to deliver the promised benefits all while fraudulently retaining the purchasers' funds.

93.    As part of Defendants' NFT scheme, Defendants marketed Metacards to purchasers by falsely claiming that, in exchange for transferring cryptocurrency to purchase the Metacard, purchasers would later receive benefits, including, among other things, rewards, exclusive access to products and services, and a return on Full Send business venture profits. Soon after completing the sale of all their Metacards, Defendants, together with others, transferred millions of dollars' worth of purchasers' cryptocurrency to, among other places, wallets controlled by Defendants.

94.    Defendants promised Metacard holders would receive exclusive and first access to Full Send products, events, and services. To appease Metacard holders who wanted answers regarding when they would see any return on their investment, Forgeard stated: "Trust me our goal is not to make this a fan club. Y'all [sic] are the layer between us and the rest of our fanbase. Stuff should go to you guys first and then you sell the rest."

95.    Ostensibly as a follow-through on this promise, held a few events that only a handful of Metacard holders were able to attend, and offered all Metacard holders a nominal discount on certain Full Send branded products. This is the only return most Metacard holders have received on their purchase.

96.    Defendants conducted illegal lotteries disguised as raffle events in which they gave away expensive products or large cash prizes.

///

97.    Defendants claim to have started a Full Send branded beef jerky company, but no Metacard holder received a return on this particular investment.

98.    Founder Defendants have not responded to Metacard holder demands for what has been done with the approximately $27 million Defendants earned.

99.    Defendants ceased using the discord channels as a means of communicating with Metacard purchasers, and Forgeard has not posted in the Full Send discord channel since August of 2022 and remains unresponsive to inquiries about when he will return to answer for his promises.

100.    Defendants failed to follow through on any of these promises.

101.    The Claims in this case are based on Defendants' fraudulent and manipulative scheme to enrich themselves by issuing false and materially misleading statements concerning:

a.    the existence of the Full Send business ventures and Metacard purchasers' investments and access to those business ventures;

b.    Defendants' efforts to make Metacard purchasers money through business ventures;

c.    the value of Metacards;

d.    the benefits of owning Metacards, including first or exclusive access to merchandise and future NFTs, as well as gyms, clubs and other businesses;

e.    that the money raised from Metacards would be put into developing businesses from which Metacard purchasers would receive rewards;

f.    that Defendants had already started developing Metacard projects such as lounges;

g.    that the Defendants were actively supporting the Metacard project and its online ecosystem.

102.    Defendants' false and materially misleading statements appeared in press releases, online chat rooms or forums located on websites, white papers, postings on

social media websites such as Twitter, promotional videos posted on websites such as YouTube, internet podcast interviews and other materials relating to Full Send and Metacards which were disseminated widely to the investing public.

103.   Each of Defendants' misrepresentations and omissions were material because they were designed to, and did, entice the public into purchasing investments (Metacards) which were nothing more than a vehicle for the individual Defendants' personal enrichment. When the magnitude of Defendants' failure to support the project and create the business venture was revealed, the trading prices of Metacards plummeted.

104.   Plaintiff alleges Defendants acted with scienter in connection with their claims. Proof of Defendants' scienter comes, in part, from podcasts in which Founder Defendants were interviewed. These podcasts show, among other things, that Metacard was a fraudulent scheme since its inception, Metacards have at all times been patently worthless, and that no investor would have purchased any Metacards absent Defendants' fraudulent statements and acts.

105.   Plaintiff and others similarly situated deserve redress from Defendants for their fraudulently promoting and selling products that did not function as advertised, failing to support the Full Send Metacard project, and manipulating the digital currency. Defendants operated this fraudulent venture to exploit and steal from Plaintiff and other customers who trusted Forgeard and Shahidi's false representations. As a result, Defendants defrauded Plaintiff and thousands of other consumers and unjustly enriched themselves by profiting off Plaintiff and others without delivering on their promises.

///
///
///
///
///

106.    The false statements and further misrepresentations continued into 2023:



107.    Today, investors and purchasers in Metacards have little to show for their investments other than broken promises. For these reasons, Plaintiff on behalf of themselves, and all similarly situated, seeks compensatory, injunctive and rescissory relief, providing rescission and repayment of all investments made to purchase Metacards during the class period, and the right to secure and conserve such funds until repayment.

