1  John P. Kristensen (SBN 224132)
2  **KRISTENSEN LAW GROUP**
3  120 Santa Barbara Street, Suite C9
   Santa Barbara, California 93101
4  Telephone: 805-837-2000
   john@kristensen.law
5
6  Jarrett L. Ellzey* (Texas Bar No. 24040864)
   Leigh S. Montgomery* (Texas Bar No. 24052214)
7  Tommy Kherkher* (Texas Bar No. 24113389)
8  **EKSM, LLP**
   4200 Montrose Blvd., Ste. 200
9  Houston, Texas 77006
   Phone: (888) 350-3931
10

11 ATTORNEYS FOR PLAINTIFF AND THE PUTATIVE CLASS
12 (* denotes *pro hac vice*)

13            **THE UNITED STATES DISTRICT COURT**
          **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**
14

15

16 TRENTON SMITH, individually        ) Case No. 8:25-cv-161-FWS-DFM
   and on behalf of all others similarly )
17 situated,                          )
                                      )
18            Plaintiff,              ) **CLASS ACTION**
                                      )
19 vs.                                )
                                      )
20                                    )
21 JOHN SHAHIDI, an individual;       ) **RESPONSE TO DEFENDANTS'**
   NELK, INC. dba NELK, FULL          ) **MOTION TO DISMISS SECOND**
22 SEND, a Canadian Company,          ) **AMENDED CLASS ACTION**
   METACARD, LLC, a Delaware          ) **COMPLAINT FOR DAMAGES**
23 Limited Liability Company; NELK    )
24 USA, INC., a Delaware Corporation; )
   KYLE FORGEARD, an individual,      )
25                                    )
26            Defendants.             )
                                      )
27 _____)

28

---

PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT
- 1 -

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................ - 1 -

II.    PROCEDURAL HISTORY ............................................................... - 2 -

III.    STANDARD OF REVIEW ............................................................... - 4 -

IV.    ARGUMENT .................................................................................... - 4 -

   ***A.    The SAC Adequately Alleges Scienter and Negligence*** ............... - 4 -

   ***B.    Plaintiff Alleged Reliance on False Statements for Second Metacard.*** ..... - 10 -

   ***C.    Plaintiff Adequately Alleged CLRA and Civil Conspiracy.*** ....................... - 11 -

   ***D.    Plaintiff's Claims Are Not Barred By Defendants' Refund Offer.*** ........... - 13 -

   ***E.    The SAC Should Not Be Dismissed with Prejudice*** ................................... - 14 -

V.    ALTERNATIVE REQUEST FOR OPPORTUNITY TO AMEND ............... - 14 -

VI.    CONCLUSION ......................................................................................... - 15 -

## TABLE OF AUTHORITIES

**Cases**

*Barker ex rel. U.S. v. Columbus Reg'l Healthcare Sys., Inc.*, 977 F.Supp.2d 1341
(M.D. Ga. 2013) ................................................................................................. - 4 -

*Coronis Health RCM LLC v. NextGen Lab'ys, Inc*., No. 823CV00111FWSDFM,
2023 WL 8522983 (C.D. Cal. Oct. 23, 2023) ................................................... - 11 -

*DCD Programs, Ltd. v. Leighton*, 833 F.2d 183 (9th Cir. 1987) .......................... - 18 -

*EVO Brands, LLC v. Al Khalifa Grp. LLC*, 657 F. Supp. 3d 131 (C.D. Cal. 2023) - 3 -,
- 17 -

*Gray v. JPMorgan Chase Bank, N.A.*, 661 F. Supp. 3d 991 (C.D. Cal. 2023) ........ - 3 -

*Guzman v. Polaris Industries Inc.*, 49 F.4th 1308 (9th Cir. 2022) ........................ - 15 -

*Harris v. PFI W. Stores*, 2020 WL 3965022 (C.D. Cal. Apr. 9, 2020) .................. - 17 -

*Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 47 Cal. Rptr. 2d 752
(1995) ................................................................................................................ - 16 -

*Michelson v. Hamada*, 29 Cal. App. 4th 1566, 36 Cal. Rptr. 2d 343 (1994) ......... - 14 -

*Oakland Raiders v. Nat'l Football League*, 131 Cal. App. 4th 621, 32 Cal. Rptr. 3d
266 (2005) ......................................................................................................... - 13 -

*Petersen v. Allstate Indem. Co*., 281 F.R.D. 413 (C.D. Cal. 2012) ....................... - 11 -

*Silver v. BA Sports Nutrition, LLC*, 2020 WL 2992873 (N.D. Cal. June 4, 2020) - 10 -

*Sonner v. Premier Nutrition Corp.*, 49 F.4th 1300 (9th Cir. 2022) ....................... - 15 -

*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) ........................ - 15 -

