1  John P. Kristensen (SBN 224132)
2  **KRISTENSEN LAW GROUP**
   120 Santa Barbara Street, Suite C9
3  Santa Barbara, California 93101
   Telephone: 805-837-2000
4  john@kristensen.law
5
6  Jarrett L. Ellzey* (Texas Bar No. 24040864)
   Leigh S. Montgomery* (Texas Bar No. 24052214)
7  Tommy Kherkher* (Texas Bar No. 24113389)
8  **EKSM, LLP**
   4200 Montrose Blvd., Ste. 200
9  Houston, Texas 77006
   Phone: (888) 350-3931
10
11 ATTORNEYS FOR PLAINTIFF AND THE PUTATIVE CLASS
12 (* denotes *pro hac vice* forthcoming)

13 **THE UNITED STATES DISTRICT COURT**
14 **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

15

16 TRENTON SMITH, individually      ) Case No. 8:25-cv-161-FWS-DFM
   and on behalf of all others similarly )
17 situated,                        )
                                    )
18            Plaintiff,            ) **CLASS ACTION**
                                    )
19 vs.                              )
                                    )
20                                  )
   JOHN SHAHIDI, an individual;     ) **PLAINTIFF'S MOTION FOR**
21 NELK, INC. dba NELK, FULL        ) **CLASS CERTIFICATION, OR IN**
22 SEND, a Canadian Company,        ) **THE ALTERNATIVE, MOTION**
   METACARD, LLC, a Delaware        ) **FOR CONTINUANCE PENDING**
23 Limited Liability Company; NELK  ) **COMPLETION OF CLASS**
24 USA, INC., a Delaware Corporation; ) **DISCOVERY**
   KYLE FORGEARD, an individual,    )
25                                  ) Courtroom: 10D
26            Defendants.           ) Judge: Hon. Fred W. Slaughter
                                    ) Hearing Date: January 8, 2026
27                                  ) Time:  10:00 a.m. PST
28

---

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION, ETC.
- 1 -

# **Table of Contents**

I.      INTRODUCTION ................................................................ - 1 -

II.     FACTUAL BACKGROUND ................................................ - 2 -

*A.    The Metacard* .......................................................... - 2 -

*B.    Metacard Pre-Sale* .................................................. - 2 -

*C.    Metacard Sale* ........................................................ - 4 -

*D.    Metacard Sale Proceeds* ......................................... - 5 -

*E.    Metacard Sale Fallout* ............................................ - 5 -

*F.    The Current Lawsuit* .............................................. - 7 -

III.    LEGAL STANDARD: CLASS CERTIFICATION .................. - 7 -

IV.     ANALYSIS: CLASS CERTIFICATION .............................. - 8 -

*A.    Class Definition* ..................................................... - 8 -

*B.    Federal Rule of Civil Procedure 23(a)* ...................... - 8 -

     1.    Numerosity: Rule 23(a)(1) ................................. - 8 -

     2.    Commonality: Rule 23(a)(2) ............................... - 10 -

     3.    Typicality: Rule 23(a)(3) .................................... - 10 -

     4.    Adequacy: Rule 23(a)(4) .................................... - 12 -

*C.    Federal Rule of Civil Procedure 23(b)(3)* ................... - 12 -

     1.    Predominance and Commonality ........................... - 12 -

     2.    Superiority ..................................................... - 16 -

V.     ALTERNATIVE REQUEST FOR ADEQUATE TIME TO CONDUCT
DISCOVERY ........................................................................ - 17 -

*A.* *Procedural Background* ............................................................. - 17 -

*B.* *Legal Standards* ........................................................................ - 18 -

*C.* *Argument* ................................................................................... - 19 -

*D.* *Conclusion* ................................................................................. - 21 -

VI.    CONCLUSION ................................................................................. - 21 -

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*ABS Entm't, Inc. v. CBS Corp.*, 908 F.3d 405 (9th Cir. 2018)............- 2 -, - 19 -, - 20 -

Bush v. Rust-Oleum Corp., No. 20-CV-03268-LB, 2024 WL 422080 (N.D. Cal. Feb. 5, 2024) ................................................................................................ - 11 -

*Cansino v. Bank of America*, 224 Cal. App. 4th 1462, 169 Cal. Rptr. 3d 619 (2014)...- 15 -

*Doninger v. Pacific Northwest Bell, Inc.,* 564 F.2d 1304 (9th Cir.1977) ....- 19 -, - 20 -

*Falcone v. Nestle USA, Inc.*, No. 3:19-CV-723-L-DEB, 2024 WL 4868298 (S.D. Cal. Sept. 26, 2024) .......................................................................................... - 14 -

*In re Bank of Am. California Unemployment Benefits Litig.*, No. 21MD2992-GPC(MSB), 2025 WL 2816808 (S.D. Cal. June 24, 2025).............................passim

*James v. Uber Techs. Inc.*, 338 F.R.D. 123 (N.D. Cal. 2021)............................. - 10 -

*Kaminske v. JP Morgan Chase Bank N.A.*, No. SACV 09-00918 JVS (RNBx), 2010 WL 5782995, 2010 U.S. Dist. LEXIS 141514 (C.D. Cal. May 21, 2010)......... - 20 -

*Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 47 Cal. Rptr. 2d 752 (1995) ................................................................................................... - 17 -

*Makaron v. Enagic USA, Inc.*, 324 F.R.D. 228 (C.D. Cal. 2018) ....................- 8 -, - 9 -

*Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036 (9th Cir. 2012) .......... - 11 -

*Parra v. Bashas', Inc.*, 536 F.3d 975 (9th Cir. 2008)............................................ - 14 -

