John P. Kristensen (SBN 224132)
**KRISTENSEN LAW GROUP**
120 Santa Barbara Street, Suite C9
Santa Barbara, California 93101
Telephone: 805-837-2000
john@kristensen.law

Jarrett L. Ellzey* (Texas Bar No. 24040864)
Leigh S. Montgomery* (Texas Bar No. 24052214)
Tommy Kherkher* (Texas Bar No. 24113389)
**EKSM, LLP**
4200 Montrose Blvd., Ste. 200
Houston, Texas 77006
Phone: (888) 350-3931

**ATTORNEYS FOR PLAINTIFF AND THE PUTATIVE CLASS**
(* denotes *pro hac vice*)

## THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

| | |
|---|---|
| TRENTON SMITH, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> JOHN SHAHIDI, an individual; NELK, INC. dba NELK, FULL SEND, a Canadian Company, METACARD, LLC, a Delaware Limited Liability Company; NELK USA, INC., a Delaware Corporation; KYLE FORGEARD, an individual, <br><br> Defendants. | ) Case No. 8:25-cv-161-FWS-DFM <br> ) <br> ) <br> ) <br> ) **CLASS ACTION** <br> ) <br> ) <br> ) <br> ) <br> ) **PLAINTIFF'S REPLY IN** <br> ) **SUPPORT OF MOTION FOR** <br> ) **CLASS CERTIFICATION, OR IN** <br> ) **THE ALTERNATIVE, MOTION** <br> ) **FOR CONTINUANCE PENDING** <br> ) **COMPLETION OF CLASS** <br> ) **DISCOVERY** <br> ) <br> ) <br> ) <br> ) |

---

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, ETC.**

- 1 -

1

## Table of Contents

I.    INTRODUCTION ................................................................................................ - 1 -

II.   DISCUSSION ................................................................................................. - 2 -

    *A.   Defendants' Argument Against Commonality and Predominance Depends on a Mischaracterization of the Case* ................................................. - 2 -

       1.   Individualized Questions of Materiality Do Not Predominate ................... - 2 -

       2.   Differences in Damages Do Not Bar Certification ................................. - 5 -

       3.   Individualized Questions of Standing Do Not Predominate ..................... - 7 -

    *B.   Plaintiff Is Typical of the Class* ........................................................ - 8 -

    *C.   Plaintiff Is an Adequate Representative* ........................................... - 9 -

    *D.   Plaintiff Has Sufficiently Alleged Numerosity* ................................. - 9 -

III.  CONCLUSION ................................................................................................ - 10 -

1

# <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3  *Braun v. Safeco Ins. Co. of Am.*, No. CV 13-00607 BRO PLAX, 2014 WL 9883831

4  (C.D. Cal. Nov. 7, 2014) ................................................................................. - 10 -

5  *Cansino v. Bank of America*, 224 Cal. App. 4th 1462,

6  169 Cal. Rptr. 3d 619 (2014) .......................................................................... - 4 -

7  *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318 (1980) ............................. - 10 -

8  *In re Bank of Am. California Unemployment Benefits Litig.*, No. 21MD2992-

9  GPC(MSB), 2025 WL 2816808 (S.D. Cal. June 24, 2025) ....................... - 6 -, - 7 -

10  *Makaeff v. Trump Univ., LLC*, No. 3:10-CV-0940-GPC-WVG, 2014 WL 688164

11  (S.D. Cal. Feb. 21, 2014) ................................................................................. - 4 -

12  *Mobile Emergency Hous. Corp. v. HP, Inc.*, No. 20-CV-09157-SVK, 2023 WL

13  9550942 (N.D. Cal. Dec. 8, 2023) ................................................................... - 10 -

14  *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015) ............ - 7 -

15  *Rusoff v. Happy Grp., Inc.*, No. 21-CV-08084-AMO, 2024 WL 5339463

16  (N.D. Cal. Sept. 27, 2024) ........................................................ - 4 -, - 5 -, - 8 -

17  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ........................................ - 7 -

18  *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010) ................ - 6 -

19

20

21

22

23

24

25

26

27

28

I.    **INTRODUCTION**

This case is not a dispute about trinkets, swag, or petty perks. It concerns a long-term investment opportunity Defendants marketed to their fanbase, raising 9,016.69 ETH ($27,951,739.00 assuming a price of $3,100 per ETH), and then treated as their own personal piggybank—using investor funds to entertain and personally enrich themselves before abandoning the project with a draconian, last-ditch refund program.