///
///
///
///
///
///

## C.    THE BEEF JERKY COVERUP

108.    After years of broken promises of the next club, gym or other shared ventures, Defendants realized they had serious legal exposure. Their plan to escape liability involved…. beef jerky. They teased this venture, two years after the original sale:







109.   Defendants announced in April 2024, that for a short, limited period of time, Metacard owners could join a "landmark initiative at the intersection of products, crypto, and digital assets that will help pave the way for the future of decentralized community ownership of real-world products."

110.   Defendants' OpenSea communication is reflected in the following screenshots taken after the passing of the 30-day deadline, but upon information and belief reflects the language of the April 2024 posting except for the reference to the deadline being passed:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1    111.    Defendant's discord communication was as follows:



1      112.   Defendant subsequently posted the following on May 20, 2024, on

2  discord:

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





113.   The "landmark initiative" involved the official launch of Defendants' "Bored Jerky" line of beef jerky products, which was announced as an "exclusive Metacard Holder Program."

114.   Under the Program, Defendants represented that they had "reserved 40% of Bored Jerky as a company for YOUR [Metacard holders'] benefit."

115.   The forty percent of Bored Jerky held by Metacard holders was to be held in "Phantom Stock Plan" set to expire in ten years with a possibility of extension if an exit had not yet occurred.

116.   In order to participate in the Program, Metacard holders were required to refer three new customers to the Bored Jerky website, boredjerky.com, using a unique referral code, with a "new customer" being defined by having a unique email address at checkout.

117.   Also in order to participate in the Program, Defendants required Metacard purchasers to release all of their claims related to Metacard pursuant to California *Civ. Code* § 1542.

118.   For those who did not want to participate in the Program, Defendants represented that they would refund the Metacard purchase price with interest.

119.   To obtain the refund, the Metacard holder was required to sign a "Token Rescission Agreement" with Defendant Metacard LLC, which provided that the Metacard holder would return all "Full-Send Metacard" blockchain-based tokens held by the Metacard holder in exchange for payment of $2,300.

120.   The offers described above were only available for thirty days—from May 20, 2024, until June 20, 2024—and were communicated through the OpenSea and discord channels that were already largely unused by Defendants to communicate with and support Metacard purchasers.

121.   Accordingly, the communication was not reasonably designed to actually reach Metacard purchasers, and in fact, not all Metacard purchasers saw the communication until after the thirty-day deadline had already passed.

122.   Many individuals who purchased Metacards did not receive the communication about the Bored Jerky Program or the Token Rescission Agreement prior to the expiration of the thirty-day deadline.

123.   Those individuals have fully lost the opportunity to participate in the Bored Jerky Program or the Token Rescission Agreement, as well as having lost any benefit that might have been received through ownership of a Metacard.

124.   Once the thirty-day deadline passed, Defendant discontinued any benefits of the Metacard and ceased pursuing any of the promised perks and benefits of the Metacard, rendering the Metacard completely valueless and obsolete.

125.   Defendants intentionally used communication channels that would not reach all Metacard purchasers and intentionally set a thirty-day deadline so as to deprive Metacard purchasers of the opportunity to participate in either the Beef Jerky Program or the Token Rescission Agreement and to create the false impression that Metacard purchasers who did not participate no longer had any rights as Metacard holders.

126.   As of the filing of this Complaint, it is not possible to purchase Bored Jerky products. The Bored Jerky website, boredjerky.com, redirects purchase requests to the online retailer Amazon, whose website reflects that Bored Jerky products are currently unavailable.

127.   As with the Metacard program, Defendants failed to pursue Bored Jerky in good faith. Defendants failed to adequately fund, staff, plan the Bored Jerky business and never had any intention of doing so.

128.   The Bored Jerky Program was simply another attempt by Defendants to fleece Metacard purchasers and keep Metacard purchasers' money without providing anything in return.