*Tenzer v. Superscope, Inc*., 39 Cal.3d 18, 216 Cal.Rptr. 130, 702 P.2d 212 (1985) - 11
-

*Toyo Tire Holdings of Americas Inc. v. Ameri & Partners, Inc*., 753 F. Supp. 3d 966
(C.D. Cal. 2024) ............................................................................................... - 10 -

*Wolf v. Superior Ct*., 107 Cal. App. 4th 25, 130 Cal. Rptr. 2d 860 (2003) ............ - 13 -

**Statutes**

Cal. *Bus.* & Prof. Code §§ 17000, *et seq*. ............................................................ - 15 -

Cal. Civ. Code § 2295 ......................................................................... - 14 -

Fed. R. Civ. P. 9(b) ........................................................................... - 11 -

**Rules**

Fed. R. Civ. P. 12(b)(6)...................................................- 3 -, - 17 -

## I.  <u>INTRODUCTION</u>

Defendants' motion tries to turn a calculated fraud into a story about "business operations." It fails because the facts, and the blockchain, say otherwise. Defendants promised consumers that purchasing a $2,300 Metacard NFT was an investment in the Full Send and Happy Dad ecosystem, offering "exclusive access" to gyms, casinos, and future ventures that the raised funds would build. But within weeks of collecting more than $23 million in Ethereum from those same consumers, Defendants drained nearly every dollar from the treasury to benefit the principals personally as well as their other entities. They reduced the balance from 7,426 ETH on January 21, 2022, to 258 ETH by April 11, 2022, before delivering a single promised product, opening a single gym, or holding a single event.

Defendants now insist that these transfers merely reflect the "conversion of cryptocurrency to cash to operate the business." Plaintiffs do not dispute that legitimate companies convert crypto to fiat currency to pay expenses. What they dispute, and what the SAC pleads in granular detail, is that no legitimate company liquidates nearly its entire capital base within days of a fundraising deadline, transfers those funds to personal wallets, and produces nothing in return. Tellingly, Defendants identify no centralized business account reserved for Metacard, LLC and the promised projects, no trace of operating expenditures, and no corresponding investment in the gyms, casinos, or events Defendants promised. A genuine business would have converted funds gradually, in tranches aligned with project budgets and operational needs. Instead, Defendants cashed out almost immediately and paid themselves and funded their other businesses. This conduct demonstrates *scienter*—intent to defraud—not routine cash management. *See Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 30 (1985).

Defendants' "refund offer" argument fares no better. Their belated rescission ploy, posted fleetingly on social media long after the money was gone, is not a defense to fraud—it is an admission of it. Plaintiff's acknowledgment of seeing that offer does not negate reliance or damages; it underscores that Defendants were scrambling to

1  sanitize a fraud already complete. The offer was temporary, limited, and conditioned
2  on signing away legal rights. Under *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153
3  (2016), an unaccepted refund offer cannot moot a live controversy, and it certainly
4  cannot erase liability for a completed scheme.

5      Defendants' offhand insinuation that Plaintiff's counsel, rather than Plaintiff, is
6  manipulating this litigation is an irresponsible attack, unsupported by evidence, and
7  contrary to professional norms. The episode reflects nothing more than the kind of
8  miscommunication that occurs when non-lawyers, unversed in the nuances of legal
9  drafting, try to recall details from memory. Plaintiffs' counsel immediately clarified
10 and corrected the record, fulfilling their professional and ethical obligations—hardly
11 the scandal Defendants slide into the conversation like unseemly neighborhood gossip.

12     The Second Amended Complaint cures every defect identified in the Court's
13 prior order. It alleges specific misrepresentations with the "who, what, when, where,
14 and how" required by Rule 9(b). It pleads contemporaneous evidence of fraudulent
15 intent, proven by immutable blockchain data showing rapid self-enrichment and
16 economic impossibility. It limits the CLRA claim to damages, not equitable relief,
17 addressing *Sonner*. And it ties reliance and damages directly to those
18 misrepresentations.

19     At bottom, Defendants want this Court to infer good faith from a record that
20 screams bad faith. But Rule 12(b)(6) requires all reasonable inferences to favor the
21 Plaintiff, not the Defendants. When those inferences are drawn, the conclusion is
22 inescapable: Defendants' "business" was never about building anything for their
23 consumers—it was about enriching themselves. Their motion should be denied.

24 **II.    <u>PROCEDURAL HISTORY</u>**

25     On May 21, 2025, Plaintiffs Trenton Smith and Michael Burrow filed their First
26 Amended Class Action Complaint ("First Amended Complaint" or "FAC") (ECF No.
27 57). The parties eventually stipulated to the dismissal of Plaintiff Michael Burrow
28 (ECF No. 70), and on July 10, 2025, Defendants filed a Motion to Dismiss First

1   Amended Class Action Complaint ("Motion to Dismiss FAC") (ECF No. 68). On
2   September 16, 2025, the Court entered an Order Granting Defendant's Motion to
3   Dismiss Plaintiff's First Amended Class Acton Complaint (ECF No. 74) ("FAC
4   Order").