*Rusoff v. Happy Grp., Inc.*, No. 21-CV-08084-AMO, 2024 WL 5339463 (N.D. Cal. Sept. 27, 2024) ............................................................- 7 -, - 13 -, - 15 -

*Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2852 (2025) ............................................................................... - 8 -

*Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016) ..................- 11 -, - 13 -

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016)....................................... - 14 -

*Vaccarino v. Midland Nat. Life Ins. Co.*, No. CV 11-5858 CAS MANX, 2013 WL 3200500 (C.D. Cal. June 17, 2013) ....................................................- 16 -, - 17 -

*Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 (9th Cir. 2009) .............. - 20 -

*Vizcarra v. Unilever United States, Inc.*, No. 4:20-CV-02777 YGR, 2023 WL
    2364736 (N.D. Cal. Feb. 24, 2023) ................................................. - 9 -, - 13 -, - 14 -

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541, 180 L. Ed. 2d 374
    (2011)...................................................................................................... - 7 -

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010) - 10 -, - 11 -,
    - 12 -, - 13 -

*Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010) .............. - 15 -

*Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001)................... - 17 -

**Rules**

Fed. R. Civ. P. 23 ................................................................................passim

## I.      <u>INTRODUCTION</u>

Plaintiff brought this lawsuit to address Defendants' role in a calculated scheme to sell the illusion of investment in a certain non-fungible tokens ("NFT") known as the "Full Send Metacard" ("Metacard"). Plaintiff and thousands of others (the "Class Members") were lured into purchasing the Metacard based on Defendants' unequivocal promises: that cardholders would receive exclusive access to lucrative business ventures, investment opportunities, and meaningful perks. Defendants never intended to comply with those promises. Instead, Defendants fleeced Plaintiff and the Class Members of over $23 million. Rather than delivering on the promises made to purchasers, Defendants flagrantly used the funds raised by the Metacard sale for their own personal benefit. Such acts of flagrant misuse included the transfer of revenues from consumers to online casino platforms soon after Defendants received the funds.

The experiences of Plaintiff and the Class Members are uniform, and all subject to the exact same words and actions of Defendants. Consequently, the harm to Plaintiff and the Class Members is likewise uniform. As set forth herein, this case is ideally suited to a class action, and Plaintiff respectfully requests that this Court grant class certification pursuant to Fed. R. Civ. P. 23.

Alternatively, Plaintiff requests this Court stay the current deadline of November 13, 2025, for filing a class certification motion until after the January 13, 2026 deadline for Defendants to produce additional documents per Magistrate Judge Douglas McCormick's order on Plaintiff's Motion to Compel. Defendants in this case obfuscated discovery efforts by refusing to fully respond to discovery requests, causing Plaintiff to seek relief from the court and resulting in difficulties for Plaintiff in preparing the current Motion.

Providing Plaintiff with adequate time to conduct relevant class discovery will allow the Court to fully undertake the necessary "rigorous analysis" for certification purposes. Denial of class discovery may be an abuse of discretion when the propriety of a class action cannot be determined without discovery. *See ABS Entm't, Inc. v. CBS*

*Corp.*, 908 F.3d 405, 427 (9th Cir. 2018). Accordingly, if this Court has any reservations about class certification, then Plaintiff requests a meaningful opportunity to conduct class discovery and file an amended motion for class certification by March 1, 2025.

## II.    FACTUAL BACKGROUND

As the Court is aware from previous briefing, including Defendants' Motion to Dismiss FAC (ECF No. 68) and Plaintiff's Response thereto (ECF No. 69), this case involves allegations by Plaintiff that Defendants sold digital assets that did not have the characteristics, uses, or benefits Defendants advertised and promoted.

### A.    *The Metacard*

Specifically, Defendants Kyle Forgeard and John Shahidi (collectively "Founder Defendants") are YouTube personalities known for their YouTube Channel "Nelk Boys," which currently has a following of 8.22 million subscribers. *See* https://www.youtube.com/channel/UCkhxWF5CTMUgxneqAFP96LQ (last viewed November 12, 2025). Defendant Nelk USA, Inc. ("Nelk USA"), is a wholly owned subsidiary of Defendant Nelk, Inc., and Defendant Metacard, LLC, is a wholly owned subsidiary of Nelk USA. *See* Exhibit ("Ex.") 1, Deposition of Drew Hill ("Depo. Hill"), November 7, 2025, 30:15–31:25. Metacard, LLC, launched the Full Send Metacard ("Metacard") at issue in this case. The Metacard is a Non-Fungible Token ("NFT")—a type of digital asset that can be purchased, sold, and transferred on other cryptocurrencies. Ex. 2, Declaration of Jeremy Clark ("Decl. Clark"), § 2.2. The Metacard was released for public sale on January 19, 2022. *Id*. § 3.1. The key decision makers for the Metacard project were Founder Defendants and Sam Shahidi. Ex. 1, Depo. Hill 32:22–25.

### B.    *Metacard Pre-Sale*

Defendants hyped the sale of Metacard on a variety of virtual platforms. For example, on January 18, 2022, the day before the release of Metacards, Founder Defendants used their podcast, Full Send Podcast, to promote the sale of Metacards.

Specifically, the podcast episode number 25 ("the podcast episode") was entitled "How the Full Send NFT Will Help Us Build an Empire," and included Defendant John Shahidi and Sam Shahidi and several other individuals who discussed the upcoming Metacard project and sale. Ex. 3, Declaration of Tom Kherkher ("Decl. Kherkher"), Ex. A. Finally, on January 18, 2022, the Defendants held a livestream ("the livestream") attended by more than 240,000 individuals to promote the sale of Metacards. Ex. 3, Decl. Kherkher, Ex. B, Livestream Transcript. Founder Defendants spoke at the livestream about the Metacard NFT project and sale and directed attendees to the podcast episode for more information. *Id*.