Defendants' attempt to reframe the case by emphasizing incidental benefits such as events and merchandise collapses under Defendants' own evidence. Defendants assert that "nearly all of the benefits provided to Metacard holders were paid for in U.S. dollars rather than ETH." Decl. Shahidi (ECF No. 99-4). While Plaintiff does not have a complete accounting of the 9,016.69 ETH ($27,951,739.00) raised in the Metacard project (because Defendants have yet to produce a single document in discovery), the information Plaintiff has underscores Defendants' fraud. For example, publicly available blockchain data shows approximately 2,101.7291 ETH ($6,515,360.20) was transferred to Coinbase or Kraken, the exchanges Defendants used to convert ETH into U.S. dollars. Ex. A, Second Declaration of Tommy Kherkher ("Sec. Decl. Kherkher") ¶¶ 9–18, Ex. 1; Depo. Hill. 176:5–14. Even *assuming* Defendants used every converted dollar for holder benefits or refunds, which Defendants have not shown, Metacard holders could have received no more than approximately 23 % of the project's total value.

Further, Defendants verified[1] that approximately 39% (about $10.9 million in ETH) of the funds raised were transferred to twelve individuals for loosely defined tasks such as "conceptualizing and designing the project" and "promoting Metacard across various social media platforms to their social media followings." The perks Defendants now emphasize are a distraction from the core misrepresentations that

---

[1] The information was provided by Defendants in their interrogatory responses.

1  induced purchasers to believe they were investing in a durable, revenue generating

2  venture, not funding personal payouts and one-time promotional activity.

3      Plaintiff, like thousands of other Nelk fans, relied on the same uniform

4  representations, was injured by the same alleged misconduct, and was offered the same

5  confusing, time-limited, onerous refund process. This case asks whether Defendants

6  can subject thousands of people to false representations, raise millions on the promise

7  of a long-term investment, and then walk away scot-free after diverting that investment

8  money for personal enrichment. Rule 23 exists to ensure they cannot.

9  **II.    DISCUSSION**

10      ***A.    Defendants' Argument Against Commonality and Predominance***

11           ***Hinges on a Mischaracterization of the Case***

12      Plaintiff and Class Members share common core factual and legal issues. The

13  "individualized issues" Defendants claim are insufficient to defeat class certification.

14           1. Individualized Questions of Materiality Do Not Predominate

15      Defendants' argument that Defendants' messaging regarding the Metacard

16  creates individualized issues ignores Defendants' consistent primary messaging: the

17  Metacard is an ongoing investment—not just a vehicle for one-time perks.

18      The podcast episode "How the Full Send NFT Will Help Us *Build an Empire*"

19  (emphasis added) and the livestream attended by more than 240,000 individuals,

20  reflect Defendants' consistent messaging that the Metacard was intended to be a long-

21  term investment from which purchasers would reap rewards. This messaging included

22  livestream statements that, "we're going to be doing a ton of projects," that "first

23  access" to those projects "goes to Metacard holders," and that the Metacard purchase

24  allows Defendants to bypass pitching to investors. Decl. Kherkher, Ex. B, Livestream

25  Transcript (ECF No. 94-3). Defendants represented they were "getting to work right

26  away" on future projects, including developing "lounges" and other physical locations

27  for Metacard holders, and that Defendants would be treating the Metacard venture "as

28  a real business," like an initial public offering that "go[es] public" and "takes . . .

money to build the business and grow the business." *Id*.

In highly similar messaging, Defendants related on the podcast episode that rather than having to figure out funding for projects, the Metacard sale would "speed up" or "start" financing, and that Metacard purchasers would be like "partners." Decl. Kherkher, Ex. A, Podcast Transcript. Defendants insisted, "we have a team, we have a budget, we have a play, and we'll go way deeper into this to make sure that this is something that is supported through all the ups and downs that happen in the FTE world and the metaverse world." *Id*.