129.   Defendants never had any intent to pursue Bored Jerky as a viable product. Rather, the Bored Jerky Program was a façade intended to strip Metacard purchasers of their rights.

130.   The mere fact that Defendants offered Metacard purchasers the option to enter the Token Rescission Agreement or Bored Jerky Program is an acknowledgment by Defendants that it failed to fulfill its promises related to the Metacard.

D.    **PLAINTIFF'S S EXPERIENCES**

131.    Plaintiff Trenton Smith listened to Defendant's podcast on or about January 18, 2022.

132.    Plaintiff Trenton Smith purchased a Metacard on January 19, 2022, for $2,300 after receiving, accepting and relying on the misrepresentations by Defendants in the podcast.

133.    Plaintiff Trenton Smith further consumed multiple of Defendant's post-release statements regarding the Metacard  project between January and March 2022.

134.    Plaintiff Trenton Smith purchased a second Metacard on the secondary market on March 31, 2022 for $3,543.03 after reviewing, accepting and relying on the misrepresentation by Defendants.

135.    In deciding to purchase the Metacard, Plaintiff Smith relied on Defendants' statements regarding the benefits of owning a Metacard, including the access to merchandise, business opportunities and memberships. Plaintiff Smith also relied on Defendants' statements regarding their use of funds raised by the Metacard sale to fulfill the promises of Metacard, as well as statements regarding the efforts Defendants had already made and would continue to make to follow through on their promises to Metacard purchasers.

136.    After two years of Defendants continuing to claim that new ventures or opportunities were going to be provided to Metacard holders, Plaintiff Smith still believed Defendants' misrepresentation.

137.    Plaintiff Smith declined to participate in the Bored Jerky Program or Token Recission Agreement during the 30-day "decision" period because he found both options unacceptable and continued to hold out hope the Metacard project would come to life.

138.    Eventually, Plaintiff Smith came to realize that the purchase was all a scam, and that Defendants had no desire to ever provide any goods or services anywhere remotely near the value of the $2,300 Plaintiff Smith spent. Defendants'

continuing misrepresentations were made, in part, to delay and discovery by Plaintiff Smith or other class members.

139.   Had Plaintiff Smith known that the purchase of the Metacard would not result in access to the benefits and perks described by Defendants or that Defendants would not use the Metacard funds or make good faith efforts to support those benefits and perks, Plaintiff Smith would not have purchased the Metacard.

140.   Plaintiff Smith suffered actual injury in the form of damages and lost money for purchasing a worthless Metacard at an insanely inflated price.

## V.   CLASS ACTION ALLEGATIONS

141.   Plaintiff brings this nationwide class action on behalf of themselves and on behalf of others similarly situated under Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

142.   The Class that Plaintiff seeks to represent is defined as follows:

> **All persons who purchased Metacards through the date of class certification.**

143.   Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

144.   Plaintiff reserves the right to amend or modify the class definition with greater specificity or division after having an opportunity to conduct discovery.

145.   <u>Numerosity,</u> Fed R. Civ. P. 23(a)(l): Class Members are numerous that joinder of all of them in a single proceeding is impracticable. The exact number of Class Members is unknown to Plaintiff now, but it is reportedly at least 10,000.

146.   <u>Commonality,</u> Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a.   Whether Defendants fraudulently promoted investment products, that did not function as promoted, causing investors/consumers like those in the Putative Class to invest in Metacard NFTs;

b.   Whether Defendants fraudulently promoted future products or services, or futures in products or services—products or services Defendants knew would not exist as promoted or at all—causing consumers like those in the Putative Class to purchase said futures or invest further in Metacard NFTs;

c.   Whether Defendants fraudulently represented their intent to pursue the Metacard benefits Defendants promoted prior to the sale of Metacards;

d.   Whether Defendants violated their agreement(s) to deliver functional products and services and breached their agreement(s);

e.   Whether Defendants knew Metacard projects would not be functional when they claimed they would be or were, and made false representations despite that knowledge;

f.   Whether Defendants had a duty to provide functional products and services to their consumers, and if Defendants violated that duty;

g.   Whether Defendants failed to deliver on its promises to consumers to provide functional products and services;

h.   Whether Defendant made any false representations to their investors or consumers, and whether Defendants knew those representations to be false, or whether those assertions were made recklessly and without adequate investigation of their truth or falsity; and

i.   Whether Defendants received revenues from their fraudulent venture, and the amount of those revenues;