5       Although ultimately dismissing the claims stated in the First Amended
6   Complaint, the FAC Order identified areas of Plaintiff's claims where Plaintiff had
7   made adequate allegations, as well as those areas where Plaintiff's allegations fell
8   short. Particularly, with respect to Plaintiff's claim of fraud, the Court held that
9   "Plaintiff adequately allege[d] promised benefits that were not conferred," but
10  "fail[ed] to sufficiently allege Defendants intended to defraud Plaintiff at the time the
11  promises were made." FAC Order, p. 9–10. With respect to Plaintiff's CLRA claim,
12  the Court determined that "Plaintiff fail[ed] to demonstrate how legal remedies are
13  inadequate or how injunctive relief is necessary to prevent a threat of future injury that
14  is actual or imminent." *Id*. p. 13. In addition, the Court determined that Plaintiff's civil
15  conspiracy claim was inadequately alleged due to failure of the underlying fraud claim
16  as well as failure to allege "when or where the conspiracy was formed or how it was
17  carried out by specific Defendants." *Id*. p. 13–14.

18      On October 7, 2025, Plaintiff Trenton Smith filed his Second Amended
19  Complaint for Damages ("Second Amended Complaint" or "SAC") (ECF No. 80).
20  The Second Amended Complaint cures the defects identified by the Court, adding
21  context to Defendants' fraudulent scheme that reflects the intentional nature of
22  Defendants' effort to fleece fans and enrich themselves. On October 21, 2025,
23  Defendants filed their Motion to Dismiss SAC (ECF No. 89) requesting dismissal of
24  the Second Amended Complaint. Defendants' request should be denied because
25  Plaintiff has adequately alleged his claims against Defendants.

26      The Court is familiar with the factual background of this case through previous
27  briefing, including Defendants' Motion to Dismiss FAC (ECF No. 68) and Plaintiff's
28  Response thereto (ECF No. 69), but Plaintiff will address the newly asserted facts as

they are relevant to each claim in Plaintiff's arguments below.

## III.  STANDARD OF REVIEW

"When ruling on a Rule 12(b)(6) motion, 'a judge must accept as true all of the factual allegations contained in the complaint.'" *EVO Brands, LLC v. Al Khalifa Grp. LLC*, 657 F. Supp. 3d 1312, 1320 (C.D. Cal. 2023). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must "state a claim to relief that is plausible on its face," meaning that the complaint must contain sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gray v. JPMorgan Chase Bank, N.A.*, 661 F. Supp. 3d 991, 994 (C.D. Cal. 2023), *aff'd*, No. 23-55318, 2024 WL 1342619 (9th Cir. Mar. 29, 2024). Deciding whether to dismiss a complaint on a Rule 12(b)(6) motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Despite these standards, Defendants ignore and discard the clear allegations in the operative Complaint, attempt to downplay the significance of those allegations, and ask the Court to improperly draw inferences from those allegations in Defendant's favor.

## IV.  ARGUMENT

Defendant's Motion to Dismiss SAC should be denied because, as discussed fully below, Plaintiff has adequately alleged each cause of action against Defendants.

### A.  *The SAC Adequately Alleges Scienter and Negligence*

Defendants argue that Plaintiff failed to adequately allege scienter or negligence. In doing so, Defendants tell this Court that the only new allegation addressing scienter is that Defendants transferred proceeds out of the cryptocurrency wallet used for the initial sales. SAC ¶¶ 158–62. Defendants' argument rests on an oversimplification of Plaintiff's allegations and strained application of governing standards. Accepting Plaintiff's allegations as true, and drawing reasonable inferences in Plaintiff's favor, Plaintiff has established a basis for finding Defendants had the

1    requisite scienter for purposes of Plaintiff's fraud claim. The entirety of the

2    circumstances alleged by Plaintiff support Plaintiff's claim that Metacard was nothing

3    but a scheme developed by Defendants to pad their own pockets without delivering on

4    any of the promises made prior to the sale.

5        Courts have been clear that "allegations of 'nonperformance' alone are not

6    enough to prove the defendant's intent to not perform;" however, courts are equally

7    clear that intent may be inferred even from *subsequent* conduct and other

8    circumstances." *Petersen v. Allstate Indem. Co*., 281 F.R.D. 413, 419–20 (C.D. Cal.