Particularly during the livestream, Defendants made numerous representations regarding the features of the Metacard geared toward inducing listeners to purchase the Metacard. For example, during the livestream, Defendant Forgeard stated "we're going to be doing a ton of projects. In all those projects the only first access goes to Metacard holders." Ex. 3, Decl. Kherkher, Ex. B, Livestream Transcript. Defendant Forgeard also stated the Metacard project allowed Defendants to bypass going to dinner with investors to pitch ideas and instead allowed purchasers to "join this community" to "help[] build something" and at the same time receive a valuable token. *Id*. Similarly, during the podcast episode, Defendants stated, "this project allows us to speed up some of the . . . to start, to start it to financing, right? Because we're always like, oh we're going to budget this, where are we going to get that? And now we have partners, right? People are going to be bought into it, right? And we're going to produce or perform." Ex. 3, Decl. Kherkher, Ex. A, Podcast Transcript.

Defendants went on to claim, "we have a team, we have a budget, we have a play, and we'll go way deeper into this to make sure that this is something that is supported through all the ups and downs that happen in the FTE world and the metaverse world." *Id*. Defendants promised they were "getting to work right away" on future projects, including developing "lounges" and other physical locations for Metacard holders. Ex. 2, Decl. Kherkher, Ex. B, Livestream Transcript. Defendant

Shahidi assured Plaintiff that Defendants would be treating the Metacard venture "as a real business," like an initial public offering that "go[es] public" and "takes . . . money to build the business and grow the business." *Id*. Defendants compared the Metacard to a "stock" or "decentralized stock." *Id*; Ex. 3, Decl. Kherkher, Ex. A, Podcast Transcript. All these statements were made the day before the Metacard went on sale and were designed to encourage sales.

Also on the livestream, Defendants announced that there would be a "whitelist" pre-sale of the Metacard at 9:30 am, which would be limited to individuals who were selected to join and completed the form to be on the whitelist. *Id*. Then a public sale of the Metacard would begin as 12:30 p.m.

### C.    Metacard Sale

Sales of the Metacard began on January 19, 2022, using Ethereum's blockchain technology. Ex. 2, Decl. Clark §§ 2.1, 3.1. Ethereum is a type of cryptocurrency. *Id*. § 2.1. To purchase Metacard, purchasers create a digital address linked to a digital wallet where Ethereum's currency, ETH, can be sent and received in a digital transaction. *Id*. The Metacard has an associated "smart contract," which is a custom software application that governs the transaction. *Id*. § 2.1, 3.5. During the initial mints (*i.e.,* the initial sales), the price of the Metacard was .75 ETH. *Id*. § 3.1. Purchasers initiate the minting process by interacting with the contract on the Ethereum platform. *Id*. To purchase the Metacard, the purchaser had to visit the website, https://fullsend.metacard.io, connect his or her wallet, and follow the prompts to mint the Metacard. *Id*.

Over the course of four different sale periods on January 19, 2022, a total of 10,000 Metacards were minted and transferred to purchasers. *Id*. Each Ethereum address could purchase between one and ten Metacards, and the 10,000 Metacards were purchased by 5,226 unique addresses, most of which (3,404) purchased only a single Metacard. *Id*.

### D.    Metacard Sale Proceeds

The initial Metacard sale earned 7424.25 ETH, valued at around $23 million, making the average cost of each Metacard $2,300. *See Id*. § 3.3. Before the sales of the Metacard were final, 2,549.25 ETH was withdrawn and transferred to a single address (the "Metacard treasury"). *Id*. Approximately forty minutes after the final Metacard sale, the remaining 4,875 ETH was transferred to the Metacard treasury. *Id*. The Metacard treasury began transferring funds to a variety of addresses over the next several months, and by April of 2022, the running balance of the account had been mostly depleted. *Id*. § 3.3, Fig. 4 and 5.

One of the recipients of the Metacard proceeds from the Metacard treasury is the website Stake.com, which is an online casino and sportsbook that allows gambling with cryptocurrencies including ETH. *Id*. § 3.3, Table 2. The Metacard treasury transferred 201 ETH to Stake.com addresses. *Id*. Another recipient of transfers from the Metacard treasury was boredjerky @ OpenSea, which received approximately 70.79 ETH, just over one-third of the amount transferred to Stake.com. *Id*.  The details of these transfers are being sought by Plaintiff in discovery, which has not been completed in this case.

### E.    Metacard Sale Fallout

After the initial sale, Metacards continued trading on the secondary market. *Id*. § 3.4. As noted above, the initial minting price of the Metacard was .75 ETH. During January following the initial sale, the value of the Metacard rose to an average of 1.08 ETH, measured by the secondary sales market. *Id*. § 3.4. In February of 2022, the average value rose to 1.47 ETH. *Id*. By May of 2022, the value fell back to .74 ETH. *Id*. The price and sales volume have continued to decrease over time. *Id*. § 3.4, Fig. 6. According to the terms of the applicable smart contract, each secondary market transfer earned royalties for Defendants. *Id*. § 3.5. Defendants collected an additional 1,500 ETH (worth approximately $4.3 million dollars) from royalties on the secondary market.

Time passed and Defendants failed to deliver on the promises they had made regarding the Metacard, and Metacard holders began expressing frustration in the Full Send discord channel. *See e.g.*, Second Amended Complaint ("SAC") ¶ 67 (comments including "Really lol," "The one scamming," and "you sure that's the tea and not the bag").[1] Despite the discontent, Defendants continued to reassure purchasers of the value of the Metacard, all the while earning the royalties from secondary market transfers. *Id*. ¶¶ 67, 70, 72, 76–78, 106.