This consistent messaging between the podcast episode and livestream is underscored by Defendants' comparison of the Metacard to a "stock" or "decentralized stock." *Id*; Decl. Kherkher, Ex. A. While Defendants describe these representations as having been made on a "single day," that "single day" was the day before the Metacard went on sale, and the statements were designed to encourage sales. Notably, Defendants do not offer any evidence any inconsistent messages were made on other days. Further, to ensure consistent messaging was received, Defendants spoke at the livestream about the Metacard NFT project and sale and directed attendees to the podcast episode for more information. Decl. Kherkher, Ex. B, Livestream Transcript.

Rounding out this consistency is the textual description attached to the Metacard NFT, which stated, "THE FULL SEND METACARD WILL GIVE EXCLUSIVE ACCESS TO WHAT FULL SEND DOES IN THE PHYSICAL AND METAVERSE. OWNING A FULL SEND METACARD ALLOWS YOU TO GET IN EARLY ON THE [*sic*] WHAT IS THE BEGINNING OF A LONG JOURNEY FOR THE FULL SEND BRAND." Decl. Clark § 3.2 (ECF No. 94-2).[2] After the rarity reveal for the Metacards, the textual description was changed to include similar statements as well as representations that "As a company, the FULL SEND goal is to launch more FULL SEND branded ventures, which include lounges, gyms, festivals, casinos, restaurants

---

[2] Plaintiff will address Defendants' objections to the Declaration of Jeremy Clark in Plaintiff's Response to Defendants' Motion to Exclude the Opinions of Jeremy Clark (ECF No. 100).

1  and more," and that ventures would "include FULL SEND apparel, virtual stores,

2  virtual festivals, metaverse casinos, and FULL SEND NFT recording artists." *Id*.

3        These are not, as Defendants suggest, "disparate statements across multiple

4  platforms." The messaging regarding the purpose of the Metacard is consistent across

5  platforms, including as part of the textual description of the Metacard NFT itself, thus

6  ensuring the message was effectively universally received. Like the messaging in

7  *Makaeff v. Trump Univ., LLC*, Defendants' messaging to its fanbase regarding the

8  investment potential of the Metacard in the day prior to the sale was "uniform, highly

9  orchestrated, concentrated and focused on its intended audience." No. 3:10-CV-0940-

10  GPC-WVG, 2014 WL 688164, at *13 (S.D. Cal. Feb. 21, 2014).

11        Defendants' various examples of what might be done with the Metacard,

12  including opening bars and creating art, do not create the disparities Defendants claim,

13  nor do they undo the effect of Defendants' primary and consistent messaging across

14  platforms: the Metacard was investment that would be treated like a business venture.

15  People purchased the Metacard did so because Defendants consistently instructed

16  them that the Metacard was an investment in a business venture. Merchandise and

17  football games are in line with the type of perks that any business provides to its

18  investors to promote goodwill.

19        Defendants' suggestion that Plaintiff's citation to *Cansino v. Bank of America*,

20  224 Cal. App. 4th 1462, 1469, 169 Cal. Rptr. 3d 619, 625 (2014), regarding the

21  presumption of reliance was AI-generated is unfounded and an obvious attempt to

22  create a distraction. Defendant is correct that the "*Id*." citations on page 16, lines 14

23  and 16 do not refer to the *Cansino* case referenced at line 12. Instead, they refer to

24  *Rusoff v. Happy Grp., Inc.*, No. 21-CV-08084-AMO, 2024 WL 5339463, at *11 (N.D.

25  Cal. Sept. 27, 2024), cited at line 6. Not every mistake is the result of AI generation—

26  some are still simple human error. The correct reference is on the same page a mere

27  two sentences prior to the incorrect reference. Further, the offending citations are

28  *direct quotes* from the *Rusoff* case, meaning they are easily searched. Defendant's

decision to sound the AI alarm reflects a choice by Defendant to forego basic diligence and to create a distraction from the actual facts and applicable law. This choice underscores Defendants' own uncertainty about the merits of its position in this case.