147.   There are questions of law common to the Putative Class and those questions predominate over questions affecting any individual Putative Class Member. Common questions of law include but are not limited to:

a.   Whether Defendants' conduct in (1) making false representations about

Metacard NFTs (2) failing to provide functional Metacard products and services, (3) selling Metacards as investments, and (4) manipulating the Metacard market, constitute acts of fraud;

b.    Whether Defendants' conduct common to the Putative Class has resulted or will result in Defendants being enriched at the expense of Putative Class Members, or in Defendant retaining a benefit to the detriment and loss of Putative Class Members, in frustration of the fundamental principles of justice, equity, and good conscience, and thus constitutes unjust enrichment;

c.    Whether Defendants' conduct common to the Putative Class demonstrates willfulness, malice, or recklessness, or whether Defendants proceeded with conscious disregard for the rights of others, therefore entitling Putative Class Members to punitive damages.

148.    Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of the claims of the Putative Class Members. Plaintiff would only seek individual or actual damages if class certification is denied. In addition, Plaintiff is entitled to relief under the same causes of action and upon the same facts as the other Members of the Putative Class. Plaintiff is advancing the same claims and legal theories on behalf of themselves and all other Class Members, and no defenses are unique to Plaintiff. Plaintiff's claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

149.    Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intend to prosecute this

1  action vigorously.

2      150.  <u>Predominance</u>. Defendant has engaged in a common course of conduct

3  toward Plaintiff and Class Members. The common issues arising from Defendant's

4  conduct affecting Class Members set out above predominate over any individualized

5  issues. Adjudication of these common issues in a single action has important and

6  desirable advantages of judicial economy.

7      151.  <u>Superiority and Manageability,</u> Fed. R. Civ. P. 23(b)(3): Class litigation

8  is an appropriate method for fair and efficient adjudication of the claims involved.

9  Class action treatment is superior to all other available methods for the fair and

10  efficient adjudication of the controversy alleged here; it will permit many Class

11  Members to prosecute their common claims in a single forum simultaneously,

12  efficiently, and without the unnecessary duplication of evidence, effort, and expense

13  that hundreds of individual actions would require. Class action treatment will permit

14  the adjudication of modest claims by certain Class Members, who could not

15  individually afford to litigate a complex claim against large corporations, like

16  Defendants. Further, even for those Class Members who could afford to litigate such

17  a claim, it would still be economically impractical and impose a burden on the courts.

18      152.  The prosecution of separate actions by individual Class Members would

19  create a risk of inconsistent or varying adjudications with respect to individual Class

20  Members, which would establish incompatible standards of conduct for Defendant.

21  In contrast, the conduct of this action as a class action presents far fewer management

22  difficulties, conserves judicial resources and the parties' resources, and protects the

23  rights of each Class member.

24      153.  Defendant has acted on grounds that apply generally to the Class as a

25  whole, so that class certification, injunctive relief, and corresponding declaratory

26  relief are appropriate on a Class-wide basis.

27      154.  Finally, all members of the proposed Class are readily ascertainable.

28  Defendant has access to Class Members' names and addresses.

# VI.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### FRAUD

**(On Behalf of Plaintiff and All Class Members Against All Defendants)**

155.    Plaintiff re-alleges and incorporate the above allegations as if fully set forth herein.

156.    Defendants sold Plaintiff and the Class Members Metacards for $2,300 with false promises as described above to entice them to purchase the cards. At the time of the sale, they had no plans other than to see how much money they could raise from their fan base. Defendants knew they were simply seeking to raise money and not provide anything substantively of value in response. They cloaked the purchase in the terms of an investment with promises of future benefits that Defendants never intended to provide.

157.    At the time they marketed and sold the Metacard NFTs, Defendants knew they would never deliver gyms, casinos, exclusive events, or long-term community benefits. Their plan was always to enrich themselves first, leaving purchasers without the promised goods and services.