9    2012) (citing *Tenzer v. Superscope, Inc*., 39 Cal.3d 18, 30, 216 Cal.Rptr. 130, 702 P.2d

10   212 (1985)). Indeed, "fraudulent intent must often be established by circumstantial

11   evidence." *Tenzer*, 39 Cal.3d at 30, 216 Cal.Rptr. 130, 702 P.2d at 219; *See also*

12   *Master Replicas, Inc. v. Levitation Arts, Inc*, No. CV081846DOCMLGX, 2008 WL

13   11340280, at *3 (C.D. Cal. Sept. 4, 2008) ("Indeed, '[a] plaintiff can prove fraudulent

14   intent by circumstantial evidence and a trier of fact may infer such intent given the

15   circumstances surrounding contract formation.'") (citing *Hsu v. OZ Optics Limited*,

16   211 F.R.D. 615, 620 (N.D. Cal. 2002)); *In re Barrack*, 217 B.R. 598, 607 (B.A.P. 9th

17   Cir. 1998) ("Fraudulent intent may be established by circumstantial evidence, or by

18   inferences drawn from a course of conduct.") (citing *In re Devers,* 759 F.2d 751, 753–

19   54 (9th Cir.1985)). Circumstantial evidence is often necessary because a plaintiff

20   "cannot be required to know and, thus, plead, the thoughts of" a defendant at the time

21   a fraudulent statement is made. *Master Replicas, Inc.*, 2008 WL 11340280, at *3.

22       The types of allegations that constitute circumstantial evidence in support

23   scienter are legion. Examples of circumstantial evidence to support an inference that

24   a defendant never intended to keep a promise include "defendant's insolvency, his

25   hasty repudiation of the promise, his failure even to attempt performance, or his

26   continued assurances after it was clear he would not perform." *Petersen*, 281 F.R.D.

27   at 420. The Second Amended Complaint has failure to attempt performance, continued

28   assurance after it was clear Defendant would not perform, insolvency by removing the

income from the project immediately.  In the context of tax fraud, "[b]adges of fraud include understatements of income, failure to maintain adequate records, implausible or inconsistent explanations of behavior, concealment of assets, and failure to cooperate with tax authorities." *Alexander Shokai, Inc. v. Comm'r*, 34 F.3d 1480, 1487 (9th Cir. 1994). In the context of fraudulently obtained loans, courts may look to debtors' statements concerning their financial condition and ability to pay. *In re Barrack*, 217 B.R. 598, 607 (B.A.P. 9th Cir. 1998). Indeed, the making of a promise with knowledge that performance would be impossible is also evidence of fraudulent intent. *Id.* (citing *In re Lee*, 186 B.R. 695, 699 (9th Cir. BAP 1995)). Even the shortness of the time span between the making of a fraudulent statement and the revelation of the truth may serve as evidence that a defendant did not intend to honor the promise made. *Canard v. Bricker*, No. 14-CV-04986-JSC, 2015 WL 1967943, at *3 (N.D. Cal. Apr. 30, 2015).

In *Petersen*, an insurer's "misrepresentation as to its willingness to perform under its policy [was] shown by the facts in the Complaint indicating [the insurer's] eagerness to cease costly performance based on minimal evidence that its obligation had ended." *Id*. The insurer had initially covered the claim but suddenly ceased coverage only *after* it became clear that further performance would be "very costly." *Id*. The court held that this supported the inference that the "initial promise of coverage was made without intent to perform," as did the insurer's failure to provide a "more substantial explanation for its denial of coverage." *Id*. at 420–21.

*Petersen* relied on *Wetherbee v. United Ins. Co. of Am*., in which an insurer's "eagerness to seize upon the admission by plaintiff's doctor as a ground for cancellation of plaintiff's benefits furnishes ample support for a finding that it never intended to fulfill ... the representations in ... policies." *Id*. at 420 (citing 265 Cal.App.2d 921, 932, 71 Cal.Rptr. 764 (1968)) (editing marks in original). In denying the defendant's motion to dismiss, the *Petersen* court emphasized that the plaintiff's complaint alleged "facts regarding *the manner* in which Defendant ceased to perform

1  and these facts support an inference that Defendant did not intend to perform when it

2  issued its policy." *Id*. at 422 (emphasis added).

3      In sum, circumstantial evidence sufficient to support an inference of fraudulent

4  intent comes in a wide variety of forms. In the current case, Plaintiff has made

5  allegations that support an inference of fraudulent intent. New to Plaintiff's SAC are

6  allegations that Defendants rapidly transferred the earnings of the Metacard sale to

7  themselves. Specifically, Plaintiff alleges that immediately after the sale of the

8  Metacard, the value of the Metacard treasury wallet was 7,426 ETH,[1] worth roughly

9  $23 million. SAC ¶ 13. By April 11, 2022, a mere eleven weeks after the sale, the

10  value was 258 ETH, representing a loss of 96.5% of the value. *Id*. ¶¶ 13, 14, 85.