In April of 2024—more than two years after the initial Metacard sale—Defendants announced their "Bored Jerky Program" to Metacard holders, which Defendants touted as a "landmark initiative." *Id*. ¶¶ 110–12. The "landmark initiative" set aside a forty percent share of Bored Jerky for Metacard holders to be held as "Phantom Stock Plan" that would expire in ten years with a possibility of extension if an exit had not yet occurred. *Id*. ¶ 112. In order to participate in the Program, Metacard holders were required to refer three new customers to the Bored Jerky website, boredjerky.com, using a unique referral code, with a "new customer" being defined by having a unique email address at checkout. *Id*.

For those who did not want to participate in the Bored Jerky Program, Defendants represented they would refund the Metacard purchase price, not to exceed $2,300.00, with interest. *Id*. To participate in the refund, a Metacard holder was required to sign a "Token Rescission Agreement" with Defendant Metacard LLC, which Defendants represented would require the Metacard holder to return all "Full-Send Metacard" blockchain-based tokens. Regardless of which option the Metacard holder selected, the offer was only available for thirty days—from May 20, 2024, until June 20, 2024. SAC ¶ 112.

Ultimately, the Bored Jerky Program appeared to be another empty promise intended to retain as much benefit from the Metacard sales as possible. As noted above,

---

[1] The screen shots are from Defendants' discord channel, in which Defendant Shahidi was continually involved. *See* Depo. Hill 111:12–112:1.

the boredjerky @ OpenSea, received only 70.79 ETH from the Metacard treasure, which amounts to just over one-third of the amount transferred to the online casino and sportsbook Stake.com. Further, as of the drafting of the current Motion, the Bored Jerky website, boredjerky.com, redirects to a different website, rangercut.com, which appears to have no functionality. https://boredjerky.com (last viewed November 12, 2025).

Based on an analysis of Metacard transfers following Defendants' choice of the Bored Jerky or refund routes, it appears that Defendants established two addresses for transferring Metacard, one for the Bored Jerky program and one for refunds. Decl. Clark § 3.6. It is not readily apparent which is which, but these two addresses hold 2,594 (~26%) and 1,287 (~13%) of Metacard NFTs respectively, suggesting that 6,119 of the 10,000 (~61%) Metacards remain in the hands of purchasers. *Id.*

### F.    The Current Lawsuit

In bringing this lawsuit, Plaintiff seeks to represent himself and all others similarly situated. Plaintiff has asserted claims against Defendants for fraud (SAC ¶¶ 156–71), violation of the California Legal Remedies Act (CLRA) (SAC ¶¶ 172–86), and civil conspiracy (SAC ¶¶ 187–91) based on Defendants' false representations regarding the Metacard Program.

## III.    <u>LEGAL STANDARD: CLASS CERTIFICATION</u>

Plaintiff's request for class certification is governed by Fed. R. Civ. P. 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 343, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011); *Rusoff v. Happy Grp., Inc.*, No. 21-CV-08084-AMO, 2024 WL 5339463, at *7 (N.D. Cal. Sept. 27, 2024). A class may be maintained where the four prerequisites of Rule 23(a) have been met—numerosity, commonality, typicality, and adequacy—and where the action classifies as one of the three types of actions identified in Rule 23(b). *Id.* at 345, 349. Plaintiff carries the burden of establishing that these requirements have been met by a preponderance of the evidence. *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1198 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2852

(2025); *In re Bank of Am. California Unemployment Benefits Litig.*, No. 21MD2992-GPC(MSB), 2025 WL 2816808, at \*17 (S.D. Cal. June 24, 2025). While the Court must conduct a "rigorous analysis" to determine whether the requirements have been met, which may require it "consider[] the merits of the underlying claim to the extent that the merits overlap with the Rule 23 requirements," but the Court should not conduct a "mini-trial" to determine whether Plaintiff could actually prevail."" the Court need not conduct a "mini-trial" on the merits of the case. *Makaron v. Enagic USA, Inc.*, 324 F.R.D. 228, 231 (C.D. Cal. 2018).

## IV.   ANALYSIS: CLASS CERTIFICATION

Plaintiff has established by a preponderance of the evidence that the requirements of Rule 23(a) and Rule 23(b) have been met in this case. Given the uniformity of Defendant's actions with respect to the Class Members and the similarity of the harm caused by Defendant's actions across Class Members, this case is ideally suited to class treatment.

### A.   *Class Definition*

Plaintiff requests certification of the following class:

**All persons who purchased a Metacard through the date of class certification**

Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff. Finally, excluded from the Class are any individuals who signed the "Token Rescission Agreement" with Defendant Metacard LLC.

### B.   *Federal Rule of Civil Procedure 23(a)*

#### 1.   Numerosity: Rule 23(a)(1)

Numerosity requires a showing that the class is so numerous that joinder of all members individually would be impracticable. *Makaron*, 324 F.R.D. at 231; *Vizcarra v. Unilever United States, Inc.*, No. 4:20-CV-02777 YGR, 2023 WL 2364736, at \*7

(N.D. Cal. Feb. 24, 2023) (citing Fed. R. Civ. P. 23(a)(1)). Numerosity may be inferred by the Court "based on the facts of each particular case to determine if numerosity is satisfied." *In re Bank of Am. California Unemployment Benefits Litig*., 2025 WL 2816808, at *18. "As a general rule, classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough." *Id*.