Because of the consistent messaging regarding material aspects of the Metacard made immediately prior to the sale of the Metacard, including the textual description attached to the Metacard NFT itself, reliance may be presumed in this case on a class-wide basis, making common issues more prevalent than individual issues. *Rusoff*, 2024 WL 5339463, at *11; *Vizcarra*, 2023 WL 2364736, at *15. This is particularly true with respect to Plaintiff's CLRA claim, "which requires the plaintiff to show that members of the public are likely to be deceived." *Rusoff*, 2024 WL 5339463, at *11.

Plaintiff confirmed he relied on Defendants' messaging regarding the potential for investment income in making his purchase. Deposition of Trenton Smith ("Depo. Smith") 57:20–58:4, 62:8–63:15 (ECF No. 99-2). And, Defendants continued to hype the investment aspect of the Metacard even in post-sale messaging made on discord channels, including on March 28, 2022, just days before Plaintiff made his second purchase. *See e.g.*, Second Amended Complaint ("SAC") ¶ 67 ("You guys bought this to make money and don't worry that is what we want as well! More communication coming as well"). Defendants made similar messaging on March 31, 2022, the same day Plaintiff made his second purchase. SAC ¶ 70 ("kyleforgeard" stating, "I want something that will go up in value and make me money. That's what our immediate focus is now as well as building the physical stuff over time") (ECF No. 80).

Defendants' suggestion there was some widely varied messaging being received and incorporated by Metacard purchasers is without meaningful basis and therefore cannot defeat class certification.

### 2. Differences in Damages Do Not Bar Certification

Defendants argue Plaintiff has failed to produce an appropriate class-wide method for calculating damages. Defendants urge that damages are too variable and will require examinations into individualized facts. Once again, Defendants' argument

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, ETC.

- 5 -

1  falls flat as Plaintiff has shown damages are not an impediment to certification.

2      Each Metacard purchase and any subsequent sale is a matter of record, since

3  each transaction is recorded and linked to a specific address and each NFT token has

4  a specific identifier. Decl. Clark §§ 2.1, 2.2, 3.1. Therefore, there are no meaningful

5  individualized questions regarding when and for how much each Metacard was

6  purchased because those questions can be resolved through examination of records.

7  *See In re Bank of Am. California Unemployment Benefits Litig.*, No. 21MD2992-

8  GPC(MSB), 2025 WL 2816808, at *29 (S.D. Cal. June 24, 2025) ("Predominance is

9  not defeated in a case where there may be some individual inquiries which can be

10  determined by a review of Defendant's records rather than a 'prohibitively

11  cumbersome' trial of individualized issues.") So, too, is Defendants' refund program

12  a matter of record, meaning this issue will not create individualized inquiries either.

13      Defendant's argument that Class Members' damages need to account for

14  benefits received is a red herring. Plaintiff's theory of the case is that Class Members

15  purchased the Metacard in reliance on Defendants' assertions regarding the investment

16  value of the Metacard, not single-serving perks. Whether one Class Member went to

17  a football game while another attended a Snoop Dogg concert and yet another Class

18  Member attended neither of those things is not at issue. Those are all perks that might

19  be received by investors in a business, but they are not the purpose of the investment.

20      Damages in this case are centered on recorded Metacard transactions, and are

21  not so individualized as to preclude certification. "[C]ertification should not be denied

22  even if plaintiffs may have to prove individualized damages at trial, a conclusion

23  implicitly based on the determination that such individualized issues do not

24  predominate over common ones." *In re Bank of Am. California Unemployment*

25  *Benefits Litig.*, 2025 WL 2816808, at *40 (internal quotation marks omitted);

26  *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1089–94 (9th Cir. 2010) ("Our

27  court long ago observed that the amount of damages is invariably an individual

28  question and does not defeat class action treatment.") (internal editing and quotation

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, ETC.

- 6 -

1   marks omitted).