158.    On January 21, 2022, just two days after launch, the Metacard treasury held approximately 7,426 ETH (valued at more than $23 million). By January 25, 2022, the balance had fallen to 3,123 ETH. By February 17, 2022, only 2,122 ETH remained. By February 23, 2022, the balance was just 1,540 ETH. By April 11, 2022—less than four months after launch—the treasury had been reduced to 258 ETH.

159.    These rapid outflows demonstrate that Defendants immediately diverted purchaser funds to themselves rather than reserving capital to build lounges, gyms, casinos, merchandise pipelines, or other promised ventures.

160.    Because Defendants drained the treasury at the outset, it was economically impossible to provide the promised goods and services. This was not a later breach of contract; it was fraud at the moment of sale.

161.    Defendants compounded their deception by comparing the Metacard sale to a "stock" or "IPO," assuring consumers that funds would "build and grow the business." In reality, Defendants diverted the money for personal gain, confirming they never intended to use the funds for the promised purposes.

162.    A promise made without intent to perform constitutes fraud.  The rapid diversion of nearly all $23 million raised is objective proof of Defendants' fraudulent state of mind: they never planned to deliver on their promises, and their scheme was always to mislead consumers into parting with their money so Defendants could enrich themselves.

163.    Plaintiff and Class Members relied on Defendants' false representations (they are identified above) and purchased the Metacards, received nothing in value in exchange. This was the Fyre Festival of NFT offers.

164.    Among other representations made by Defendants, Plaintiff and the Class Members relied on Defendants statements that:

a.    the Metacard was not just a piece of art;

b.    the Metacard would give purchasers access to everything that Defendants had at the time of sale and everything that Defendants were going to do in the physical world the digital world and in the metaverse;

c.    Metacard holders would get first and exclusive access to Defendants' projects in the NFT space;

d.    Defendants would collaborate with other entities and that Metacard holders would get first access to those collaborations;

e.    Metacard holders would have first access to Defendants' merchandise going forward;

f.    Defendants were in the process of, and would continue, planning and executing projects, particularly a lounge and gym, with additional plans such as casinos, hotels, and other business in the future, from which Metacard holders would receive benefits and special access;

g.    Defendants would put on exclusive events for Metacard holders;

h.    Metacard holders would have input Defendants' business endeavors;

i.    The purchase price paid by Metacard purchasers would be used to fund the perks, amenities and businesses Defendants promised Metacard purchasers;

j.    Defendants had a team and a budget devoted to fulfilling the promises made to Metacard purchasers.

165.    Defendants knew that these statements were false and that Defendants never intended to pursue businesses or other benefits on behalf of the Class Members. Rather, at all times Defendants' plan was to enrich themselves through the sale of Metacard without providing any meaningful benefit to Metacard purchasers, including Plaintiff and the Class Members.

166.    Plaintiff and the Class Members would not have purchased Metacards had they known of the falsity of Defendants' statements.

167.    Plaintiff's and the Class Members' reliance on Defendants' statements was reasonable. Defendants were uniquely situated to have exclusive knowledge of their plans for supporting and fulfilling promises to the Metacard purchasers that Plaintiff and Class Members could not have known. Plaintiff and the Class members had no reason to believe that Defendants would use the funds raised by the sale of Metacards for any purpose other than providing the services, perks, amenities and opportunities Defendants promised to Metacard purchasers such as Plaintiff and the Putative Class Members.

168.    Defendants' scienter is demonstrated not only by their post-sale abandonment, but by their contemporaneous conduct. At the time they promised gyms, casinos, and "first access" to projects, they planned to divert the raised funds for their own enrichment. The drain of the Metacard treasury—from 7,426 ETH to 258 ETH in under four months—proves that Defendants always intended to pocket the money, making their promises an economic impossibility. On information and belief, the

promised goods and services required tens of millions of dollars, and completely inadequate funds remained after four months.

169.   Plaintiff and the Class Members were damaged as a result of Defendants' intentional misrepresentations in that they purchased Metacards that they would not have purchased but for the misrepresentations.