11  Defendants pocketed these proceeds. *Id*.

12      Even while draining the funds earned from the Metacard sale, Defendants

13  continued to "hype" the Metacard for Defendants' own sole benefit. Specifically,

14  Defendants had embedded a "smart contract" (a self-executing code that governs the

15  rules of the NFT blockchain) in the Metacard NFT code that funneled to Defendants

16  ten percent of the royalties from post-sale transfers of the Metacard. *Id*. ¶¶ 7, 9–11. In

17  other words, Defendants stood to earn even more money through post-sale transfers of

18  the Metacard, thus incentivizing Defendants to continue the charade of the benefits

19  available through the Metacard for as long as possible. *Id*. ¶¶ 11, 14. Through this

20  smart contract, Defendants earned an additional $4.3 million over the next two years.

21  *Id*. ¶¶ 11, 14, 63, 72. Plaintiff was taken in by Defendant's hype and made a second

22  Metacard purchase on the secondary market in the amount of $3,543.03 on March 31,

23  2022. *Id*. ¶¶ 134, 135.

24  ///

25  ///

26

27  [1] "ETH" is an abbreviation of "Ether," which is the native cryptocurrency of
Ethereum. SAC ¶ 8. Ethereum is a decentralized, open-source blockchain platform that

28  enables peer-to-peer transactions and the execution of self-enforcing "smart contracts."
*Id*. ETH is used to pay for transaction fees, power smart contract operations, and act as
a medium of exchange and value within the Ethereum ecosystem. *Id*.

1    Despite demands from Metacard holders, Defendants have provided no
2    explanation for what they accomplished with the initial $23 million earned from the
3    Metacard sale or the additional $4.3 earned from secondary market sales. *Id*. ¶¶ 81,
4    98. Defendants' rapid depletion of 95% of the value of the Metacard treasury wallet
5    with nothing of value to show for it and no explanation of how the funds were spent
6    supports a finding of scienter. *See e.g.*, *Petersen*, 281 F.R.D. at 420 ("Further,
7    Defendant's misrepresentation of its intent to perform is shown by its alleged failure
8    to pay a covered claim and failure to provide a more substantiated explanation for its
9    denial of coverage."). The same is true for Defendants' rapid depletion of the Metacard
10   treasury wallet executed contemporaneously with continued assurances that the
11   promises of the Metacard would be delivered. *Tenzer*, 39 Cal.3d at 30, 216 Cal.Rptr.
12   130, 702 P.2d at 219 (recognizing that intent may be inferred from a defendant's
13   "continued assurances after it was clear he would not perform").

14       Moreover, Plaintiff's additional allegations are not to be read in a vacuum—
15   they add context to Plaintiff's allegations carried over from the First Amended
16   Complaint. For example, as Plaintiff alleged in the First Amended Complaint, on April
17   5, 2022, eleven weeks after the sale of the Metacard, Defendants announced they were
18   "working on something huge" and "very financially beneficial for the holders."
19   SAC ¶ 72. But by April 11, 2022, the Metacard treasury wallet had been depleted from
20   its initial high in January of 2022, of 7,426 ETH, to 258 ETH. *Id*. ¶ 85. As noted above,
21   Defendants were incentivized to make fraudulent representations regarding the
22   Metacard even after the sale in order to encourage secondary market sales of the
23   Metacard due to the royalty clause embedded in the Metacard, which ultimately earned
24   Defendants an additional $4.3 million. *Id*. ¶¶ 7, 9–11, 14, 81, 98.

25       The transfer of the funds reduced the value of the Metacard treasury wallet by
26   96.5%, leaving no meaningful funds available for Defendants to execute any of its
27   promised ventures, such as gyms and casinos. *Id*. ¶¶ 85, 86. In the absence of sufficient
28   funds, the benefits Defendants promised—promises made both prior to and after the

Metacard sale—became economically impossible. *Id.* ¶¶ 13, 87. Yet, Defendant continued to make promises regarding the Metacard's benefits for another two years despite the economic impossibility of delivering on those promises. *Id.* ¶¶ 14, 56.

Defendants argue that "[m]oving funds to operate the program, pay expenses, and fund benefits Plaintiff admits were delivered is how businesses function, not evidence that any promise was fraudulent." Motion to Dismiss SAC, p. 1. There is a lot wrong with this argument. For starters, Plaintiff's allegations establish that any "benefits" provided by Defendant were nominal and not reflective of the $23 million raised by the Metacard sale. SAC ¶ 12. The alleged "benefits" included a live event at which Snoop Dogg performed that was attended by only 300 of the 7,000 Metacard holders (*Id.* ¶ 65); a few private watch parties attended by a fraction of the Metacard community (*Id.* ¶ 58); a 50% off coupon for Full Send branded supplements (*Id.* ¶ 73); and illegal lotteries disguised as raffle events (*Id.* ¶ 75). Defendants were well aware that the benefits provided were insufficient, as evidenced by Defendants' continued promises to deliver something of value to Plaintiff. *Id.* ¶¶ 66, 67, 70–72, 76–78. If Defendants' explanation were genuine, one would expect them to specify that the funds were deposited into a *Metacard, LLC* operating account. Instead, they refer vaguely to "an operating account," a phrase that could encompass any number of their related ventures. Their reluctance to identify the account speaks volumes.