Numerosity is easily met in this case. All 10,000 Metacards that were initially minted were purchased. Ex. 2, Decl. Clark, Figure 3, p. 13. Although it is not possible to determine exactly how many unique purchasers there are, some assumptions can be made that suggest that the number of purchasers is in the thousands. In the initial mint, the 10,000 Metacards were purchased by 5,226 unique addresses. Ex. 2, Decl. Clark § 3.1. each unique address could purchase a maximum of ten Metacards, but most addresses (3,404) purchased only one. *Id*. This supports the conclusion that there are 3,404 class members *at a minimum*. Secondary market transfers brought the total of unique addresses that held a Metacard at some point to 16,744. *Id*. § 4.1. Numerosity is clearly met in this case.

In assessing numerosity, courts also consider the ascertainability of the class members. "To be ascertainable, the definition of the class must be definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member before trial, and by reference to objective criteria." *James v. Uber Techs. Inc.*, 338 F.R.D. 123, 130 (N.D. Cal. 2021) (internal quotation marks omitted). "The Court must identify the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the best notice practicable in a Rule 23(b)(3) action." *Id*. (internal quotation marks omitted).

The Class Members are ascertainable. Although the names of individuals who purchased the Metacards are not identified, there are unique digital addresses that were used to purchase the Metacards. Ex. 2, Decl. Clark § 3.1, 4.1. Therefore, it is possible to use these unique addresses to ascertain the members of the Class. Plaintiff already

has a proposed system for sending notice to class members should this class be certified. *See Id.*

### 2. Commonality: Rule 23(a)(2)

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(2)). The issues of commonality under Rule 23(a)(2) and predominance under Rule 23(b)(3) are related in that predominance asks whether "the questions of law or fact common to class members predominate over any questions affecting only individual members." *In re Bank of Am. California Unemployment Benefits Litig.*, 2025 WL 2816808, at *21. Accordingly, Plaintiff will discuss commonality in conjunction with predominance in Section V.C.1, *infra*.

### 3. Typicality: Rule 23(a)(3)

Under Rule 23(a)(3) "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Civ. Proc. 23(a)(3). Typicality tests "whether other members have the same or similar injury, whether the action is based on conduct, which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Jaguar Land Rover N. Am., LLC*, 617 F.3d at 1175. The typicality standard is "permissive," requiring "only that the representatives' claims are 'reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012). Because typicality concerns the nature of the claims or defenses, not the particular underlying facts or relief sought, typicality demands only that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Id.*

"Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct, which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of

conduct." *Ruiz Torres v. Mercer Canyons Inc*., 835 F.3d 1125, 1141 (9th Cir. 2016) (internal quotation marks omitted). However, the focus is on the class representatives, not whether there are some unique defenses applicable to individual class members. *In re Bank of Am. California Unemployment Benefits Litig*., 2025 WL 2816808, at *19.

In the current case, Plaintiff's claims are typical of the Class. The pre-sale messages that Defendants broadcast in the Instagram post, the podcast episode and the livestream were uniform across the platforms and were the primary sources of information regarding the Metacard sale. *See* Ex. 3, Decl. Kherkher, Ex. A, Podcast Transcript; Ex. 3, Decl. Kherkher, Ex. B, Livestream Transcript; SAC ¶¶ 110–12. In fact, Defendants represented in the livestream that 242,000 individuals had tuned in. Ex. 3, Decl. Kherkher, Ex. B, Livestream Transcript. Accordingly, Metacard purchasers received a uniform set of messages regarding the Metacard the day prior to the initial mint. Plaintiff would not have received these messages an in any way different from the rest of the Class Members.

Metacard purchases were made in a uniform fashion, with thousands purchasing during the initial mint on January 19, 2022, and secondary market purchases taking place following the initial mint, all through the cryptocurrency platform that required the creation of an address associated with a digital wallet. Ex. 2, Decl. Clark §§ 2.1, 3.1, 3.4. Plaintiff necessarily went through this process to purchase his Metacard during the initial Mint.

When the time came for Defendants to pull the plug on the Metacard Program, Defendants gave all Metacard purchasers the same options—a 30-day window in which to participate the Bored Jerky Program or the Token Rescission Agreement, or else lose the opportunity entirely. SAC ¶ 112. Plaintiff's situation was no different.

Typicality is met in this case. Plaintiff was exposed to the same messaging from Defendants and participated in the Metacard Program in the same manner as the Class Members. Plaintiff is subject to no unique defenses. Therefore, this factor weighs in

favor of certification.

### 4. Adequacy: Rule 23(a)(4)

Rule 23(a)(4) provides that class representatives must "fairly and adequately protect the interests of the class." *Jaguar Land Rover N. Am., LLC*, 617 F.3d at 1172. Adequacy demands that class representatives and their counsel vigorously prosecute the action and hold no conflict of interest with the class members. *Id*.

Plaintiff has and will continue to adequately represent the Class. Ex. 4, Declaration of Jarrett L. Ellzey ("Decl. Ellzey") ¶ 10; Ex. 5, Declaration of Plaintiff Trenton Smith ("Decl. Plaintiff") ¶¶ 7–9, 16. Plaintiff has been actively engaged in this case. Ex. 4, Decl. Ellzey at ¶ 11; Ex. 5, Decl. Plaintiff ¶¶ 7, 8. He has and will continue to vigorously prosecute this action. Ex. 4, Decl. Ellzey at ¶ 11; Ex. 5, Decl. Plaintiff ¶¶ 7, 8, 16. Further, Plaintiff has no conflict of interest with other Class Members and is subject to no unique defenses. Ex. 5, Decl. Plaintiff ¶ 10. As noted above, Plaintiff's experiences with the Metacard Program are fundamentally the same as the Class Members' experiences.