2      Differences in damages do not defeat certification. *Id.* at \*19 ("Differences

3   related to Class Plaintiffs' potential damages and potential damages of the putative

4   class members do not defeat typicality as long as the alleged injury is common to the

5   putative class members.") (collecting cases). Damages may be calculated based on the

6   purchase price of the Metacard, available from a review of records. It is not necessary

7   for Plaintiff to show his damages calculation method "will work with certainty at this

8   time," but rather he need only propose a "valid method . . . for calculating those

9   damages." *Id*. at \*40. Plaintiff proposed a method of calculating damages via the

10  records of Metacard transactions; that is all that is required at this stage. *Pulaski &*

11  *Middleman, LLC v. Google, Inc*., 802 F.3d 979, 987–88 (9th Cir. 2015).

12      3.   Individualized Questions of Standing Do Not Predominate

13      Defendants also focus on refunds as being an individualized inquiry affecting

14  damages, particularly as it impacts standing. This is incorrect. Refunds are a matter of

15  record, so there are no "issues" that predominate.

16      Additionally, the refund program offered by Defendant was inadequate and

17  onerous. That some Metacard purchasers chose to and were able to take advantage of

18  it does not defeat class certification. A comparison of refund record to purchase

19  records should easily show any potential purchasers with no damages. *See In re Bank*

20  *of Am. California Unemployment Benefits Litig.*, 2025 WL 2816808, at \*21 ("When

21  'one or more of the central issues in the action are common to the class and can be said

22  to predominate, the action may be considered proper under Rule 23(b)(3) even though

23  other important matters will have to be tried separately, such as damages or some

24  affirmative defenses peculiar to some individual class members.'") (quoting *Tyson*

25  *Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

26      Even if the refund program is part of Plaintiff's class-wide theory of the case, it

27  would not defeat, but support class certification. Despite earning $23 million in the

28  initial Metacard sale and an additional $4.3 million from royalties, Defendants spent

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, ETC.

- 7 -

between only $2 and $3 million on refunds. The paltry refund costs demonstrate Defendants' continued efforts to enrich themselves at the expense of the Class. Decl. Clark §§ 3.3, 3.5; Depo. Hill 280:10–19.

Defendants' efforts to take an issue applicable to the entire class, and that at best impacts only damages, and label it "individualized" should be rejected. As long as at least one of the case's central issues predominates and is common to the class, "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Rusoff*, 2024 WL 5339463, at *10.

### B.    *Plaintiff Is Typical of the Class*

Defendants' treatment of the Class Members was universal, making Plaintiff typical of the class. Defendants argue that Plaintiff is not typical because he received thousands of dollars in benefits from the Metacard and therefore cannot represent those who received no benefits. Defendants' argument misses the point of Plaintiff's claim: **nobody** who purchased the Metacard received the benefits promised by Defendants. See Decl. Kherkher, Exs. A-B. Instead, Defendants fleeced Plaintiff and the Class for approximately $27 million, while simultaneously enriching themselves.

Defendants argue Plaintiff had a variety of reasons for purchasing the Metacard, such as his Nelk Boys fandom and his desire to add to his collection of NFTs. But whether there are additional reasons for purchase does not refute that Plaintiff relied on Defendants' misrepresentations of the investment potential of the Metacard when deciding to purchase the same. *Rusoff*, 2024 WL 5339463, at *11. Plaintiff confirmed his initial interest in the Metacard was based on Defendants' representations that purchasers would be a "part of the Full Send brand and the releasing of gyms and casinos and hotels," and he might receive some investment income. Depo. Smith 57:20–58:4, 62:8–63:15. Defendants' position that by March 31, 2022, Plaintiff might have had some other knowledge that would have impacted reliance is pure speculation. This is insufficient to overcome the class-wide evidence presented by Plaintiff.

1    Defendants also argue Plaintiff's response to Defendants' refund offer

2  differentiates him from the rest of the Class. But the refund offer itself was so onerous

3  that it could not constitute a valid offer. Even if it were a valid offer, Plaintiff did not

4  accept it, and Defendants have not shown that Plaintiff's reasons for rejecting the offer

5  meaningfully differentiate him from other Class Members who rejected the offer.

6    Defendants' effort to distinguish Plaintiff's circumstances is based on irrelevant

7  issues. Plaintiff is typical and class certification should be granted.