170.   Defendants' representations that it intended to pursue the Bored Jerky business were false, and Defendants knew they were false in that Defendants never intended to pursue the Bored Jerky business.

171.   Defendants actions were done with malice, oppression and fraud and all acts were ratified by the other Defendants. The foregoing conduct of Defendants: (i) constitutes intentional misrepresentation, deceit, and/or concealment of material facts known to Defendants with the intent on the part of Defendants of depriving Plaintiff and the Class Members of their money and capital, property and legal rights or otherwise causing Plaintiff and the Class Members injury; (ii) was intended by Defendants to cause <u>injury</u> to Plaintiff and the Class Members and/or was despicable conduct that was carried out by Defendants with a willful and conscious disregard of the rights of Plaintiff and the Class Members; and/or (iii) was despicable conduct that subjected Plaintiff and the Class Members to cruel and unusual hardship in conscious disregard of Plaintiff's  and the Class Members' rights so as to justify an award of punitive damages against Defendants pursuant to Cal. *Civ. Code* § 3294.

## SECOND CAUSE OF ACTION

### CALIFORNIA LEGAL REMEDIES ACT

### (On Behalf of Plaintiff and All Class Members Against All Defendants)

172.   Plaintiff re-alleges and incorporate the above allegations as if fully set forth herein.

173.   The California Consumers Legal Remedies Act ("CLRA"), Cal. *Civ. Code* §§ 1770, *et seq.*, was enacted to protect consumers against unfair and deceptive business practices. It creates a non-exclusive statutory remedy for unfair

methods of competition and unfair or deceptive acts or business practices. Its self-declared purpose is to protect consumers against these unfair and deceptive business practices, and to provide efficient and economical procedures to secure such protection. Cal. *Civ. Code* § 1760. The CLRA was designed to be liberally construed and applied in favor of consumers to promote its underlying purposes. *Id*. The CLRA applies to Defendants' acts and practices described herein because it extends to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to Plaintiff and the Class Members.

174.    The Metacards themselves are "goods" or "services" within the meaning of Cal. *Civ. Code* § 1761(a) or (b), and the transactions/agreements are "transactions" within the meaning of Cal. *Civ. Code* § 1761(e).

175.    Plaintiff and the Class Members are each a "consumer" within the meaning of Cal. *Civ. Code* § 1761(d).

176.    Defendants' acts and practices occurred within the process of selling "goods", "services" and/or entering into "transactions.

177.    Defendants had exclusive knowledge of undisclosed material facts, *i.e.* the actual value of the Metacards and their properties, Defendants' intent to utilize funds received from the sale of Metacard to support the benefits Defendants promised, and Defendants' intent to make good faith efforts to delivery the benefits promised, all of which were unknown to Plaintiff or the Class Members.

178.    Defendants engaged in unfair acts and practices by withholding and misrepresenting material facts about the properties of the Metacards they sold Plaintiff and the Class Members.

179.    Defendants' intent is underscored by their pre-sale plan to enrich themselves first. By quickly draining the treasury, Defendants ensured that there would never be sufficient funds to provide the "characteristics, uses, and benefits" they promised under Cal. Civ. Code § 1770(a). Their diversion of funds demonstrates that the goods and services were misrepresented at the time of sale.

180. Plaintiff and the Class Members were not aware of the actual properties of the Metacards at the times of purchase and/or sale.

181. Had Plaintiff and the Class Members known of the properties of the Metacards, they would not have proceeded with purchasing and/or selling them through Defendants.

182. Defendants violated the CLRA by engaging in the above unfair acts and practices, which results in the following violations:

(a)    In violation of § 1770(a)(2), Defendants have misrepresented the source, sponsorship, approval, or certification of goods or services;

(b)    In violation of § 1770(a)(5), Defendants have represented that the Metacards have characteristics, uses and benefits that they do not have;

(c)    In violation of 1770(a)(7), Defendants have represented that the Metacards are of a particular standard, quality or grade when they are not;

(d)    In violation of 1770(a)(9), Defendants have advertised goods or services with intent not to sell them as advertised;

(e)    In violation of 1770(a)(13), Defendants have made false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions;

(f)    In violation of 1770(a)(14), Defendants have made false or misleading statements that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

(g)    In violation of 1770(a)(19), Defendants inserted unconscionable provisions in allegedly binding notices to, if they even apply, including, but not limited to, waiving claims for certain damages, including but not limited to, claims for punitive damages.