More importantly, Plaintiff has not alleged that the transfer of funds was for purposes of operating the program and paying expenses. Plaintiff has alleged that Defendants pocketed the funds themselves. Defendants' argument that the funds *could have* been used to operate the business requires the Court to improperly draw an inference in Defendants' favor, when the Court is required to draw all reasonable inferences in Plaintiff's favor. *Canard*, 2015 WL 1967943, at *4 (rejecting defendant's argument that the facts in the complaint also support a non-fraudulent explanation because drawing inferences in the defendant's favor "flip[s] the 12(b)(6) standard on its head").

1  Defendants want this Court to draw the inference that the $23 million was spent
2  on business "expenses" and "benefits." But this conclusion is inconsistent with
3  Plaintiff's allegations that Defendants drained 95% of $23 million within three months
4  of the sale of the Metacard (SAC ¶¶ 13, 14, 85) and then spent the next two years
5  teasing that they were working on projects that never materialized (SAC ¶¶ 66, 72, 76,
6  77, 106), only to deliver "phantom" shares of Bored Jerky, which was nothing more
7  than a rebranding of a pre-existing beef jerky company and which required Metacard
8  holders to produce new customers and failed miserably (SAC ¶¶ 79, 112–16, 126–28).
9  The only inferences to be drawn from these allegations are that Metacard was a
10 fraudulent scheme since its inception; Metacards have at all times been patently
11 worthless; and that no investor would have purchased any Metacards absent
12 Defendants' fraudulent statements and acts. SAC ¶ 104. At every turn, Defendants
13 made promises and representations they never kept, which is strong support for
14 Plaintiff's claim that Defendants acted with intent to defraud Plaintiff at the initial
15 rollout of the Metacard.

16    In short, Plaintiff does not rely on allegations of Defendant's nonperformance
17 alone. Rather, as permitted under *Petersen* and *Tenzer*, Plaintiff provides substantial
18 amounts of circumstantial evidence that provides context to Plaintiff's fraud claim and
19 allows the Court to draw the reasonable, if not only, inference that Defendants did not
20 intend to perform at the time the promises were made. Therefore, Plaintiff's fraud
21 claim should not be dismissed.

22    **B.    *Plaintiff Alleged Reliance on False Statements for Second Metacard.***

23    While recognizing that the Court already ruled on falsity and reliance as to the
24 pre-sale statements, Defendants argue that Plaintiff failed to allege falsity or reliance
25 on related to his second Metacard purchase on March 31, 2022. In making this
26 argument, Defendants essentially ask the Court to view the second purchase in a
27 vacuum, treating only statements made after the initial Metacard offering as being
28 relevant to Plaintiff's decision to purchase a second Metacard. But this isolated lens

ignores the context of the first purchase and the cumulative impact of Defendants' pre-
and post-sale statements. Defendants' arguments should be rejected.

Plaintiff alleged that on March 31, 2022, he made a second Metacard purchase
for $3,543.03 "after reviewing, accepting and relying on the misrepresentation by
Defendants." SAC ¶ 134. There is no indication that Plaintiff's decision to purchase a
second Metacard was based solely on statements made by Defendants after the initial
sale, particularly since Defendants' post-sale statements were largely continuations of
Defendants' initial promises. Defendants' arguments that there must be some
independent reliance for Plaintiff to have made a second Metacard purchase is
illogical, particularly in light of this Court's finding that Plaintiff already established
reliance. FAC Order, p. 10.

All of that being said, it is worth noting that between Plaintiff's first and second
Metacard purchases. Specifically, in March of 2022, Defendant Forgeard announced
that Full Send would open a sports bar with well-known Miami restauranteur Dave
Grutman, who Forgeard claimed owned the rarest of Metacards, a "cyber red"
Metacard. SAC ¶ 166. But the sports bar never opened. *Id.*

### C.    *Plaintiff Adequately Alleged CLRA and Civil Conspiracy.*

Plaintiff stands on his arguments made in his Response to Defendant's Motion
to Dismiss FAC (ECF No. 69) with respect to his California Legal Remedies Act
(CLRA) claim. The SAC clearly states that notice was sent, that Defendants refused
to fix the problem as requested, and Plaintiff now seeks damages. Although this Court
noted its disagreement in its FAC Order, Plaintiff contends that his CLRA claim is
explicitly permitted by the Ninth Circuit decisions in *Sonner v. Premier Nutrition
Corp.*, 971 F.3d 834 (9th Cir. 2020) ("*Sonner I*"), *Guzman v. Polaris Industries Inc.*,
49 F.4th 1308 (9th Cir. 2022) ("*Guzman*")[2], and *Sonner v. Premier Nutrition Corp.*,

---

[2] Counsel for Plaintiff, John Kristensen, is lead counsel in *Guzman*, which was certified and is awaiting
ruling on Plaintiff's motion for partial summary judgment, of the sole cause of action, damages under the
CLRA.