Plaintiff's counsel are likewise adequate, holding no conflict of interest with the Class Members. Ex. 4, Decl. Ellzey ¶ 12. Plaintiff's counsel have vigorously prosecuted this case, as evidenced by the filings in this case thus far. Further, Plaintiff's counsel are highly qualified, with significant experience in class actions. *Id*. ¶¶ 14–22.

The adequacy requirement is clearly met in this case.

### C.    *Federal Rule of Civil Procedure 23(b)(3)*

Under Rule 23(b)(3), a plaintiff must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Jaguar Land Rover N. Am., LLC*, 617 F.3d at 1172 (quoting Fed. R. Civ. P. 23(b)(3)); *Vizcarra*, 2023 WL 2364736, at *15.

### 1. Predominance and Commonality

The commonality requirement of Rule 23(a)(2) has "been construed

1 permissively, and all questions of fact and law need not be common to satisfy the rule."

2 *Rusoff*, 2024 WL 5339463, at *10 (quoting Fed. R. Civ. P. 23(a)(2)). (internal

3 quotation and editing marks omitted). Even a single common question will suffice to

4 fulfill this requirement, but that question needs to "generate common *answers* apt to

5 drive the resolution of the litigation." *Torres*, 835 F.3d at 1133 (emphasis in original).

6 "In determining whether the common question prerequisite is met, a district court is

7 limited to resolving whether the evidence establishes that a common question is

8 *capable* of class-wide resolution, not whether the evidence in fact establishes that

9 plaintiffs would win at trial." *Falcone v. Nestle USA, Inc*., No. 3:19-CV-723-L-DEB,

10 2024 WL 4868298, at *5 (S.D. Cal. Sept. 26, 2024). Commonality exists "[w]here the

11 circumstances of each particular class member vary but retain a common core of

12 factual or legal issues with the rest of the class." *Parra v. Bashas', Inc.*, 536 F.3d 975,

13 978–79 (9th Cir. 2008).

14      Predominance is related to commonality in that it "asks whether the common,

15 aggregation-enabling, issues in the case are more prevalent or important than the non-

16 common, aggregation-defeating, individual issues." *Vizcarra*, 2023 WL 2364736, at

17 *15 (internal quotation marks omitted). "An individual question is one where members

18 of a proposed class will need to present evidence that varies from member to member,

19 while a common question is one where 'the same evidence will suffice for each

20 member to make a prima facie showing or the issue is susceptible to generalized, class-

21 wide proof." *Id*. (internal quotation and editing marks omitted) (citing *Tyson Foods,

22 Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

23      However, as long as at least one of the case's central issues predominates and

24 is common to the class, "the action may be considered proper under Rule 23(b)(3)

25 even though other important matters will have to be tried separately, such as damages

26 or some affirmative defenses peculiar to some individual class members." *Id*. Judicial

27 economy is a key concern of the predominance inquiry. *In re Bank of Am. California

28 Unemployment Benefits Litig*., 2025 WL 2816808, at *21. Determining whether

common issues predominate requires some examination of the elements of the plaintiff's claims. *Id*.

### CLRA

Plaintiff's CLRA claim asks whether members of the public are likely to be deceived by a representation, and the test is an objective one—the "reasonable consumer" test. *Rusoff*, 2024 WL 5339463, at *11. Accordingly, the finder of fact need not examine Class Members' individual interactions with Metacard. *See Id*. at *13.

### Fraud

Plaintiff's fraud claim requires proof of the following elements: (1) misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance on the misrepresentation, (4) justifiable reliance on the misrepresentation, and (5) resulting damages. *Cansino v. Bank of America*, 224 Cal. App. 4th 1462, 1469, 169 Cal. Rptr. 3d 619, 625 (2014). "[R]eliance may be presumed if the defendant's misrepresentations or omissions were material." *Id*. "A misrepresentation is judged to be material if a reasonable person would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Id*. (internal quotation and editing marks omitted). Therefore, like the CLRA claim, the finder of fact need not examine Class Members' individual reliance on Defendants' statements.

Thus, the common questions at issue in Plaintiff's common law fraud claims will be similar to those at issue in Plaintiff's CLRA claim. One of those common questions will be whether Defendants' representations made in the podcast episode and livestream were false or misleading. This is a common question—the answer will be the same for every Class Member because it examines the statements made and Defendants' universal intent. For example, this case will ask whether Defendants' statement that they have a "team" and a "budget" was false or misleading, and the answer to that question will depend on Defendants' words and actions and will be the same for every Class Member. This is true for every statement made by Defendants in

their livestream and podcast episode. *See Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1093 (9th Cir. 2010) ("Plaintiffs' case will not require the fact-finder to parse what oral representations each broker made to each plaintiff. Instead, the factfinder will focus on the standardized written materials given to all plaintiffs and determine whether those materials are likely to mislead consumers acting reasonably under the circumstances.").

Similarly, for both Plaintiff's common law fraud claim and CLRA claim, the finder of fact will have to determine whether each of Defendants' statements in the podcast episode and livestream was "material." This analysis is judged on an objective standard and therefore will not vary from Class Member to Class Member. The finder of fact will also examine what, if any, benefits of the Metacard were provided. There are no individualized questions with respect to this issue as well because Defendants intended that any benefits of the Metacard would be available to all Metacard holders. Ex. 1, Depo. Hill 187:22–188:21.