8    ### C.    *Plaintiff Is an Adequate Representative*

9    Defendants also incorrectly argue Plaintiff is not an adequate representative.

10  Defendants' first point is that there have been factual errors in the pleadings. While

11  Plaintiff admits he missed errors in some of the pleadings, he confirmed he did conduct

12  reviews and was relying on himself and his attorneys, not just his attorneys, to ensure

13  accuracy in this case. Depo. Smith 44:12–45:13, 46:10–24, 47:16–48:6. This review

14  is in addition to Plaintiff's other participation in this case, including sitting for his

15  deposition. Far from demonstrating his inadequacy, Plaintiff's participation in the

16  discovery process and his review of pleadings, even if imperfect, supports Plaintiff's

17  role as representative. *See e.g. Pryor v. Aerotek Sci., LLC*, 278 F.R.D. 516 (C.D. Cal.

18  2011) (holding plaintiff adequate despite inaccuracies that were later corrected

19  because they had "demonstrated a willingness to participate in the litigation").

20    The result should be the same here. Defendants have shown no conflict of

21  interest between Plaintiff and the Class, and Plaintiff has demonstrated his willingness

22  to participate in the litigation process. Plaintiff is an adequate representative.

23    ### D.    *Plaintiff Has Sufficiently Alleged Numerosity*

24    Finally, Defendants argue Plaintiff has failed to offer evidence of numerosity

25  only with respect to the CLRA claim. It is estimated that the number of unique

26  Metacard holders are in the range 3,448 to 5,528. *See* Decl. Clark § 4.1. In *Braun v.*

27  *Safeco Ins. Co. of Am.*, relied upon by Defendants, the court recognized that a class of

28  forty people is generally considered adequate to support the numerosity requirement.

No. CV 13-00607 BRO PLAX, 2014 WL 9883831, at *5 (C.D. Cal. Nov. 7, 2014). Given that there are 3,448 to 5,528 putative Class Members, forty people represent a mere 1.16% to 0.72% of the total Class. It is reasonable to infer that 1.16% of the Class is California residents, particularly given that at the time of the events at issue in this case, several Defendants were themselves residents or had their principal place of business in California. *See* SAC ¶¶ 18, 19, 21, 23. Further, Counsel for Plaintiff has received eighty-three inquiries from individuals who claim to be victims of Defendants' Metacard scheme, eight of which live in California Sec. Decl. Kherkher ¶ 19. This suggests a figure of closer to ten percent California residents.

A plaintiff "need not state an exact number to meet the threshold requirements of Rule 23," but instead "the 'numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations.'" *Mobile Emergency Hous. Corp. v. HP, Inc.*, No. 20-CV-09157-SVK, 2023 WL 9550942, at *8 (N.D. Cal. Dec. 8, 2023) (quoting *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980)). Rather, when "the exact size of the class is unknown, but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." *In re Abbott Lab'ys Norvir Anti-Tr. Litig.*, No. C 04-1511 CW, 2007 WL 1689899, at *5–6 (N.D. Cal. June 11, 2007) (quoting 1 Alba Cone & Herbert B. Newberg, *Newberg on Class Actions* § 3.3 (4th ed.2002)).

## III. CONCLUSION

Plaintiff has established a firm basis supporting his request for class certification that relies on Defendants' uniform representations to and treatment of the Class Members with respect to the sale and rescission of the Metacard. Plaintiff respectfully requests this Court grant his Motion and provide a path for Class Members to address the harm Defendants have caused.

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, ETC.

- 10 -

1    Dated:        January 22, 2026                    **KRISTENSEN LAW GROUP &**
                                                       **ELLZEY KHERKHER SANFORD**
2                                                      **MONTGOMERY, LLP**

3

4                                                      */s/ Jarrett L. Ellzey*
                                                       _____
5                                                      John P. Kristensen
                                                       Leigh S. Montgomery
6                                                      Jarrett L. Ellzey
                                                       Tommy Kherkher
7                                                      Josh Sanford
8                                                      ***Attorneys for Plaintiff***

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28