183. The actions were done by Defendants with malice, oppression and fraud and all acts were ratified by the other Defendants.

184.    Pursuant to Cal. *Civ. Code* § 1782(d), Plaintiff and the Class Members seek a Court order enjoining the above-described wrongful acts and practices of Defendants and for restitution and disgorgement.

185.    Pursuant to Cal. *Civ. Code* § 1780(d), filed concurrently herewith is an affidavit showing that this action has been commenced in the proper forum.

186.    On or about February 3, 2025, Plaintiff provided Defendants with written notice of his claims, via U.S. certified mail, return receipt requested, and demanded that, within 30 days, Defendants correct, repair, replace or other rectify the acts and practices complained of herein pursuant to Section 1770 of the CLRA. Defendants failed to do so or agree to do so. Therefore, Plaintiff now seeks damages for such deceptive practices pursuant to Cal. *Civ. Code* § 1782.

## THIRD CAUSE OF ACTION

### CIVIL CONSPIRACY

### (On Behalf of Plaintiff and All Class Members Against All Defendants)

187.    Plaintiff re-alleges and incorporate the above allegations as if fully set forth herein.

188.    Defendants agreed and conspired to solicit Plaintiff and those similarly situated to become Metacard purchasers. By engaging in the conduct described more fully above, Defendants acted in concert. Defendants intended and knew that the agreed acts would result in harm to Plaintiff and the Class Members, because they knew the Metacard had no value and did not intend to fulfill their promises related to the Metacard.

189.    Defendants coordinated draining of the treasury within weeks of the sale shows a meeting of the minds to misappropriate consumer funds. Each Defendant participated in diverting the ETH balance for personal gain, ensuring that the venture could never deliver the promised benefits. This coordinated action in furtherance of fraud supports liability for civil conspiracy.

///

190.   Defendants' acts and omissions in furtherance of their conspiracy proximately caused harm and damages to Plaintiff and those similarly situated by inducing them to purchase the Metacard, which served only to financially benefit Defendants. Plaintiff and those similarly situated seek to recover all their actual, direct and consequential damages, general and special damages, and all other penalties for Defendants' conspiracy.

191.   Defendants acted jointly, in concert, or in a conspiracy to commit fraud, and violate the CLRA. Defendants' concerted conduct renders each and all of Defendants jointly and severally liable for Plaintiff and the Class Members' damages.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of himself and the Class described above seek the following relief:

1.  For an Order certifying the Class, and appointing Plaintiff and their Counsel to represent the Class;

2.  For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein;

3.  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendants' wrongful conduct;

4.  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

5.  For an award of punitive damages, as allowable by law;

6.  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

7.  Pre-judgment and post-judgment interest on any amounts awarded; and

8.  Any other relief that this court may deem just and proper.

Dated:  October 7, 2025

**KRISTENSEN LAW GROUP & EKSM, LLP**

_/s/ John P. Kristensen_

John P. Kristensen
Leigh S. Montgomery
Jarrett L. Ellzey
Tommy Kherkher
Josh Sanford

**_Attorneys for Plaintiff and the Putative Class_**

# DEMAND FOR JURY TRIAL

Plaintiff hereby demand a jury trial as to the entire action and all Claims for relief.

Dated:  October 7, 2025

**KRISTENSEN LAW GROUP & EKSM, LLP**

*/s/ John P. Kristensen*

John P. Kristensen
Leigh S. Montgomery
Jarrett L. Ellzey
Tommy Kherkher
Josh Sanford

***Attorneys for Plaintiff and the Putative Class***

## <u>CERTIFICATE OF SERVICE</u>

I certify that on Tuesday, October 7, 2025, a true and correct copy of the attached **SECOND AMENDED COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**, was served via CM/ECF to all participants of record, pursuant to Fed. R. Civ. P. 5:

*/s/ John P. Kristensen*
John P. Kristensen