49 F.4th 1300, 1304-05 (9th Cir. 2022) ("*Sonner II*"). Plaintiff's CLRA claim seeks damages, not injunctive relief. The Court in *Guzman* struck the Unfair Competition Law ("UCL") claim with prejudice, not the CLRA claim. The Ninth Circuit held that the district court could only dismiss without prejudice, if it never had jurisdiction of the claim.

Plaintiff has also adequately alleged his civil conspiracy claim. In its FAC Order, the Court stated that its first basis for dismissing Plaintiff's civil conspiracy claim was that the underlying claims failed. As fully set forth above, Plaintiff has now adequately alleged his claims, thus removing this barrier.

Second, Plaintiff has alleged facts that support his civil conspiracy claim. Civil conspiracy requires proof of three elements: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581, 47 Cal. Rptr. 2d 752, 757 (1995). Civil conspiracy allowed liability to be imposed "on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Id*. A civil conspiracy is fundamentally the "formation of a group of two or more persons who have agreed to a common plan or design to commit a tortious act." *Id*. 40 Cal. App. at 1582, 47 Cal. Rptr. 2d at 758.

In its FAC Order, the Court determined that Plaintiff failed to sufficiently allege "when or where the conspiracy was formed or how it was carried out by specific Defendants." FAC Order, p. 14. However, Plaintiff's Second Amended Complaint includes allegations that Defendants coordinated draining of the Metacard treasury within weeks of the sale, which shows a meeting of the minds to misappropriate consumer funds. SAC ¶ 13, 14, 85, 189. Each Defendant participated in diverting the ETH balance for personal gain, ensuring that the venture could never deliver the promised benefits. *Id*. This coordinated action in furtherance of fraud supports liability for civil conspiracy. *Id*. At the same time, Defendants continued their messaging to

maintain the value of the Metacard, particularly in the months after the sale of the
Metacard (*Id.* ¶¶ 14, 56, 66, 72, 76, 77, 85–87, 106, 166), with the goal of maintaining
the inflated value of the card in order to earn substantial post-sale royalties (*Id.* ¶¶ 7,
9–11, 14, 63, 72). This scheme could not have occurred but for the coordinated efforts
of Defendants, who knowingly capitalized on their pre-existing fame to make promises
to their fan base to sell a worthless NFT.

Accordingly, Plaintiff has adequately alleged each element of a civil conspiracy,
and Defendants' request for dismissal should be denied.

### D.    *Plaintiff's Claims Are Not Barred by Defendants' Refund Offer.*

Defendants incorrectly argue that Plaintiff's claims are barred by Defendants'
refund offer because Plaintiff alleged that he received the Defendants' communication
regarding the refund offer but declined to participate. SAC ¶ 137. Plaintiff made the
decision because he found the options presented by Defendants unacceptable and
continued to hold out hope the Metacard project would come to life. *Id.*

Defendants mischaracterize the Court's rejection of Defendants' request for
dismissal due to the rescission offer as being wholly based on Plaintiff's failure to
receive the offer. However, the Court was clear that the rejection was also based on
Plaintiff's decision to seek damages beyond what Defendants' rescission offer
included. FAC Order p. 6 (*In re MacBook Keyboard Litig.*, 2019 WL 6465285, at *8
(N.D. Cal. Dec. 2, 2019) (finding that defendant's repair program does not moot
plaintiffs' claims because they seek relief beyond what the program offered); *Fischer
v. Comfrt LLC*, 2025 WL 1827769, at *8 (C.D. Cal. June 30, 2025) (finding that an
email and letter offering monetary relief was insufficient to demonstrate plaintiff's
claim was moot because there is no evidence that the refund offer was accepted);
*Overton v. Bird Brain, Inc.*, 2012 WL 909295, at *4 (C.D. Cal. Mar. 15, 2012)
(declining to determine whether plaintiff's claims are mooted by a recall and refund
program at the motion to dismiss stage)).