The falsity and materiality of Defendants' statements are key elements of Plaintiff's fraud and CLRA claims. Going through each statement, Defendants' efforts (or lack thereof) to deliver on those standards, and Defendants' knowledge of the falsity of its statements are all substantial factors geared assessing the ultimate issues in this case. The same is true for the question of whether those statements were material.  These are questions that either depend on Defendants' own statement of mind and actions or are judged on an objective standard, meaning the answers will not vary from Class Member to Class Member. Therefore, these are "common, aggregation-enabling, issues" that will be far more prevalent and important than any "non-common, aggregation-defeating, individual issues" that Defendants might identify. As such, common questions predominate in this case with respect to Plaintiff's fraud and CLRA claims. *See In re Bank of Am. California Unemployment Benefits Litig.*, 2025 WL 2816808, at *39 (citing *Vaccarino v. Midland Nat. Life Ins. Co.*, No. CV 11-5858 CAS MANX, 2013 WL 3200500, at *15-16 (C.D. Cal. June 17,

2013) (finding common issues predominate for common law fraud and the fraud prong of the UCL where "all class members here received uniform representations, and [Defendant] treated the proposed class the same")).

### Civil Conspiracy

Plaintiff's civil conspiracy claim requires proof of three elements: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581, 47 Cal. Rptr. 2d 752, 757 (1995). Once again, the answers to these questions are primarily aimed at *Defendants'* actions, meaning the answers will not vary from Class Member to Class Member. Accordingly, questions surrounding Plaintiff's civil conspiracy claim are common to the Class Members and predominate over individual questions.

Because common issues predominate over individual questions, the commonality and predominance requirements weigh in favor of certification.

### 2. Superiority

"Superiority requires a consideration of (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation in the particular forum; and (D) the likely difficulties in managing a class action." *In re Bank of Am. California Unemployment Benefits Litig.*, 2025 WL 2816808, at *46 (internal quotation marks omitted) (citing Fed. R. Civ. P. 23(b)(3)(a)-(d) and *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001)).

Each of these factors weighs in favor of class certification. First, Plaintiff is aware of no other Class Member who is interested in individually controlling the prosecution or defense of an action separate from this case. Ex. 5, Decl. Plaintiff ¶ 12.

With respect to the desirability of concentrating the litigation in this forum, Plaintiff submits that this factor weighs in favor of superiority. Almost all the relevant

facts involve virtual or digital platforms, including Instagram, podcasts, livestreams, discord channels, cryptocurrency, digital transfers and digital wallets. Therefore, the location is less important with respect to these facts. However, California is the home state of Plaintiff and was the home state or principal place of business of Defendants Shahidi, Forgeard, Nelk USA, Inc., and Metacard, LLC. at the time of the events at issue, making this forum preferable to all others.

Finally, there are no apparent difficulties in managing a class action that would be unusual or particular to this case. Accordingly, each factor is either neutral or weighs in favor of superiority and thus class certification.

## V.    ALTERNATIVE REQUEST FOR ADEQUATE TIME TO CONDUCT DISCOVERY

Although Plaintiff believes has demonstrated above that class certification is appropriate, if this Court should disagree then Plaintiff requests that, rather than deny Plaintiff's class certification request, the Court grant Plaintiff additional time to conduct relevant discovery and re-submit his request for class certification.

### A.    Procedural Background

In order to prepare for the current motion requesting class certification, Plaintiff served Interrogatories and Requests for Production ("RFPs") upon Defendants as soon as discovey opened. Defendants served responses on or about August 6, 2025, containing excessive and unwarranted objections, giving rise to a discovery dispute between the parties. The dispute was detailed in the Joint Stipulation re: Plaintiff's Motion to Overrule General and Boilerplate Objections, Compel Further Responses to Discovery and Enter Protective Order ("Motion to Compel") (ECF No. 77, 77-1).

Following a hearing on October 14, 2025, the Court ordered Defendant to produce certain discovery responses within thirty days or ninety days and to meet and confer on others. Ex. 6, Transcript of October 14, 2025, Proceedings Before U.S. Magistrate Judge Douglas F. McCormick ("Hearing Transcript"). Notably, Counsel for Plaintiff specifically objected to these deadlines as being beyond the November

13, 2025, deadline for filing the current Motion, but to no avail. Hearing Transcript, pp. 7, 14–15. As further related below, the discovery disputes and timeline for Defendants' responses have impaired Plaintiff's ability to provide additional evidence in support the current Motion.

### B.    *Legal Standards*

To undertake the rigorous analysis of the prerequisites for class certification, as a district court must, may require discovery. *ABS Entm't, Inc. v. CBS Corp.*, 908 F.3d 405, 427 (9th Cir. 2018) (citing *Kamm v. Cal. City Dev. Co.,* 509 F.2d 205, 210 (9th Cir.1975) ("The propriety of a class action cannot be determined in some cases without discovery;" "To deny discovery in [such cases] would be an abuse of discretion."). The Ninth Circuit has recognized that "the propriety of a class action "cannot be determined in some cases without discovery, as for example, where discovery is necessary to determine the existence of a class or set of subclasses" and it would be an abuse of discretion deny discovery in such case. *Kamm*, 509 F.2d at 210. In this vein, the Ninth Circuit has explained that explained that "the better and more advisable practice" is to permit enough discovery to establish whether a class action is maintainable, "especially when the information is within the sole possession of the defendant." *Doninger v. Pacific Northwest Bell, Inc.,* 564 F.2d 1304, 1313 (9th Cir.1977); *ABS Entm't,* 908 F.3d at 427 (internal citations omitted) (remanding action for "reconsideration of whether pre-certification discovery is warranted")*.* A district court should afford the litigants an opportunity to present evidence as to whether a class action was maintainable," *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009), and the necessary antecedent to the presentation of evidence is enough discovery to obtain the material, especially when the information is within the sole possession of the defendant. *Doninger*, 564 F.2d at 1313.