///

1   While the change in allegations regarding Plaintiff's receipt of the offer is
2   unfortunate, Plaintiff still seeks relief beyond what Defendants' rescission offer
3   included, especially since Plaintiff paid $3,543.03 for the second Metacard on March
4   31, 2022. SAC ¶ 134. Defendants benefitted financially from Plaintiff's purchase of a
5   second Metacard through Defendants' 10% royalty clause. *Id*. ¶ 11. Plaintiff's
6   purchase of a second Metacard was made in reliance on Defendants' statements
7   regarding the benefits of owning a Metacard. *Id*. ¶ 134. However, Defendants only
8   offered $2,300.00 per Metacard—more than $1,200.00 less than what Plaintiff paid.
9   *Id*. ¶ 119. Accordingly, Defendants' rescission offer did not make Plaintiff whole and
10  Defendants' request for dismissal on this basis should be denied. *See Long v. Graco*
11  *Children's Prods, Inc*., No. 13-CV-01257-JD, 2014 WL 7204652, at *4 (N.D. Cal.
12  Dec. 17, 2014) (denying motion to dismiss where the evidence did not reflect an offer
13  of full refund by defendant).

14  **E.    The SAC Should Not Be Dismissed with Prejudice**

15  Based on the above, Plaintiff's Second Amended Complaint should not be
16  dismissed.

17  **V.    ALTERNATIVE REQUEST FOR OPPORTUNITY TO AMEND**

18  Although Plaintiff has demonstrated above that his Second Amended Complaint
19  adequately alleges each cause of action raised, if this Court should disagree then
20  Plaintiff requests that any dismissal be without prejudice to Plaintiff's opportunity to
21  re-plead and amend. This is particularly so with respect to Plaintiff's civil conspiracy
22  claim, which, given the secretive nature of a civil conspiracy, may ultimately be
23  support by facts realized through the discovery process.

24  "If a court determines that a complaint should be dismissed, it must then decide
25  whether to grant leave to amend." *EVO Brands, LLC v. Al Khalifa Grp. LLC*, 657 F.
26  Supp. 3d 1312, 1320 (C.D. Cal. 2023). Federal Rule of Civil Procedure 15(a)(2) is
27  clear that leave to amend a complaint should be freely given when justice so requires.
28  *Id*. In fact, a district court that decides to dismiss a complaint under Rule 12(b)(6)

1  "should grant leave to amend even if no request to amend the pleading was made,

2  unless it determines that the pleading could not possibly be cured by the allegation of

3  other facts." *Id.* "Leave to amend generally shall be denied only if allowing

4  amendment would unduly prejudice the opposing party, cause undue delay, or be

5  futile, or if the moving party has acted in bad faith." *Id.* In addition, the Court should

6  take into consideration the underlying purpose of Rule 15, which is "to facilitate

7  decision on the merits rather than on the pleadings or technicalities." *DCD Programs,*

8  *Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987).

9       This case is in its early stages, so Defendants will not be prejudiced by the

10  amendment. Further, Plaintiff seeks to amend in good faith in order to make additional

11  allegations intended to address any shortcomings identified by the Court. Accordingly,

12  leave to amend should be granted.

13  **VI.    CONCLUSION**

14       The Second Amended Complaint pleads a clear, fact-based fraud. Blockchain

15  data shows that Defendants raised over $23 million in Ethereum and drained nearly all

16  of it within weeks—before producing a single promised gym, casino, or event.

17  Defendants offer no verified record that these funds were ever held in a legitimate

18  operating account or used for genuine business purposes. Their after-the-fact "refund

19  offer" cannot erase that conduct or moot live claims.

20       Having now alleged the who, what, when, where, and how of Defendants'

21  misrepresentations and intent, Plaintiffs have cured every deficiency the Court

22  previously identified. Accepting those allegations as true, the only plausible inference

23  is that Defendants intended to enrich themselves, not to deliver the promised benefits.

24  ///

25  ///

26  ///

27  ///

28  ///

1       For these reasons, Plaintiff respectfully requests that the Court deny Defendants'

2  Motion to Dismiss in its entirety, or alternatively grant leave to amend.

3

4  Dated:       October 30, 2025            Respectfully Submitted,

5

6                           **KRISTENSEN LAW GROUP & EKSM, LLP**

7                           */s/ John P. Kristensen*

8                           John P. Kristensen

9                           Leigh S. Montgomery*

10                         Jarrett L. Ellzey*

11                         Tommy Kherkher*

12                         Josh Sanford*

13                        ***Attorneys for Plaintiff***

14                         *(pro hac vice)*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>**CERTIFICATE OF SERVICE**</u>

2      I hereby certify that on October 30, 2025, I electronically filed a true and correct

3  copy of the foregoing document with the Clerk of the Court using the CM/ECF system,

4  which will send notification of such filing to all counsel of record.

5

6

7                                        */s/ John P. Kristensen*
                                          John P. Kristensen

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28