In *ABS Entm't*, the Ninth Circuit reversed the district court's striking of ABS's certification motion and remanded for consideration of the class action motion on the merits, including reconsideration of whether pre-certification discovery is warranted.

1    908 F.3d 405 at 427. The Court noted Rule 23(c)(1)(A)'s "emphasis on the parties'

2    obligation to present the court with sufficient information to support an informed

3    decision on certification" and referenced the parties' need for sufficient time to

4    develop an adequate record. *Id.*

5        The Ninth Circuit precedent supports the right of class counsel here to conduct

6    precertification discovery once a prima facie case has been pled and has survived a

7    motion to dismiss. *See, e.g., Kaminske v. JP Morgan Chase Bank N.A.*, No. SACV 09-

8    00918 JVS (RNBx), 2010 WL 5782995 at *2, 2010 U.S. Dist. LEXIS 141514 (C.D.

9    Cal. May 21, 2010). Moreover, even the absence of a such a prima facie showing

10   would not end the inquiry. Pre-certification discovery may be permitted where the

11   plaintiff, alternatively, demonstrates "that discovery measures are likely to produce

12   persuasive information substantiating the class action allegations." *Doninger*, 564

13   F.2d at 1313. Nevertheless, where the plaintiff makes a prima facie showing of Rule

14   23's prerequisites, there is no burden on the plaintiff to demonstrate that discovery

15   measures are likely to produce persuasive information substantiating the class action

16   allegations. *Id.*

17       As detailed above, Plaintiff can satisfy his burden to make a prima facie showing

18   of the Rule 23 requirements. As detailed below, Plaintiff can also demonstrate that

19   discovery measures are likely to produce persuasive information substantiating his

20   class allegations.

21   **C.    *Argument***

22       Much of the information requested in the Interrogatories and RFPs was relevant

23   to the current motion. For example, in Interrogatory No. 3, Plaintiff requested the

24   identity of "each purchaser of a Metacard, NFT and, if known, their address, the email

25   address and telephone number." Motion to Compel, p. 29. This information would

26   have provided Plaintiff with information regarding the identities of some of the Class

27   Members and the opportunity to interview one or more of those individuals for

28   purposes of providing support to the current Motion. Moreover, this information might

have provided useful evidence related to the numerosity and ascertainability requirement.

In Interrogatory No. 7, Plaintiff requested a "detailed breakdown" of the total amount of money or cryptocurrency raised from the sale of Metacard NFTs and how those funds were used or distributed. Motion to Compel, p. 32. This information would have been relevant to the typicality, commonality and predominance inquiries because it would show a uniform treatment of funds relevant to issues raised by Plaintiff's fraud and CLRA claims without regard to individualized questions among Class Members. The same is true for Interrogatory No. 8. Motion to Compel, p. 36.

In RFP No. 2, Plaintiff requested documentation "regarding the ownership/structure of Nelk, Nelk USA and Metacard LLC, including in by-laws, corporate minutes, shareholder percentages and filings with the California Secretary of State or any federal (Canada too), provincial, state or local entity." This information is potentially relevant to show that Plaintiff's civil conspiracy claim rests on uniform evidence, thus supporting commonality and typicality.

Although Plaintiff's counsel took the deposition of Drew Hill, the Director of Operations for Nelk USA who also performed work for Metacard, LLC, Plaintiffs were unable to discover details regarding the transfers from the Metacard treasure wallet, which likely would be relevant to the current Motion as well. *See* Ex. 1, Depo. Hill 28:13–15, 116:2–25 (stating that although he was in control of five digital wallets, he would have to get their blockchain addresses off his computer to verify transfer information).

In addition, the key decision makers on the Metacard project are Founder Defendants and Sam Shahidi. Ex. 1, Depo. Hill 135:13–15. Plaintiff requests an opportunity to depose these individuals to further establish the propriety of class certification.

These are just some examples of the types of information that has been requested and additional discovery that would be helpful in pursuing the current

Motion. Plaintiff has been diligent in pursuing discovery—Plaintiff served written discovery requests in a timely manner and Plaintiff's counsel has taken the deposition of Drew Hill on November 7, 2025. Importantly, Plaintiff's counsel did not receive the transcript of this deposition until November 11, 2025, creating a time crunch in preparing the current Motion.

### D.   *Conclusion*

Plaintiff has made his prima facie showing of the Rule 23 requirements and also demonstrated that discovery measures are likely to produce persuasive information substantiating his class allegations. Pre-certification class discovery is warranted, and thus, any determination of the class certification issue at this juncture is premature and improper according to Ninth Circuit precedent. Accordingly, Plaintiff requests that if this Court is inclined to deny Plaintiff's request for class certification, then the Court instead extend the deadline for filing the request for class certification until March 1, 2026, at the earliest, which will provide Plaintiff time to receive and analyze Defendants' discovery responses and prepare an amended motion for class certification.

## VI.   **CONCLUSION**

For the reasons stated above, this Court should grant Plaintiff's request for class certification or alternatively grant Plaintiff adequate time to complete discovery related to class certification issues and set a deadline for Plaintiff to file an amended motion for class certification on March 1, 2026, at the earliest. In addition, Plaintiff requests that Plaintiff's Counsel be appointed Class Counsel in this case.

1    Dated:       November 13, 2025              **KRISTENSEN LAW GROUP & EKSM, LLP**

2

3                                               */s/ Jarrett L. Ellzey*

4                                               John P. Kristensen
                                                Leigh S. Montgomery*
5                                               Jarrett L. Ellzey
6                                               Tommy Kherkher
                                                Josh Sanford
7                                               ***Attorneys for Plaintiff***

8
                                                *(*pro hac vice* forthcoming)
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28